Jeremy Pinson # 16267-064
_____
Name and Prisoner/Booking Number

USP Tucson
_____
Place of Confinement

PO Box 24550
_____
Mailing Address

Tucson      AZ   85734
_____
City, State, Zip Code

**(Failure to notify the Court of your change of address may result in dismissal of this action.)**

```
┌─────────────────────────────────┐
│ ✓ ___ FILED      ___ LODGED     │
│   ___ RECEIVED   ___ COPY       │
│                                 │
│   FEB 1 6 2023                  │
│                                 │
│   CLERK U S DISTRICT COURT      │
│   DISTRICT OF ARIZONA           │
│                    DEPUTY       │
└─────────────────────────────────┘
```

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

Jeremy Vaughn Pinson
_____,
(Full Name of Plaintiff)

                    Plaintiff,

v.

(1) Federal Bureau of Prisons,
_____,
(Full Name of Defendant)

(2) J. Christensen
_____,

(3) K. Moran
_____,

(4) Mark Gutierrez
_____,

                    Defendant(s).

☑ Check if there are additional Defendants and attach page 1-A listing them.

CASE NO. 22-CV-00298-RM
_____
(To be supplied by the Clerk)

### CIVIL RIGHTS COMPLAINT
### BY A PRISONER

☐ Original Complaint
☐ First Amended Complaint
☑ Second Amended Complaint

## A.  JURISDICTION

1.  This Court has jurisdiction over this action pursuant to:
    ☐ 28 U.S.C. § 1343(a); 42 U.S.C. § 1983
    ☑ 28 U.S.C. § 1331; *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).
    ☑ Other: 42 U.S.C. 1985, 1986 )_____.

2.  Institution/city where violation occurred: USP Tucson / Systemwide

Revised 12/1/20                                    1

**550/555**

(5) Muhammad Zantout
(6) T. Schneider

Page 1-A

## B. DEFENDANTS

1. Name of first Defendant: _Federal Bureau of Prisons_. The first Defendant is employed as: _____ at _USP Tucson / Systemwide_.
   (Position and Title)                                        (Institution)

2. Name of second Defendant: _____. The second Defendant is employed as: ___
   as: _____ at _____
   (Position and Title)                                        (Institution)

3. Name of third Defendant: _____. The third Defendant is employed
   as: _____ at _____.
   (Position and Title)                                        (Institution)

4. Name of fourth Defendant: _____. The fourth Defendant is employed
   as: _____ at _____.
   (Position and Title)                                        (Institution)

If you name more than four Defendants, answer the questions listed above for each additional Defendant on a separate page.

## C. PREVIOUS LAWSUITS

1. Have you filed any other lawsuits while you were a prisoner?   ☐ Yes   ☐ No

2. If yes, how many lawsuits have you filed? _150+_. Describe the previous lawsuits:

   a. First prior lawsuit: _Pinson_
      1. Parties: _Pinson_ v. _Estrada_
      2. Court and case number: _18-CV-535-RM_
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) _Pending_

   b. Second prior lawsuit: _Pinson_
      1. Parties: _Pinson_ v. _Duketts_
      2. Court and case number: _19-CV-422-RM_
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) _Pending_

   c. Third prior lawsuit: _Pinson_
      1. Parties: _Pinson_ v. _USA_
      2. Court and case number: _19-CV-401-RM_
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) _Pending_

If you filed more than three lawsuits, answer the questions listed above for each additional lawsuit on a separate page.

2

## D.   CAUSE OF ACTION

### COUNT I

1.   State the constitutional or other federal civil right that was violated: *Violation of the Eighth Amendment*

2.   **Count I**.  Identify the issue involved.  Check **only one**.  State additional issues in separate counts.
   ☐ Basic necessities          ☐ Mail              ☐ Access to the court      ☐ Medical care
   ☐ Disciplinary proceedings   ☐ Property          ☐ Exercise of religion     ☐ Retaliation
   ☐ Excessive force by an officer  ☒ Threat to safety ☐ Other: _____.

3.   **Supporting Facts.**  State as briefly as possible the FACTS supporting Count I.  Describe exactly what **each Defendant** did or did not do that violated your rights.  State the facts clearly in your own words without citing legal authority or arguments.

*Due to space limitations, facts begin on Page 7-24*

4.   **Injury.**  State how you were injured by the actions or inactions of the Defendant(s).
*See pages 7-24*

5.   **Administrative Remedies:**
   a.   Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?                                                                  ☒ Yes   ☐ No
   b.   Did you submit a request for administrative relief on Count I?                              ☒ Yes   ☐ No
   c.   Did you appeal your request for relief on Count I to the highest level?                     ☒ Yes   ☐ No
   d.   If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not.  _____

3

## COUNT II

1. State the constitutional or other federal civil right that was violated: _Violation of 5th Amendment_.

2. **Count II.** Identify the issue involved. Check **only one.** State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Disciplinary proceedings
   - ☐ Excessive force by an officer
   - ☐ Mail
   - ☐ Property
   - ☐ Threat to safety
   - ☐ Access to the court
   - ☐ Exercise of religion
   - ☒ Other: _Equal Protection Clause_.
   - ☐ Medical care
   - ☐ Retaliation

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count II. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

_See Pages 7-24_

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

_See Pages 7-24_

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?  ☒ Yes  ☐ No
   b. Did you submit a request for administrative relief on Count II?  ☒ Yes  ☐ No
   c. Did you appeal your request for relief on Count II to the highest level?  ☒ Yes  ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

4

## COUNT III

1. State the constitutional or other federal civil right that was violated: *Violation of 8th Amendment*.

2. **Count III.** Identify the issue involved. Check **only one**. State additional issues in separate counts.
   - ☐ Basic necessities
   - ☐ Disciplinary proceedings
   - ☐ Excessive force by an officer
   - ☐ Mail
   - ☐ Property
   - ☐ Threat to safety
   - ☐ Access to the court
   - ☐ Exercise of religion
   - ☐ Other: _____
   - ☑ Medical care/*Mental Health*
   - ☐ Retaliation

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Count III. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

   *See Pages 7-24*

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
   *See Pages 7-24*

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?  ☑ Yes  ☐ No
   b. Did you submit a request for administrative relief on Count III?  ☑ Yes  ☐ No
   c. Did you appeal your request for relief on Count III to the highest level?  ☑ Yes  ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

If you assert more than three Counts, answer the questions listed above for each additional Count on a separate page.

5

## E. REQUEST FOR RELIEF

State the relief you are seeking:

1. An injunction (1) enjoining BOP from continuing to house plaintiff in SHU (2) enjoining BOP from using sex as a basis for designation or transfer initial determinations, (3) enjoining BOP from denying plaintiff a meaningful opportunity to transition to a women's prison, (4) enjoining BOP from failing to enforce 28 CFR 115.67 meaningfully (5) enjoining BOP from refusing plaintiff housing at a lesser-security prison (6) enjoining BOP from housing plaintiff as a Mental Health Care Level 3 in SHU in excess of 30 days.

2. Award plaintiff costs and fees.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___2-13-2023___                    _____
              DATE                                   SIGNATURE OF PLAINTIFF



_____
(Name and title of paralegal, legal assistant, or
other person who helped prepare this complaint)


_____
(Signature of attorney, if any)


_____
(Attorney's address & telephone number)


## ADDITIONAL PAGES

All questions must be answered concisely in the proper space on the form.  If you need more space, you may attach no more than fifteen additional pages.  But the form must be completely filled in to the extent applicable. If you attach additional pages, be sure to identify which section of the complaint is being continued and number all pages.

Claim One, Facts - Continued From P. 3:

I - Gender Dysphoria and Standards of Care

At birth, people are typically assigned a gender. That assigned gender usually correlates with the person's external physical characteristics and genitalia. Someone with male characteristics is thought to be a man, and someone with female characteristics is thought to be a woman. For many, the gender they were assigned at birth corresponds to their gender identity - that is, the gender they know and perceive themselves to belong to. But when a human's internal sense of belonging to a particular gender - also known as gender identity - is different than the identity assigned at birth to that individual, he or she is transgender.

Some transgender people experience gender dysphoria a serious medical condition defined as "distress that accompanies the incongruence between one's experienced and expressed gender and one's assigned or natal gender." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 822 (5th ed. 2013).

Most Courts agree that the World Professional Association For Transgender Health Standards of Care for the Health of Transsexual, Transgender, and

7

Gender Nonconforming People ("WPATH SOC") are the internationally recognized guidelines for the treatment of individuals with gender dysphoria. (From: Edmo v. Corizon Inc., 935 F.3d 757, 769 (9th Cir. 2019)).

Most major medical and mental health groups in the United States recognize the WPATH SOC as representing the consensus of the medical and mental health communities. This includes the American Medical Association, the Endocrine Society, the American Psychological Association, the World Health Organization, the American Psychiatric Association, the American Academy of Family Physicians, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology, and American Society of Plastic Surgeons, whom all endorse all the protocols in accordance with WPATH SOC.

Defendant BOP uses WPATH SOC as a guide but does not follow them in their entirety. WPATH SOC holds that the "health care for transsexual, transgender, and gender non-conforming people living in an institutional environment should mirror that which would be available to them if they were not living in a non-institutional setting within the same community." SOC at 67.

"Housing ... for transexual, transgender, and gender non-conforming people living in institutions should take into account their gender identity and role, physical status, dignity, and personal safety." SOC at 68.

Finally, WPATH Cautions: "Institutions where transsexual, transgender, and gender nonforming people reside and receive healthcare should monitor for a tolerant and positive climate to ensure residents are not under attack by staff or other residents." SOC at 68.

II. BOP Policies And Procedures

On January 18, 2017 the BOP released a Transgender Offender Manual ("Manual" hereafter) to "ensure the BOP properly identifies, tracks, and provides services to the transgender population." (Program Statement 5200.04). The 2017 Manual was the first policy for the BOP with regards to its transgender population.

The Manual established the "Transgender Executive Council ("TEC")" to offer advice and guidance on unique measures related to treatment and management

needs of transgender inmates." (5200.04 at 4). The Manual incorporated the Prison Rape Elimination Act ("PREA") regulations on the management of transgender inmates into the BOP's procedures for designating inmate placements. 28 CFR Part 115 (5200.04 at 5).

The administration of President Trump brought revisions to the Manual in 2018. (see 5200.04 CN-1). The most significant change was to require the TEC to "use biological sex as the initial determination for designation or transfer (id. at 10).

In making housing determinations, the Manual directs that a transgender person's "own views (with respect to his/her own safety must be given serious consideration" (id.).

Further, the Manual directs the TEC decision be reached after the Warden of the individual's current facility submit documentation to the TEC citing the individual's reasons for seeking redesignation or healthcare. Only the Warden.

I. The Plaintiff

The plaintiff is 37-years old. With brief exceptions not exceeding 10 months, she has been confined to a state or federal prison or detention center since she

was 11 years old. Plaintiff never attended school beyond the Sixth Grade. Plaintiff has received all her healthcare from correctional facility providers since age 11. She has never had a choice of physician, psychiatrist, mental health clinician, medication or procedure in her life since age 11. She has received the care dictated to her by correctional systems and their staff.

Though born with a penis, plaintiff's experienced/expressed gender has never matched her sex characteristic, She has always had a strong persistent desire to be rid of her genitalia because of the incongruence, and a strong desire to be female. Plaintiff has been this way since she was 10 years old.

Other children, and even family members, called her "gay" and associated slurs. Plaintiff rebelled against her childhood education because she was socially isolated and continually traumatized by homophobic/transphobic peers.

Plaintiff has experienced depression and suicidal ideation and attempts since she was 11 years old. When she was 10 years old she swallowed all

11

her mother's antidepressants following a bullying incident with other cisgender male children who punched her and screamed "faggot" repeatedly.

Plaintiff was sexually abused by a neighbor at age 6 who threatened to kill her if she told anyone he was trying to anally penetrate her with his penis. The man was in his mid-30's.

Plaintiff was raised in poverty by a single mother who moved from state to state unable to pay her bills in housing, utilities and other basic necessities. She loved plaintiff but did not understand her Gender Dysphoria.

## IV. Plaintiff's Federal Incarceration

In 2007 plaintiff was sentence to 240 months of imprisonment in the BOP. The BOP did not in 2007 have any policies or regulations in place for the housing and designation of transgender persons beyond: those with a penis went to a male prison, those with a vagina went to a female prison.

Solely due to her age, plaintiff's "Male Classification Custody Score" was elevated significantly resulting in

12

her housing in a high-security prison the United States Penitentiary ("USP") in Beaumont, Texas. Upon arrival to USP Beaumont her first cellmate was a cisgender caucasion male whose first question was "Whoa, are you a fag?" and shortly thereafter told plaintiff to move cells or be stabbed. In federal prisons known to inmates as "active yards" caucasion ~~real~~ males are not permitted to house with, sit with, eat with, talk with or otherwise socialize with homosexual or transgender inmates. This is an inmate made rule, driven by white supremacist gangs, and is enforced by violence systemwide.

In response, plaintiff begged her unit team and custody staff to be sent to a women's prison. She explained to her case manager and unit manager, and later the Captain, Warden and Medical that she was a woman and had been improperly housed. Some expressed confusion. Some were openly hostile. Plaintiff first heard a phrase from the Captain she still hears to this day, "if you got a dick, you're a man". A sexual encounter with another prisoner led to the plaintiff being designated a "verified protective

custody case" by institutional SIS staff and as a result she was transferred to USP Florence, Colorado.

At USP Florence, plaintiff was again feeling unsafe in the general population. Her requests to go to a women's prison were met by her case manager with scorn and ridicule, at one point the case manager said "get the fuck out of my office with that shit Pinson." Fearful an attack against her was imminent due to the hostile remarks of white inmates plaintiff made a knife out of plastic, walked into the officer's station and told the officer she had a knife. This got her put in the Special Housing Unit. ("SHU"). At her DHO hearing on the Code 104 the DHO asked plaintiff "Why did you have a knife?" to which plaintiff replied "It was a check-in move." (The term "check-in" is slang for protective custody request).

Once in Florence SHU, plaintiff was brutally knocked out and raped by her cellmate. Plaintiff tried to report the rape and was viciously ridiculed by staff who labelled her a "snitch" among other inmates, as well as "fag" and taunts in a child-like voice "Boo-Hoo-Hoo he raped me." Plaintiffs family and attorney Julia Summers wrote BOP asking the agency to protect her. Instead, BOP transferred her to USP Victorville in California.

14

On Valentine's Day 2008 plaintiff arrived to USP Victorville. On April 8, 2008 plaintiff was attacked by 5 inmates — caucasian males — with weapons who severely beat her. "Kill the fag" and "Kill the rat" were yelled by her attackers. Plaintiff was placed into the SHU, her attackers remained in general population and faced no charges or punishment.

In May 2008 plaintiff was taken by writ of habeas corpus to face a new indictment in Houston, Texas. (United States v. Pinson, Case No. 08-CR-00283-H) (S.D.Tex.)) Immediately plaintiff chose to cooperate. The deal with prosecutors required the U.S. Attorney to write a letter to the Warden of USP Victorville, the regional director, and then-BOP Director Harley Lappin to protect her because she was at substantial risk of serious bodily injury or death. Sentencing Judge Lee Rosenthal then ordered BOP to send a representative to the Sentencing Hearing to make clear the U.S. Attorney and Court were asking BOP to protect her. The Judge made extensive recommendations in the Judgment document, none of which the BOP followed except one: She was sent to USP-II in

15

Coleman, Fla.

Upon arrival to USP-II plaintiff was placed in SHU when she told her intake screener she was a woman. The screener quipped "Oh you need some serious help if you think that." Once in SHU inmates and staff would taunt plaintiff daily for being "a fag" and even at certain meals would joke "Oh I better cut up your hotdogs, you might do something nasty" or "these are hotdogs not dildo's." Plaintiff was transferred to the SMU Program in Alabama.

Once in the Alabama SMU the harrassment, slurs and threats were continued non-stop for months. The plaintiff would eventually be transferred to the federal supermax ADX Florence in Colorado.

Once in ADX plaintiff's mental health in the harsh confines of solitary confinement began to deteriorate. She would be repeatedly hospitalized for suicide attempts. A class-action lawsuit she would file as alleging serious deficits in BOP's delivery of mental health treatment at ADX. Bacote et al. v. Federal Bureau of Prisons, No. 12-CV-01570-RPM (D.Colo) would end in sweeping policy changes, creation of new programs, a settlement of millions of dollars, and plaintiff was

16

removed from supermax ADX and sent to a series of prisons from 2014 to 2017 always alternating between a Mental Health Care Level 3 or 4 the BOP's highest levels. Also, in 2015 plaintiff was diagnosed with Gender Dysphoria upon BOP formally removing from its policy that an inmate could not receive transgender healthcare if they did not enter BOP custody on hormone therapy.

The plaintiff could not have entered BOP on hormone therapy, as in 2006 when she left the Oklahoma Dept. of Corrections to enter federal custody the DOC did not provide healthcare to any transgender inmates at all.

BOP's policy change was the result, in part, of a settlement in a lawsuit in the District of Massachusetts that removed the policy barrier to plaintiff's diagnosis and treatment that was in place when plaintiff entered the BOP.

In 2017 plaintiff was transferred to the Federal Medical Center in Rochester, Minnesota for an evaluation and treatment plan by a team of medical doctors, psychologists and psychiatrists.

17

After months of evaluations the team of doctors decided to prescribe Wellbutrin for Depression, Ativan and Clonazepam for anxiety/Gender Dysphoria, Estrogen and Spironolactone for Gender Dysphoria and other medications unrelated to plaintiffs psychiatric conditions. Having stabilized plaintiff she was then discharged to USP Tucson in Feb. 2018.

At the time of her designation to USP Tucson the plaintiff was stable, happy and safe with minor exception at FMC Rochester, MN. Plaintiff had no advance warning she was being sent to USP Tucson.

## V. 2018 to Present

At the time of her designation to USP Tucson, a high security male prison, BOP Policy had been amended by Director Mark S. Inch – a Trump appointee – to require the TEC to "use biological sex as the initial determination for designation or transfer" (Prog. Stmt. 5200.04, CN-1, at 10).

Although the BOP was required by 28 C.F.R. 115.42 and the Manual to take plaintiff's "own views with respect to his/her own safety must be given serious consideration" Noone in the BOP has ever asked the plaintiffs "own

18

views" "with respect to her own safety" prior to, or after, her designation to USP Tucson.

Within months of arrival to USP Tucson the plaintiff's treatment plan put together by BOP's team of doctors at FMC Rochester was discontinued by a USP Tucson physician following an argument with the plaintiff.

Further, a great number of staff at USP Tucson call transgender inmates like plaintiff a "faggot" or "dicksucker," and much of the cisgender male population follows staff examples.

Despite the well-known sexual abuse and harassment of transgender inmates in the BOP, an allegation dating nearly 30 years to BOP trans-inmate Dee Farmer in Farmer v. Brennan, 511 U.S. 825 (1994), BOP continues to target victims of sexual abuse and harassment who file PREA complaints or lawsuits which plaintiff has done more than 10 times since her arrival to USP Tucson.

Former USP Tucson SIA A. Gallion and SS Tech J. Lawson during 2018-2019 told numerous USP Tucson inmates that plaintiff had filed PREA complaints but

Without her consent. These Inmates include Gary Long Jr., William Allen, Jason Gendron, Craig Morgenstern, Jessica Gulisano, Jacky Freeman, and others. This in turn caused plaintiff to bear the reputation as a PREA filer, the equivelant of an informant/snitch.

Plaintiff was assaulted twice in 2019 resulting in serious injuries, in 2020 she was assaulted twice resulting in serious injuries, in 2021 she was assaulted once resulting in serious injuries, and on June 3, 2022 she was transferred back to USP Tucson after leaving Dec. 4, 2020 as a result of this Court's Order Doc. 88 Pinson v. Othon, No. 20-CV-00169-RM (D. Ariz.).

Both plaintiff's 2020 designation to USP-II Coleman, and her later designation back to USP Tucson were controlled by the 2018 Manual that required BOP to "use biological sex as the initial determination for designation or transfer" 5200.04, CN-1, 2018 Ed.). If plaintiff had had a vagina under the Trump-era version of the Manual rather than a penis, her initial determination for designation or transfer would have been a women's facility.

The U.S. Government, by and large accepts all the WPATH SOC as the proper protocols — from Defense Department to Health and Human Services — with the BOP as the

20

notable exception. In compliance with a Presidential Executive Order issued in Jan. 2021 BOP issued a Female Offender Manual that recognizes LGBTQ women in BOP policy and sets forth the need to manage them a certain way, the BOP made no such changes to its policies for LGBTQ inmates in male prisons of any security level.

But for her penis, BOP would not have housed her in a men's facility in 2007.

But for her penis, BOP would not have used her "biological sex as the initial determination for designation or transfer," of the plaintiff 2018 or later.

But for her penis, plaintiff would never have been in a men's prison to be raped, beaten, stabbed, harrassed, ridiculed and discriminated against by cisgender male inmates and staff.

Continuing along this line of events, plaintiff arrived back to USP Tucson in 2022 on June 3, A cisgender male inmate told plaintiff he would kill or seriously injure her if plaintiff didn't agree to serve as his prostitute alongside

transgender Jessica Gulisano all of whom lived in
A-1 the USP Tucson unit for Care Level 3 inmates.
Plaintiff immediately reported Tyrone Brown's threat
to her psychologist, Lt. Kehl, her mother Debra Pinson,
and one of her attorneys Andrew Talai. Brown was
immediately placed in SHU pursuant to 28 C.F.R.
115.62.

An investigation by the Special Investigative Services
Unit at USP Tucson determined Brown posed a credible
and continuing threat to plaintiff and others. As a
victim of repeated violence in the BOP plaintiff asked
her mother and lawyer Talai to contact BOP to make
absolutely crystal clear that Brown was kept away from
her.

The complaints by Debra Pinson, Andrew Talai and later
the family of Ernesto Zaragosa-Solis, and others to
BOP angered some staff who berated plaintiff, made
various threats of retaliation in interviews of Gulisano
and Zaragosa-Solis, if the non-incarcerated persons were
not told to stop accusing staff of not doing their
jobs to keep inmates safe, and plaintiff didn't stop
writing grievances and other communications critical of
staff. Zaragosa-Solis was told to convince plaintiff to
stop filing grievances and lawsuits or she would get

hurt. After Zaragosa-Solis told plaintiff this, she emailed BOP's Transgender Executive Council that 28 C.F.R. 115.62 and 115.67 were again being violated.

Within 48 hours of her email to the TEC, the BOP released Brown from SHU where he attacked the plaintiff Gulisano and Zaragosa-Solis causing serious injuries. The inmates were placed in the SHU and a series of false allegations were concoted to support a request to transfer plaintiff.

Plaintiff has spent nearly 900 days in SHU since 2020. She has been told by no less than 25 staff members at USP Tucson that her filing lawsuits has made her a target of retaliation, since 2020, a list that includes Lieutenants (Falconer, Campbell, Rivera, Rodriguez), Unit Team (Felix, Flores, Schlor, Makowski, Smith) SIS Staff (Merrell, Rhynard, Shirley, Gallion, Cristizio, Van Devener, Ulrich) and others.

Plaintiff struggles with suicidal thoughts, depression, anxiety, insomnia, PTSD, urges to cut her genitalia off. She has lost nearly 50 pounds since Sept. 14, 2022. Her psychologist has stated multiple times "I'd like to see all my Care-3 inmates in general population, but it's the Warden keeping you here and I'm just a psychologist they dont listen to me" as recently as last week.

Q3

The plaintiff is not the first transgender inmate to sue BOP alleging discrimination, deliberate indifference, negligence, retaliation, or even that BOP staff use deceptive practices to mislead or deceive federal Judges. Christina Iglesias (Iglesias v. Fed Bureau of Prisons, No. 19-cv-415 (NJR)(S.D. Ill.)), and July Justine Shelby v. W.S. Pliler, No. 19-cv-02020 (VSB)(S.D.N.Y.), Leibelson v. Collins, No. 15-cv-12863 (N.D.W.Va) and Shorter v. Barr, No. 19-cv-108-WS (N.D. Fla.) are some examples of others to do so.

24

1. Claim Four: Civil Rights Conspiracy in Violation of 42 U.S.C. 1985 and 1986

2. Issue Involved: Retaliation ☑

3. Facts:

Following the placement of Tyrone Brown in SHU plaintiff's Mother, Debora Pinsan, and attorney Andrew Talai, continued sending messages to the BOP to urge staff to protect plaintiff from Tyrone Brown.

The first acts of retaliation began with Defendant Christensen who summoned plaintiff to the USP Tucson Lieutenant's Office to verbally threaten her with placement in SHU long-term and transfer if she did not instruct her attorney to cease complaints relating to Tyrone Brown. Christensen made a verbal tirade about how he "didn't give a fuck about Judges or U.S. Attorneys" getting involved expressing multiple other overt threats. The plaintiff reported Christensen's threats to Jenna Epplin of the Transgender Executive Council by email.

After the Sept. 14, 2022 attack by Brown upon

25

plaintiff and others, Christensen would interview the plaintiff, Ernesto Zaragosa-Solis and Jose Armendariz on Oct. 5, 2022 during which he threatened to keep the 3 inmates in SHU with a transfer to a more dangerous prison if they did not agree not to file a lawsuit against him or the BOP and expressed having the full support of the BOP defendants Christensen along with Gutierrez, the Warden, and, Zantout, the Associate Warden. All 3 inmates, refused to drop any future lawsuits. Christensen then admitted to opening and seizing plaintiff and Zaragosa-Solis' Request For Administrative Remedy sent as a "sensitive" and "PREA" complaint via special mail procedures of 28 CFR Part 540 that had been inspected and sealed by Prison and Zaragosa-Solis to defendant Schneider for mailing to BOP's Western Regional Director. Neither Christensen nor Schneider had legal authority to open and cease the "Special Mail" nor did they have a warra to open plaintiff's mail once sealed nor to sieze its contents.

Plaintiff complained to defendants Gutierrez and Zantou as did Armendariz and Zaragosa-Solis after the Oct. 5, 2022 interview and both expressed anger that the 3 inmates were still trying to exhaust administrative remedies to pursue an FTCA lawsuit for the events tha led to the 9-14-22 attack, both reiterated a choice=

drop the lawsuit or stay in SHU and get a transfer somewhere less safe.

On Nov. 3, 2022 plaintiff was handcuffed and shackled to attend a settlement conference in Case No. 19-CV-00401-RM before Magistrate Judge Bowman. Defendant Zantout personally escorted plaintiff while sending messages on a mobile phone/cell phone type device. Zantout called plaintiff "a troublemaker" for suing BOP staff and mocked plaintiff as never leaving SHU with her "friends" until the lawsuits were stopped or dropped. Plaintiff angrily retorted that witness tampering in a federal court case was illegal and Zantout laughed at her. At the hearing it was conveyed to plaintiff that the BOP attorney would not agree to any settlement involving a cessation of plaintiff's being retaliated against with long-term SHU.

Between Sept. 14, 2022 and the present plaintiff has been told by BOP staff repeatedly that her litigation and her FTCA claim were the reason she remained in SHU. These statements were clear, unambiguous and not subject to misinterpretation.

27.

42 U.S.C. 1985 is not limited to persons who act under color of law, it reaches private conduct that fits the terms of the statute. Persons who conspire to deter by force, intimidation, or threat, any party or witness from testifying freely and truthfully in federal court, or conspires to harm a party or witness for doing so are liable under the first clause of 42 U.S.C. 1985(2). 42 U.S.C. 1986 provides for liability for anyone who, having knowledge that a § 1985 conspiracy is about to be committed does nothing about it.

The interview and threats did not end on Oct. 5, 2022 Christensen's interview and report was reviewed by Zantout and Gutierrez who on or about Nov. 8, 2022 approved defendant Moran to initiate disciplinary charges by Incident Report 3695602 for refusing to agree to drop her lawsuits during the Oct. 5, 2022 with Christensen. Though the incident report did not contain the verbatim quotes of plaintiff's statements during the interview it falsely accused her of threatening staff. A Discipline Hearing Officer later acquitted plaintiff of all charges but Gutierrez and Zantout refused to release her from SMU.

When disciplinary charges did not work, Christensen, Zantout and Gutierrez submitted a request for transfer that

contained multiple additional false statements to secure transfer, much like Moran used false and misleading statements in the Incident Report to secure a conviction against plaintiff for her refusal to drop the lawsuits pending and anticipated

Pinson, Zaragosa-Solis, and Armendariz worked hard to raise awareness and seek relief by mailing letters to the following with these same facts:

| Entity | Certified Mail No. |
|---|---|
| BOP Regional Director | 7020 2450 0000 6741 2646 |
| LAMBDA LEGAL | 7020 2450 0000 6741 4343 |
| DOJ Inspector General | 7020 2450 0000 6742 4564 |
| Professor Dean Spade | 7020 2450 0000 6741 4329 |
| BOP Regional Director | 7020 2450 0000 6742 4120 |
| Attorney Jim Davy | 7020 2450 0000 6742 4151 |
| Pam Sonnen - PREA Auditor | 7020 2450 0000 6742 2096 |
| ACA Auditors | 7020 2450 0000 6741 5111 |
| Attorney Stacy Scheff | 7020 2450 0000 6741 5623 |
| The Marshall Project | 7020 2450 0000 6742 0610 |
| LAMBDA LEGAL | 7020 2450 0000 6742 0245 |

It became necessary that all letters of this nature must be sent certified mail due to Schneider and

Christensen admitted to opening plaintiff's Special Mail and Legal Mail on Oct. 5, 2022 without her permission or a warrant from a Judge of any court to attempt to impede her efforts to pursue her administrative remedies and private letters to her attorneys Andrew Talai, Dee-Dee Samet, German Yusufov, ~~████████~~ and others.

Schneider in particular did the same to Nathan Bryan and Mikeal Stine's incoming and outgoing mail to Court appointed attorney Stephanie Bond and Laura Udall. Bryan's letters concerned the homicide investigation he is under and the plaintiff watched and listened to Schneider tell Bryan "we do it all the time the Warden can open anyone's mail if I say so" in response to Bryan's complaint that Schneider was seizing and "giving to SIS" letters from Bond and Udall to Bryan the exact same way he opened and seized plaintiff and Zaragosa-Solis' special mail and legal mail, with Christensen.

A pattern, practice and culture of retaliation exists in the BOP and noone need rely solely of plaintiff's credibility to understand this fact. It is contained in multiple reports from the U.S. House of Representatives, EEOC lawsuits by BOP's own staff, class action lawsuits against BOP. The individual defendants mock inmates grievances and lawsuits with statements disdainful of the idea they can be held accountable,

In a decision in a case involving former President Trump's attorney Michael Cohen a federal judge wrote about the BOP's retaliation and conspiring with others to do so:

"Cohen's complaint... now before this Court raise fundamental questions about the meaning and value of constitutional rights, the relationship between a citizen and the government, and the role of the federal courts in protecting those rights. The ability to publicly criticize even our most prominent politicians and leaders without fear of retaliation is a hallmark of American democracy."

"And, it is a further hallmark of American democracy that where one's rights have been violated one may seek to vindicate those rights in the courts. In the oft-quoted words of Chief Justice John Marshall 'the government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested right."

(Michael Cohen v. United States No. 21-cv-10774 (S.D.N.Y.),

31

Plaintiff has been in the SHU for 153 days now because defendants Moran, Gutierrez, Christensen, Zantout and Schneider have conspired to harrass, threaten, intimidate, obstruct and impede plaintiff's being a party or witness in federal courts critical of BOP and its staff. When disciplinary charges didn't work they have now resorted to requesting a transfer on the basis of more false allegations.