United States District Court
District of Arizona

Jeremy Pinson,
Plaintiff,

V.

Michael Carvajal, et al.,
Defendants

No. 22-CV-00298-RM

Motion For TRO To Prevent Further Violations of the First Amendment AND Fifth

Comes now the pro se plaintiff pursuant to Fed. R. Civ. P. 65(b) and seeks a preliminary injunction or TRO to prevent further violations of the First Amendment, Fifth Amendment.

I. Background:

This case proceeds on a 3-Count Second Amended Complaint (Doc. 23)("SAC") for a multitude of violations of her Constitutional rights. The SAC details a significant degree of retaliation and abuse of her (id.) and being targeted for her First Amendment activities ranging from access to the Courts, grievances, and engagement with representatives of the news media. (id.). On June 12, 2023 Mailroom Officer Felix presented himself to my cal to deliver legal mail to me. (Pinson Decl. at 3). He

-1-

also handed me a photocopy of correspondence from Beth Schwartzapfel a reporter for The Marshall Project that regularly publishes in newspapers such as the New York Times and USA Today, online, and on the radio or television. (Id. at Att. A). Felix then asked me what I was going to say about him and USP Tucson to the members of the news media, because my letters to representatives of the news media are often critical of the BOP. (See, e.g. id. at Att. B). I told him I was gonna tell the truth as I see it and it really was "none of [his] business" and "read it when the articles are published". (Id. at 2-3). He then stated "Oh yeah, well you just got your last piece of mail period" and refused to accept or mail my legal mail. (Id.).

## II. Standards of Review

A Temporary Restraining Order ("TRO") is issued to preserve the status quo pending a hearing upon a motion for preliminary injunction. See, e.g. Washington v. Reno, 35 F.3d 1093, 1096-97 (6th Cir. 1994) (granting TRO against BOP).

By contrast, for a preliminary injunction the plaintiff must show, "either (1) a likelihood of success on the merits and the possibility of irreparable injury or

(2) the existence of serious questions going to the merits and the balance of hardships tipping in [her] favor." *Warsoldier v. Woodford*, 418 F.3d 989, 993-94 (9th Cir. 2005).

## III. Arguments

### A. There Are Serious Questions going to the merits of Plaintiff's Claims

Utilizing the "serious questions" test set out in *Warsoldier*, 418 F.3d at 993-94, this case involves "serious questions" going to the merits. This is for a multitude of reasons as is set forth more fully herein.

### 1. Access to Courts / Interference

The Ninth Circuit has recognized two types of Access-to-the-Courts claims: (1) where an inmate is being "frustrated" or "impeded", and (2) where they suffer a "right to assistance". See: *Gilmore v. Lynch*, 319 F. Supp. 105, 111 (N.D. Cal. 1970)(holding the right of court access means "all the means a defendant or petitioner might require to get a fair hearing from the judiciary"); *Prison Legal News v. Lehman*,

397 F.3d 692, 703 (9th Cir. 2005)(holding that a policy applied to suppress materials that would embarrass prison officials or educate prisoners about their rights would violate the First Amendment). The Supreme Court in 1941 struck down a BOP regulation permitting it to screen prisoners' submissions to Courts. Ex Parte HULL, 312 U.S. 546, 549 (1941).

## a. Right to Assistance

Prison officials must "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Bounds v. Smith, 430 U.S. 817, 828 (1977).

It later was clarified that to enforce the Bounds obligations a prisoner must show:
(1) She was, or is, suffering "actual injury" by being "frustrated" or "impeded,"
(2) in bringing a "non-frivolous claim,"
(3) about her criminal conviction or sentence or the conditions of her confinement.
Lewis v. Casey, 518 U.S. 343, 351-53 (1996).

## 1) The Actual Injury Requirement

Lewis v. Casey says prison officials who impose

unreasonable restrictions on prisoners litigation, Court access, law library or assistance, and an obstacle to impair the prisoner's ability to present one's case effectively are actionable. See: Cody v. Weber, 256 F.3d 764, 768 (8th Cir. 2001)(holding the advantage defendants obtained by reading plaintiff's private legal papers constituted actual injury); Goff v. Nix, 113 F.3d 887, 890-92 (8th Cir. 1997)(holding that inability of inmates to recruit witnesses is an actual injury); then the Supreme Court in a later decision that cases that were inadequately tried or settled, or where a particular Kind of relief could not be sought, as a result of officials' actions, could support a claim of the denial of court access, in addition to those that were never filed. Christopher v. Harbury, 536 U.S. 403, 414-16 n.13 (2002). Christopher was not a prison case, and it referred to a case which was not filed or dismissed, but it refers to Lewis v. Casey repeatedly.

2) The Non-Frivolous Claim Requirement

To violate the right of access, that merely means her claims must be arguable, See: Lewis, 518 U.S. at 353 n.3. A frivolous claim is defined as

5

One that "lacks an arguable basis either in law or fact". Neitzke v. Williams, 490 U.S. 319, 325 (1989). Not, that she must prove should won. Gomez v. Vernon, 962 F. Supp. 1296, 1302 (D. Idaho 1997).

3) Conditions of Confinement Requirement

Lewis v. Casey says that the affirmative obligation to help prisoners bring lawsuits extends to an attack on the "conditions of their confinement" 518 U.S. at 355.

4) The Requirement to Plead the "Frustrated or Impeded" Claim

In Christopher v. Harbury the Supreme Court said you must describe the interference with your legal work. 536 U.S. at 416.

In Small v. City of New York, 274 F. Supp. 2d 271, 278-79 (E.D.N.Y. 2003) the plaintiffs argued that intimidating witnesses and destroying evidence would impair their ability to recover damages for conscious pain and suffering and punitive damages, clarified, reconsideration denied, 304 F. Supp. 2d 401 (E.D.N.Y. 2004).

And the Seventh Circuit said "A prisoner states an access-to-courts claim when he alleges that

even though he successfully got into Court by
filing a complaint... His denial of access to
legal materials caused a potentially meritorious
claim to fail." Marshall v. Knight, 445 F.3d
965, 969 (7th Cir. 2006). Bounds v. Smith
itself supports this view, 430 U.S. at 825-26,
and so does the Supreme Court in Christopher
V. Harbury, 536 U.S. at 416 n.13, 414 (citing
Lewis v. Casey).

5) How Right to Assistance Has Occurred

Although the Court was repeatedly advised
of challenges plaintiff faced drafting her own
Complaint (Doc. 7, 16, 18) the Court dismissed the
Original Complaint by Order (Doc. 8), the First
Amended Complaint by Order (Doc. 13), and because
it dismissed them, it also denied requested
injunctive relief each time as well, based upon
its decision to dismiss each Complaint. (Doc. 8, 13).
    At the same time, the Court also refused to
appoint counsel (Doc. 23).
    The Orders (Doc. 8, 13, 23) did not discuss
plaintiff's (1) right to assistance under Lewis,
Bounds or Christopher and this motion raises
the issue in the first instance for the Court's

7

review and decision.

So far, her right to assistance has been violated in the following ways:

1. Dismissal of the Complaint and First Amended Complaints were permanEnt for when an amendment is filed, the priors no longer exist. See: Ferdik v. Bonzelet, 963 F.2d 1258, 1262 (9th Cir. 1992). Each was dismissed for deficits in her factual pleading caused by (1) inadequate access to a law library (2) access to her legal files and papers. (see Decl.).

2. Denials of the Preliminary Injunctions, were because the sua sponte dismissals of the operative Complaint rendered them unlikely to succeed on the merits. They became the fruit of the poisonous tree sown by the BOP's denial of "adequate, effective and meaningful" assistance. Bounds, 430 U.S at 822.

3. Plaintiff has no access to a photocopier to serve her Motions upon defendants as required by Fed. R. Civ. P. 5. See, Clerrett to Carell v. Multnomah County, 141 F.Supp.2d 1046, 1056 (D.Or. 2001).

4. Plaintiff has no access to the Court's Local Rules, and the Court has reprimanded her for

Man't Motions it deemed non-compliant
(Doc. 28).

5. Plaintiff has no access to hiring an expert
witness. Typically in medical care cases,
especially those involving transgender
inmates, require expert testimony. In its
Amicus Curiae brief in De'Lonta v. Johnson,
No. 11-7482, the ACLU Foundation and ACLU of
Virginia argued:

> "a particular inmate's serious medical needs
> adequately is a question of fact, which
> will be determined by expert testimony"
> (citing, Allard v. Gomez, No. 00-16947, 9
> Fed. App'x. 793, 794 (9th Cir. 2001)).

6. The same is true, the need for experts, in a
case involving the Equal Protection Clause.
As the ACLU wrote in De'Lonta:

> "Equal Protection Claim(s) raises
> difficult questions ... [and] should be
> resolved with the benefit of a
> developed factual record and adversarial
> briefing" by qualified persons. (Id.)

At both USP Tucson, and plaintiff's last 4
facilities, there is no way to identify or
locate expert witnesses. No internet, no
phone book, no directory, nothing by which
anyone could locate and contact an
expert of any kind. (Decl. of Pinson).

Neither the Complaints, nor injunction motions
could have benefitted from declarations from
experts — like Dr. Randi Ettner in Iglesias
v. Fed. Bureau of Prisons, No. 19-CV-415
(S.D. Ill. 2022) (granting injunction), and
that information from an expert, or evidence,
is completely unavailable in this case and
plaintiff has access only to that which
BOP supplies in that regard.

7. Aside from its single, often inoperable, law
library that 150 inmates must share at
a single terminal and only during one
8 hour shift, BOP supplies no other type
of alternate assistance as it must. Not
someone "trained in the law" Bounds, 430
U.S. at 828; nor trained inmate paralegals
(see, e.g. Knop v. Johnson, 977 F.2d 996, 1005
(6th Cir. 1992) (and, Lindquist v. Idaho State

Board of Correction, 776 F.2d 851, 855-56 (9th Cir. 1985)(stating inmate law clerks sufficient).

Whether by prison lockdowns, staff laziness, or any other reason plaintiff does not even receive one hour per week of access to the law library which some courts have held the reasonable minimum. See, e.g. Johnson-El v. Schoemehl, 878 F.2d 1043, 1053 (8th Cir. 1989) (one hour twice a week in the law library was "obviously inadequate to research most legal claims"); many of the elements of the two dismissed complaints (Doc. 1 and 8, 13), and therefore the preliminary injunctions, were not accessible to her within a reasonable amount of time to research and articulate those complaints — 48 minutes in six months to be specific — (Pinson Decl.). 48 minutes in six months means that plaintiff got 48 of the total of 259,200 minutes that the law library existed but was inaccessible to her. (id). 180 days consists of 60 minutes per hour, 24 hours per day, for a total of 259,200 minutes. Plaintiff is a pro se litigant who must look up the standards, elements of her claims, research other

11

cases of such claims, research questions of defendants past litigation involving same claims (i.e., Iglesias v. Fed. Bureau of Prisons) then apply it all to her factual pleadings in her Complaint, twice, in 48 minutes on top of the loss of her access to her files and other factors discussed herafter. The same applies to any appeal she might have filed from the fact she was denied injunctive relief because she couldnt meet the Court's exacting standards in drafting her 2 seperate complaints without access to the means to do so - A Catch-22 that could not be appealed in good faith as the lack of "adequate, effective and meaningful" assistance to brief the appeal was not and is not present.

In denying her request for counsel (Doc. 23) the Court called plaintiff's challenges in prison ~~cases~~ "typical" of the pro se inmate litigants it deals with every day. It did not mention whether those challenges rise to a denial of her right to assistance or whether it was "adequate, effective and meaningful" Bounds, ~~430 U.S.~~ 430 U.S. at 808.

12

In dismissing the original complaints (Doc. 8, 13) the Court did not mention, review, nor discuss if the deficits were impacted by the lack of assistance or whether it was "adequate, effective and meaningful. It called plaintiff a "serial litigant" and it looked to other cases for what it called "material differences" (Doc. 23). It did not similarly research whether plaintiff had sufficient right to assistance or whether that right was being violated. (Doc. 8, 13). It also did not explain why if plaintiff could not adequately plead her claims in her situation how ordering her to repeat the exercise in the same situation when she wrote the first two. As a result some claims weren't re-pled, because plaintiff lacked the means to do so.

She has, and will continue, to have her right to assistance violated. A right this Court can remedy. See: Prince v. Schriro, et al., CV-08-1299-PHX-SRB, 2009 WL 1456648, at 4 (D.Ariz. May 22, 2009).

b. Interference / Retaliation

In addition to a right to assistance, prisoners retain a separate right to be free from interference with Court access and retaliation.

1) Interference is prohibited by the Constitution when the interfering party is Government. See, John L V. Adams, 969 F.2d 228, 235 (6th Cir. 1992). As with other Constitional violations, such interference must be intentional. Simkus v. Bruce, 406 F.3d 1239, 1242-43 (10th Cir. 2005). The Supreme Court has said rules that obstruct access to the Courts are invalid. Procunier v. Martinez, 416 U.S. 396, 419 (1974). The Supreme Court has struck down prison rules. Ex Parte Hull, 312 U.S. at 549; Johnson v. Avery, 393 U.S. 483, 490 (1969) Confiscation of legal papers is unconstitutional. Thompson v. Washington, 362 F.3d 969, 970 (7th Cir. 2004). So too with legal books. (id.).

Neither the first two Complaints, nor the Motions seeking injunctive relief, nor the Motion for appointment of counsel could be written with the benefit of legal research books plaintiff purchased (Pinson Decl.) because the BOP has

14

banned receipt, categorically, of all books via U.S. Mail in SHU including legal reference books. Even the Bible is not permitted purchased and received. (Id.). See, Heinrich ex rel. Heinrich v. Sweet, 62 F.Supp. 2d 282, 315 (D. Mass. 1999)(stating that the right of court access is violated when government officials wrongfully and intentionally conceal information crucial to judicial redress, do so in order to frustrate the right, and substantially reduce the likelihood of obstructing unearned litigation advantages).

The plaintiff keeps being unable to seek judicial redress via preliminary injunction because of these deficits from not having access to her legal files, to a ban on receipt of books, to inadequate law library time, to refusing to send out her legal mail, to isolating her away from all possible witnesses. This is so because without the means to put a proper complaint together, or access the Local Rules, or her files to assemble the complaint properly, no motion for

preliminary injunction can succeed, and
no appeal from the denial thereof could
be adequately pursued, then and now.
(Pinson Decl.).

2) Retaliation is prohibited for using the
Courts or trying to do so. See, Siggers-El v.
Barlow, 412 F.3d 693 (6th Cir. 2005). This
is so, whatever the form of the retaliation.
DeTomaso v. McGinnis, 970 F.2d 211, 214
(7th Cir. 1992). The Supreme Court has
explained:

   "The reason why such retaliation
    offends the Constitution is that
    it threatens to inhibit exercise
    of the protected right --- Retaliation
    is thus akin to an 'unconstitutional
    condition' demanded for the receipt
    of a government-provided benefit."
Crawford-El v. Britton, 523 U.S. at 588, n. 10.

Transfers are retaliation, See: Gomez v. Vernon,
255 F.3d 1118, 1127-30 (9th Cir. 2001), so is
being held in segregation, Trobaugh v. Hall,
176 F.3d 1087, 1088 (8th Cir. 1999), as is

16

a threat to transfer, Gomez 255 F.3d at 1127-30, and interference with medical care, Davis v. Goord, 320 F.3d 346, 353 (2d. Cir. 2003), filing of false disciplinary charges too, Austin v. Terhune, 388 F.3d 147, 150 (9th Cir. 2004). All apply in this case:

a. The evidence is clear. Plaintiff was put in SHU 9-14-22 for an SIS Investigation and during her interview staff told her to drop the lawsuits or stay in SHU a long-time and be transferred. (Pinson Decl.). That statement is all that must be proven to prove motive and intent. See, Bruce v. Ylst, 351 F.3d 1283, 1288-89 (9th Cir. 2003); Hart v. Hairston, 343 F.3d 762, 764 (5th Cir. 2003)(per curiam); Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001).

b. Plaintiff faced disciplinary charges for saying she was going to hold staff accountable. (Pinson Decl.), Austin, 388 F.3d at 150.

c. Because of the retaliation, plaintiff can't meet BOP's prerequisites to obtain Gender

17

Confirmation Surgery (Prison Decl.).

d - Plaintiff has been singled out to be
housed in the most isolated part of
SHU cut off from the entire prison
population, which is only being done
to a single other USP inmate who
killed his cellmate. (Prison Decl.)
The Warden, Captain and AW laugh at
Plaintiff and brag they can do "anything
[they] want" to her. (id.).

## Sec.1 Conclusions

Litigating from prison is hard enough without
prison officials denying "adequate, effective
and meaningful" assistance. Plaintiff has
already had her case delayed by almost a
year held in PLRA screening because of the
inability to plead her claims, that led to the
denial of judicial redress in the form of a
preliminary injunction. With counsel denied,
and her right to assistance violated, the
interference and retaliation on top of it supply
every conceivable element of denial of access
to the Court in all 3 ways it can occur

under the First Amendment. Prison walls do not form an iron curtain between prisoners and the Constitution. In every pro se prisoner case the prisoner begins with a "right to file a court action" which "might be said to be his remaining most 'fundamental political right, because its preservative of all rights.'" McCarthy v. Madigan, 503 U.S. 140, 153 (1992)(quoting Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886)).

But exercising that "most fundamental political right" is not without consequence. It will get you labelled = "serial litigant", with no regard to whether the case is of merit or not. It will anger prison staff, who will get Government lawyers and will never, ever, admit fault. Meanwhile, inside prison walls in a place the Court doesn't see prison officials do all they can to punish those who exercise that most fundamental political right to frustrate and impede litigants. Not punish claims, or rights, or facts, or merits. They target and punish litigants. They know the law affords them great deference. Turner v. Safley, 482 U.S. 78, 89 (1987). They know Courts view prisoner claims with skepticism and sometimes

even animus. They can, and will, exploit everything they can to kill a prisoners claims under a mountain of rules and technicalities.

Because they begin with all the advantages, one would think that the need to punish those who seek redress from the Courts would not exist. But it does. And the evidence here clearly and cogently outlines what they are doing. The Court should grant an injunction to protect her "most fundamental political right" she has left to her.

About Plaintiff, this Court has written before:

"Plaintiff's argument is based on a temporary housing placement preventing her from accessing her legal documents. Plaintiff does not state for how long she will be incarcerated in the SHU or whether she has requested access to her legal documents" (Doc. 59 in Case No. 19-cv-401-RM).

It has also written:

"It is concerning that, during the pendency of this action, the BOP

20

transferred Plaintiff without her legal materials
and that many of those materials ... have not
been returned to her at any time over the
past eight months ... Plaintiff has been
deprived of access to essential legal materials
~~to go~~ she compiled to prosecute this action."
(Doc. 59 in Case No. 20-CV-00070-RM).

The Plaintiff has spent more than 5,000
days of her life in segregation, she has
challenged her conditions as best that
she could, prison officials have imposed
every conceivable barrier to her litigating
her claims. She may not have a right
to appointment of counsel (Doc. 23) but
she absolutely has a right to exercise
her First Amendment rights. What she
says may embarrass or even anger the
BOP (See Ex.1, Att. B) when said to courts
or the news media. This does not mean
they can retaliate and interfere by refusing
to take her legal mail to this court or
repeatedly violate 18 U.S.C. 1512, 1515 with
threats and intimidation.

Wherefore, plaintiff requests the Court Order

21

relief on Sec. 1 because plaintiff has established "serious questions going to the merits" of her First Amendment access to the Courts and Interference/Retaliation issue. *Warsoldier*, 418 F.3d at 993-94.


## 2. Safety and Equal Protection

The Second Amended Complaint ("SAC") seeks relief under the "deliberate indifference" standard of the Eighth Amendment and Equal Protection Clause of the Fifth Amendment.

### a. Deliberate Indifference

Prison officials display "deliberate indifference" for a prisoners safety by failing to "act reasonably" in response to danger. *Farmer v. Brennan*, 511 U.S. 825, 828, 834-47 (1994); *Clem v. Lomeli*, 566 F.3d 1177, 1181-82 (9th Cir. 2009)(jury could find defendants' failure to act, as well as acting, could support finding of deliberate indifference.

The Supreme Court has said that "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such

a risk." Farmer, 511 U.S. at 843. Thus there are two kinds of fact situations that can establish deliberate indifference in a prisoner's case, the failure to respond to a particular threat to a particular prisoner ("Individual Risk") or to an identifiable group of them ("Group Risk"). Farmer, 511 U.S. at 843. That liability may extend not only to the intended victim of the assault but also to prisoners who are injured trying to stop the assault. Pool v. Missouri Dept. of Corr. and Human Resources, 883 F.2d 640, 645 (8ᵗʰ Cir. 1989).

1) <u>Individual Risk</u> = Prison officials may be found deliberately indifferent for failing to protect prisoners who have been identified as at a risk of harm. Hearns v. Terhune, 413 F.3d 1036, 1041 (9ᵗʰ Cir. 2005). In securing dismissal, on mootness grounds, defendant BOP told this Court — under penalty of perjury — that the plaintiff could not be housed in the general population of USP Tucson. Pinson v. Estrada, No. 18-cv-00535-RM (Doc.115 )(D. Ariz.) and Pinson v. Othon, No. 20-cv-00169-RM (Doc.173) (D. Ariz.). Placing her in a situation of danger from others known to be aggressive and violent

23

is deliberate indifference. Hearns, 413 F.3d at 1041; Redman v. City of San Diego, 942 F.2d 1435, 1444 (9th Cir. 1991)(en banc); Robinson v. Prunty, 249 F.3d 862, 866-67 (9th Cir. 2001). And so is failing to take measures to control a prisoner whom they themselves have already identified as dangerous. Gulett v. Haines, 229 F.Supp.2d 806, 821-24 (S.D. Ohio 2002). As is failing to act on a specific warning of danger to a particular prisoner. See, Berg v. Kincheloe, 794 F.2d 457, 460-61 (9th Cir. 1986). Certainly many courts have held labelling a prisoner a "snitch" or otherwise informing other prisoners that she has cooperated with law enforcement, or has complained to prison staff about the conduct of another prisoner, is deliberate indifference. See, Pinson v. Unknown Party, 698 Fed. Appx. 445 (9th Cir. 2017)(reversing grant of summary judgment where USP Tucson SIA Alfonso Mendez labelled her a "snitch"). Also, e.g. Flint v. KY Dept. of Corr., 270 F.3d 340, 344, 353 (6th Cir. 2001); Benefield v. McDowall, 241 F.3d 1267, 1271 (10th Cir. 2001); Hamilton v. Leavy, 117 F.3d 742, 748 (3d Cir. 1997).

2) <u>Group Risks</u>: Even if prison officials don't know about the risk to a particular prisoner, they can be held liable for policies or conditions that are

dangerous to an identifiable group of prisoners. Farmer, 511 U.S. at 843 ("it does not matter whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk"); James v. Hernandez, 215 F.3d 541, 542-43 (5th Cir. 2000) (per curiam)(same); Doe by and through Doe v. Washington County, 150 F.3d 920, 923 (8th Cir. 1998).

Identifiable groups acknowledged by the courts so far include accused or convicted sexual offenders, Weiss v. Cooley, 230 F.3d 1027, 1029-32 (7th Cir. 2000), transgender prisoners, Greene v. Bowles, 361 F.3d 290, 294 (6th Cir. 2004); Randolph v. State, 74 F.Supp.2d 537, 542 (D. Md. 1999)(citing Farmer, 511 U.S. at 843).

b. Equal Protection:

The Fifth Amendment requires the federal government from denying any person within its jurisdiction the equal protection of the laws. Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975). That means "that all persons similarly situated should be treated alike." City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439 (1985).

Equal protection forbids inequality that lacks

25

Valid justification. In cases of Transgender persons officials must show that their practices are "substantially related" to the "important governmental objectives" known as Intermediate or Heightened scrutiny. See Bostock v. Clayton County, 140 S.Ct. 1731 (2020); Karnoski v. Trump, 926 F.3d 1180 (9th Cir. 2019).

* Discriminating by "disallowing gender reassignment surgery should be treated as discriminating against transgender persons because they are the only ones seeking this surgery." Doe v. Snyder, 28 F.4th 103 (9th Cir. 2021).

"The burden rests with the State to demonstrate that its proferred justification is exceedingly persuasive" not just a hypothesized or post-hoc justification created in response to litigation. Whitaker by Whitaker v. Kenosha, Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d 1034, 1050 (7th Cir. 2017) (cited in Iglesias v. Fed. Bureau of Prisons, No. 19-CV-415-NJR (S.D.Ill., Dec. 27, 2021).

C. Application

The Court may take judicial notice that the BOP in at least 3 cases has said about the transition of transgender inmates to female facilities and Gender Confirmation Surgery ("GCS") that it has a set of

26

criteria - Pinson v. U.S. Dept. of Justice, No. 19-CV-00235-RM (D. Ariz.); Iglesias v. Fed. Bureau of Prisons, No. 19-CV-415-NJR (S.D. Ill.); Shelby v. Pliler, No. 19-CV-02020-VSB (S.D.N.Y.). See: Fed. R. Evid. 201.

Those criteria are outlined in Program Statement 5200.08 (Ex. 2, Excerpt of P.S. 5200.08).

In both Iglesias and Shelby, after a full and fair development of a factual record, BOP was found to violate the Constitution. In Iglesias Chief Judge Rosenstengl wrote:

"Assignment to a female prison not only affirms gender identity, but continues to place her in an atmosphere where she is protected from sexual abuse and harrassment" (Dec. 27, 2021 Order);

"The record is clear. BOP houses inmates, by default, in the prison of their gender assigned at birth. Thus, a sex-based classification is used, and intermediate scrutiny will be applied. (Id.);

"BOP's own relevant policies provide that

27

housing decisions should not be made
solely on the basis of genitals. Yet,
BOP places transgender women in male
facilities until they meet the target
hormone level requirement and low-security
level requirement" (id.);

"And if a gender-assigned female had an
issue at a female facility — whether that
was a physical fight or an inappropriate
or illegal sexual act — the BOP would
never consider a transfer of that individual
to a male facility" (id.).

What was true in Iglesias and Shelby, is true here
also. These facts support that :

1. No medical procedure in the BOP, except GCS,
   is tied to security level or disciplinary history.
   (Pinson Decl. at 15 ).

2. Pinson is a Maximum Custody Inmate and
   cannot be housed in lower security. (Pinson
   Decl. at 16).

3. Ten Wardens including the current one have told

plaintiff they will "never" remove her Maximum Custody which categorically excludes her from lesser security, a female prison, nor GCS. (Pinson Decl. at 16).

4. BOP uses "Male" custody classification protocols under its program Statement 5100.08, rather than its "Female" protocols. (Pinson Decl. at 17).

5. Despite multiple, serious injuries plaintiff has received at the hands of cisgender men, for years, BOP refuses to house her in lesser-security or women's facilities. (Pinson Decl. at 16-18), and cites her "Maximum Custody" status with no consideration of how such a status impacts her safety. (id.).

In sum, BOP uses its own discriminatory criteria to deny her transition to a women's prison, which has the secondary consequence of categorically denying GCS. Then it uses "Male" classifications and procedures on her, not its distinctly separate "Female" procedures in P.S. 5100.08, to keep her in a high security

29

Male prison regardless of whether she'd be safer in a lesser-security or women's prison. Under BOP's policies on Maximum Custody inmates:

"The highest Custody level assigned to an inmate requiring the highest level of security and staff supervision...

Accordingly, quarters... are assigned to ensure Maximum Control and Supervision." (P.S. 5100.08, quoted from Doc. 75-1 at Page 20 of 23 in Case No. 19-cv-00401-RM)

It also says:

"Since Medium security level facilities are not authorized to house Maximum Custody inmates, the inmate MUST be referred for transfer to a High security level institution." (P.S. 5100.08 at Ch. 7, Page 4) (~~[crossed out]~~ Excerpt of 5100.08) (Ex-1, At. 1

Under its existing criteria, plaintiff cannot be housed in lesser-security regardless of her safety needs, the Equal Protection Clause, or medical care such as GCS which is bound

30

by the BOP directly to security and other criteria. And this categorical exclusion is tied to BOP's policy that:

"Inmates will not be submitted to the TEC for consideration until they have maintained one year clear conduct for 100 and 200 series incident report sanctions" (P.S. 5200-08, as submitted in Doc. 124-1 at Page 7 in Case No. 19-cv-00235-RM)).

This official policy literally means that an inmate convicted of, say, Code 196 (Abusing the Mail), or Code 197 (Abusing the Telephone), or Code 112 (drinking alcohol or using narcotics), Code 207 (wearing a mask), Code 218 (breaking a window), Code 219 (stealing an apple), Code 226 (possessing the stolen apple) are all preclusive acts which can categorically prevent removal of Maximum Custody, housing in lesser security, housing in a womens prison, and thus GCS under existing procedures. This policy is absurd and subjects transgender inmates to criteria to receive medical care that no cisgender inmate faces. And no Court has ever permitted prison

31

Officials to tie an entire class of persons, their medical care, and their safety, to be compromised or harmed because the prisoner stole an apple or smoked some marijuana, in the ways BOP has enshrined in its policies, and how it applies those policies.

The question under the Constitution is a simple one under the Eighth Amendment, do prison officials know Pinson is at risk both individually and as a trans person?

The record makes plain that it does. (See Doc. 22).

The next question is, does BOP act to protect her from those individual and group risks?

The record makes plain that it doesn't. (See Ex. 1)

The next question for Equal Protection purposes is also simple, does BOP discriminate against its trans inmates?

Not only does the record show that it does, but both the Iglesias and Shelby Courts decided this

as well. (See: Doc. 22, Ex. 1, 2, 3)

Is that discrimination "substantially related" to the "important governmental objectives"? (Bostock, Karnoski).

The record demonstrates it does not. (See Iglesias and Shelby, Doc. 22, Ex. 1).

This record establishes "serious questions going to the merits" that warrants entry of a preliminary injunction. Warsoldier, 418 F.3d at 993-94.

B. The Balance Of Hardships Tips In The Plaintiff's Favor

The hardships to plaintiff are equal to, and in fact greater, than those suffered by Iglesias and Shelby = plaintiff has been raped, sexually harrassed, beaten, stabbed, has severe depression and PTSD, struggles with suicidal ideation, anxiety, attempted autocastration repeatedly. (See Ex. 1, Att. E).

As Chief Judge Rosenstengl put it in her

decision in Iglesias:

"Iglesias has informed BOP Medical Staff that
denying her the treatment she needs has caused
her to experience suicidal ideation, anxiety,
depression... Defendants were aware of a
substantial risk of serious harm."

An Injunction soon followed, See: 2021 WL 6112790 (S.D.Ill.
Dec. 27, 2021), Modified, 2022 WL 1136629 (S.D.Ill, Apr. 18, 2022)

The Shelby Court, after briefing and testimony at an
evidentiary hearing found:

"BOP's repeated refusals to transfer Petitioner
to a women's facility to further her gender
transition despite knowing the condition of
Petitioner's physical and mental health, violate
Petitioners Eighth Amendment rights... The
evidence supports the Court's conclusion
that this justification was manufactured
because of this litigation... The BOP also
posits that permitting Petitioner to live
among Women will be traumatizing and
possibly dangerous to them... the hypothetical
concern that Petitioner will hurt someone

Must be counter-balanced by the actual
evidence that she has been assaulted
and harrassed in a men's facility."

Shelby (Ex. 4 at P. 22).

BOP first diagnosed Plaintiff with Gender Dysphoria
in 2014. (Pinson Decl.). Plaintiff has consistently
sought GCS since that time. (id.). She was provided
hormone therapy in 2015, but her dysphoria has
only worsened with time. (id.). Plaintiff attempted
suicide, autocastration, numerous times between 2015
and 2018. (id.). After her participation in the ADX
Mental Health Class-action, Cunningham et al. v. Fed.
Bureau of Prisons, No. 12-CV-001570-MEH (D. Colo.)
BOP transferred plaintiff through a number of its
high security prisons. (id.)=

1. At USP Allenwood plaintiff was removed from
   General Population due to being sexually harrassed
   (Pinson Decl.);

2. Next, at USP Terre Haute a white supremacist
   beat her in the head repeatedly with a lock
   tied to a belt. (id.).

3. Next, an MCFP Springfield facility offered

35

her non-stop sexual harrassment. (Pinson Decl.);

4. Next, at FMC Rochester plaintiff suffered minor sexual harrassment and was told by her Case Manager that a new Warden planned to transfer her as "too litigious" (Pinson Decl.);

5. Plaintiff was surprised one day by BOP in Feb. 2018, stuffed into a private jet, and flown to USP Tucson where she would suffer 3 brutal attacks, an attempted rape, and extensive sexual harrassment. (Pinson Decl.) (See also: Case No. 19-cv-422-RM at Doc. 117); No. 20-cv-00070-RM at Doc. 42); and No. 19-cv-00235-RM.

6. After multiple attacks, BOP officials at USP Tucson requested her transfer to "an appropriate High Security facility" relying upon, in part, the Sept. 4, 2019 statement of "Ms. Erika Schmitt, Mental Health Treatment Coordinator, Central Office" whom "deemed Pinson precluded from SMU/ADX due to the presence of a serious mental illness and recommend placement at a USP commensurate with his security needs." (Pinson Decl.). The USP Tucson Warden also wrote, "Inmate Pinson has not been referred to medical for evaluation or for any treatments" and "According to Psychology

and Medical Services, inmate Pinson has
other specified psychological diagnoses." (id.)

7. As a result of the Memo from the Warden,
BOP redesignated Plaintiff to USP-II in
Coleman, FL where she was sexually
assaulted, harrassed, and beaten in the
head again by an ex-gangmember. (Pinson
Decl.).

8. After 11 months in Segregation Pinson was
transferred to USP Tucson again. She had
encountered one sexual predator, Tyrone
Brown, who as the SAC (Doc. 22) details
tried to prostitute her and eventually
tried to kill her. (id., also Pinson Decl.).

Neither prison, Tucson in sending her to Coleman
nor Coleman sending her back to Tucson made
any mention of:

1. Her desire for GCS (Pinson Decl.)
2. Her Gender Dysphoria (id.)
3. That lesser security or a women's facility
   would be less dangerous to her, or even
   that Pinson wanted to go to a women's
   prison (id.).

37

Instead, this Court was told one thing while the DSCC and TEC were told something remarkably different. To this Court BOP, under penalty of perjury, Stated:

"most importantly, threat assessments which determined that inmate Pinson could not safely be housed in USP Tucson's general population" (Pinson v. Othon, No. 20-cv-00162-RM at Doc. 120, Ex. A, Decl. of Acting Warden Michael Segal)

What Segal told the TEC however was:

"During his tenure at USP Tucson he has presented himself as a serious management problem... he has not followed the instructions of his unit team... he was not able to make any significant progress in the Challenge Program due to his egregious behavior resulting in multiple investigations and repetitive SHU placements." (Pinson Decl.)

The Memo also said:

"Pinson cannot be housed in general population as he poses a threat to the safety

38

and orderly running of the institution"
and in reaching this conclusion relied
upon, in part, "documents" inmate Pinson
"submitted" "to the Courts." (id.).

BOP officials told another Court that her new
Settlement Agreement could not be honored, in
part, because she could not be housed safely
in general population at USP Tucson. See, Pinson
v. United States, No. 18-CV-118-SHR (M.D. Pa.).

In Coleman's documentation for a transfer BOP
officials claimed that even though she'd been
the victim of sexual and physical assault, she
was just trying to manipulate the system to
get to a womens prison, it did not mention
her Gender Dysphoria, GCS, nor her transition.
(Pinson Decl.).

At a settlement hearing on Nov. 3, 2022 AUSA
Denise Ann Faulk and BOP Attorney Clay Cook
in Case No. 19-CV-00401-RM told Magistrate
Judge Leslie O. Bowman that Pinson's offer to
settle in exchange for her release from SHU
and to a unit or facility that under the BOP's
"Transgender Offender Manual" (P.S. 5200.08) own

policy stated "a transgender ... inmate's own views with respect to his/her own safety must be given serious consideration" (id. at P.6) and "In situations where the transfer request is related to progressing the individual inmate's transion (i.e., transfer to a different sex facility) the TEC will consider the case" (id at 7).

AUSA Faulk and Cook told Judge Bowman that they categorically refused to consider such an agreement. Not because it would increase her chances to safely transition, nor her medical and mental health needs, nor her safety needs, nor her Equal Protection concerns. (Pinson Ded.) But, simply because they categorically rejected such an offer. (id.).

Of the offer, AUSA Faulk would later write:

> "Plaintiff is reminded of the settlement offer undersigned counsel rejected in Pinson v. Estrada, No. 4:18-CV-00535, and Plaintiff's recognition at the time that the offer was improper. Plaintiff's purported settlement offer shared the same defect." (Doc. 81 at 7, Case No. 19-CV-00401-RM).

AUSA Faulk would not explain why the offer which

was authorized by BOP Program Statement 5200.08 (Pinson Decl.) and at a later telephonic discussion Faulk admitted that she "gets paid a salary no matter what" in response to plaintiff's attempt to discuss settlement and question as to why she and BOP were completely uncooperative in working together to resolve litigation while also making progress on her transition to a women's facility and ultimately GCS. Faulk based her decision on getting "paid a salary no matter what" not plaintiff's safety, Medical or Mental health needs, nor Equal Protection considerations on a "categorical" basis as she had done with Judge Bowman who will be called as a witness in this case. (Pinson Decl.).

Case No. 19-cv-00401-RM proceeds to trial in Sept. 2023.

The hardships to plaintiff are severe, chronic, unconstitutional and violate BOP's duties under 18 U.S.C. 4042(a) that require it to provide her "safekeeping, care, and subsistence" as well as "for the protection of her"

The hardships to BOP are non-existent as two

41

federal courts have already described as variously "overblown", "tautologies" and "based on bias and fear and not evidence. It is not reasonably related to the legitimate penological interest of protecting prisoners." Shelby, Ex. 4 at 23).

But for being born with a penis, plaintiff would not ever have been assigned to a male facility in the first place. And, but for her litigiousness, these cases could be resolved like any other legal dispute, because that litigiousness has earned her the everlasting enmity of BOP and its lawyers. No matter how many times plaintiff seeks to find common ground, BOP and its lawyers categorically refuse to work with her in a united spirit of finding a resolution together. BOP and its lawyers have never cited safety, medical or mental health as a basis to categorically refuse her settlement offers which focus on her transition

BOP invites upon itself any hardship a preliminary injunction could cause, by refusing to even discuss an out of court resolution. It should not be rewarded for this intransiegence.

## C. The Court Should Hold An Evidentiary Hearing And Appoint Counsel

1) <u>Evidentiary Hearing</u>: This case and this motion warrant an evidentiary hearing. First, because most Courts inside and outside this Circuit do so before deciding a preliminary injunction or TRO of this nature.

In Edmo v. Corizon, Inc., No. 17-CV-00151-BLW the District of Idaho held an evidentiary hearing on the preliminary injunction brought by a trans inmate. (Affirmed, 935 F.3d 757 (9th Cir. 2019), cert. den. No. 19-1280 (S.Ct. 2020)).

In Norsworthy v. Beard, 87 F.Supp.3d 1164 (E.D.Cal) the Eastern District of California held an evidentiary hearing.

In Quine v. Beard, ~~Of F.Supp~~ No. 14-CV-02726-JST (N.D.Cal. 2015) the Northern District of California held an evidentiary hearing.

In F.V. v. Barron, 286 F.Supp.3d 1131 (D. Idaho 2018) the District of Idaho held an evidentiary hearing.

In, Doe v. Mass. Dept. of Corr., No. 17-12255-RGS, the District of Massachusetts held an evidentiary hearing.

In Iglesias, the Southern District of Illinois held an evidentiary hearing.

In Shelby, the Southern District of New York held an evidentiary hearing. (Ex. 4)

In Johnson v. Kruse, No. 17-CV-237-JPG the Southern District of Illinois held an evidentiary hearing.

In Hampton v. Baldwin, 2018 U.S. Dist. LEXIS 190682 (S.D. Ill.) the Southern District of Illinois held an evidentiary hearing.

In Shaw v. District of Columbia, 944 F.Supp.2d 43 (D.D.C. 2013) the District of Columbia held an evidentiary hearing.

In Tay v. Dennison, 457 F.Supp.3d 657 (S.D. Ill. the Southern District of Illinois held an evidentiary hearing.

In McKibben v. McMahon, 2015 WL 10382396 (C.D.

Cal.) the Central District of California held an evidentiary hearing.

In Barnes v. Lawrence, No. 19-CV-00806-SMY, 2019 WL 6117721 (S.D.Ill.) the Southern District of Illinois held an evidentiary hearing.

Second, Iglesias and Shelby both illustrate the dangers of ruling just on the briefs. BOP lawyers can, and will, misrepresent facts to mislead the Courts, create post-hoc justification in response to litigation, defy injunctions once issued, and "manufacture" excuses. See Iglesias, 2022 WL 1136629 (S.D.Ill., Apr. 18, 2022)(Ordering BOP, DOJ Attorneys and Transgender Executive Council to show cause why they shouldnt be held in contempt for misconduct in litigation).

Third, Aside from that, credibility determinations will need to be made in this case on this Motion if given a fair hearing. In Case No. 19-CV-235-RM BOP told this Court it hasnt begun her transition to a womens prison or GCS because of her then-"hormone levels" and "Mental health" among other factors. The Warden of USP Tucson recently responded to a BP-9 when plaintiff demanded

45

BOP stop using "__Male__" custody classification procedures that=

"due to inmates being scored based off their designated institution, you are appropriately scored using the Male Custody Classification Form."

(See Ex[A]B (Resp.). This is in line with Warden Gutierrez, Asst. Warden Muhammad Zantout, and Captain Christopher Marlow telling her "as long as you have a dick you are a man" or "you are in a man's prison, because you are a man" (Pinson Decl. at 18 ; Zaragosa-Solis Decl. at 1-2). This supports her equal protection claims as well as her other claims, and contradicts what BOP had claimed in No. 19-CV-00235-RM. A hearing allows for cross and direct examination of these various discrepancies between what is said to the Court, and what is written internally. The record shows the Warden, whom BOP designates in its policies as the first step in transition related transfers (See, P.S. 5200.08 at 6 "Warden's will consult with WASPB prior to submitting a designation request to the DSCC for the redesignation of transgender inmates" or at P.7 "the Warden will submit to the TEC" and also

46

P.7 "they may be considered on a case-by-case basis, by the Warden"). The Warden's own BP.9 Response says she's being treated as Male not because of her history, her safety needs, her hormone levels, her medical needs, her Mental health needs, or any other excuse it created in Case No. 19-CV-00235-RM, it simply says it is treating her as Male listing a sole reason: she is in a male prison. So which is it, the first reason? The one it gave in 2016? The one it gave in 2018? The one it gave in 2019 and 2020? Or the one it gives now? Because all those justifications given change each time. (Pinson Decl.). At plaintiff's count BOP has come up with a different reason, at different times, 8 times now since 2014-15. These contradictions are best resolved upon live testimony, so the Court can make credibility determinations.

2) <u>Appointment of Counsel</u>:

The interests of justice warrant appointment of counsel to represent plaintiff. A district court has the discretion under 28 U.S.C. 1915(e)(1) to designate counsel to represent an idigent Civil litigant in exceptional circumstances. See Wilborn v. Escaldero, 789 F.2d 1328, 1331 (9th

47

ir. 1986). This requires an evaluation of both the likelihood of success on the merits and the ability of the plaintiff to articulate her claims pro se in light of the complexity of the legal issues involved. d. Neither of these factors is dispositive and both must be viewed together before deciding on a request for counsel under § 1915(e)(1).

As Judge Tigar of the Northern District of California wrote in Norsworthy v. Beard, No. 14-cv-00695-JST (N.D. Cal. Mar. 26, 2014):

"The action presents novel and complex legal issues." Under Wilborn, because even reasonable jurists are deeply divided on the issue of trans prisoners rights. (Citing Kosilek v. Spencer, 740 F.3d 733 (1st Cir. 2014).

The dissent in Edmo v. Corizon Inc, No. 19-35017 (9th Cir., Feb. 10, 2020) also wrote:

GCS "is a new, rapidly changing, and highly controversial area of medical practice."

Every case cited on Pages 43-45 of this motion, in support of a requested evidentiary hearing, involved

a trans person, mostly in prison settings, who
were all appointed counsel because these cases
involve complicated medical and legal questions
sharply disputed material facts.

The plaintiff here is no different than the
one in Iglesias v. Fed. Bur. of Prisons, 2022
WL 6112790 (S.D. Ill. Dec. 27, 2021) who proved
that her Equal Protection rights were violated
by the BOP. (Id.).

The Shelby Court, No. 19-CV-02020-USB (S.D.N.Y.
2022), relying on Iglesias, found that BOP's
decisions with its transgender inmates were:

"based on bias and fear, and not evidence."
(id.)(Ex. 4).

The BOP has, for years and years, shifted its
varying explanations as to why it will not
allow plaintiff to transition. These explanations
on internal documents are not consistent with
its representations in Court. Meanwhile, plaintiff
has been subjected to beatings, attempted
rape, sexual assault and sexual harassment
In Court personnel (i.e. Warden Segal) use

female pronouns, then on internal documents use the Male pronouns when requesting her transfer.

The current Warden admits BOP does not treat her as a Female, it does not utilize its policies (P.S. 5100.08) for females and 5100.08 only has 2 sets of gender-based classification "Male" or "Female" not Transgender.

The plaintiff is likely to succeed on the merits because each Court to decide the issue involving transgender federal prisoners in BOP has found BOP, after full adversarial testing, to have violated the Fifth And Eighth Amendments.

Conversely, it is also true that Judges in this district have issued rulings diametrically opposed to those of Judges around the Nation. See, e.g. Pinson v. U.S. Dept. of Justice, No. 19-CV-00235-RM (D. Ariz.) and Martinez v. Corr. Corp. of America, No. CV-11-02390-PHX-NVW (D. Ariz.). Obviously there exists tension in the decisions of this Court versus others inside and outside this Circuit. That type of position is consistent with the dissent in Edmo, but at the end of the day the binding opinions of the Ninth Circuit in

Edmo as well as Rosati v. Igbinoso, 791 F.3d 1037 (9th Cir. 2015) favor plaintiff's likelihood of success on the merits.

In terms of plaintiff's ability, while there may be no constitutional right to appointed counsel there certainly is a constitutional right to access to the Courts as outlined in Pages 3-22 herein, and as also stated that right is being violated. That strongly supports the second factor under Wilborn.

Furthermore, there is no reason plaintiff should be singled out for denial of access to an attorney given the overwhelming consensus of Courts nationwide supporting that Counsel is necessary in cases of Trans rights. See, e.g. Iglesias, Shelby, Norsworthy, Quine, Edmo, Rosati, Shaw, Tay, Doe, Johnson, McKibben, F.V., at Pages 43-45 herein.

Denying her access to the Courts by making it impossible for her to collect witness statements or hire an expert witness (See Pages 7 to 18, herein) violates the First Amendment, sabotages prosecution with this case, and when combined

51

refusal to appoint counsel creates a scenario where not only are her First Amendment rights violated, but so too are her Fifth and Seventh Amendment rights, and statutory rights such as 42 U.S.C. 1981, 1985(2), 1985(3), and 18 U.S.C. 1512, 1515.

The Court labels plaintiff a "serial litigant" because she has vigorously exercised her constitutional and statutory rights. It is not clear what the Court means by that label. Is exercising one's First Amendment rights viewed negatively? Is the fact plaintiff is in prison, a factor in viewing her exercising that right negatively? Doc. 8, 13 and 23 are riddled with what appears to be doubts and skepticism. Counsel is crucial if the Court approaches plaintiff's case and claims negatively or as outlined above, because counsel can alleviate this stigmatizing and its impact on her claims. As an officer of the Court counsel can present the claims with the assurance they are sincere, genuine, authentic and in good faith.

Furthermore, BOP, its lawyers, have presented past legal arguments inconsistent with the positions presented at the Presidential and Cabinet Level of the current administration. President Biden, Attorney General Garland

and others (i.e. Secretary of the Dept. of Health and Human Services) have acknowledged anti-trans discrimination throughout the prior presidential administration, with repeated pledges to protect and support the rights of trans Americans. They have not condoned violating the Fifth and Eighth Amendment rights of any trans Citizen in the manner the Iglesias and Shelby Court's ruled were violated. The BOP has not stopped since Iglesias or Shelby, it violates the rights of Plaintiff and Trans inmates on a systemwide basis. See: Doe v. Snyder, 28 F.4th 103 (9th Cir. 2021)("disallowing gender reassignment surgery should be treated as discriminating against transgender persons because they are the only ones seeking this surgery").

The Ninth Circuit has reversed because, like this case, "the medical issues raised in this matter are complex". ~~Remanded~~ Huynh v. Callison, 700 Fed. Appx. 637 (9th Cir. 2017)(also see, Tilei v. McGuinness, 642 Fed. Appx. 719, 722 (9th Cir. 2016)("Tilei's deliberate indifference claim is legally complex. Tilei's claim will turn on complex medical questions ... Causation, and likely will require the testimony of expert witnesses.").

53

in these trans cases, BOP Attorneys have also been caught exhibiting dishonest, misleading, obstructive behavior to win. Not accused, caught. See, Iglesias, 2022 WL 1136629 (S.D.Ill., Apr. 18, 2022). And, with the complicity of BOP's Transgender Executive Council, (id.). This, too, will impact plaintiff's ability to prosecute her claims like all the others.

Next, discrimination against trans individuals has a long and insidious history. In 1990, the medical community did not acknowledge gender dysphoria either as an independent diagnosis or as a subset of any other condition. It did recognize a class of other disorders that it characterized as "gender identity disorders". According to the then-current version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") "the essential feature" of a "gender identity disorder" was "an incongruence between assigned sex (i.e., the sex that is recorded on the birth certificate) and gender identity." Am. Psych. Assn, DSM at 71 (3d ed. Rev. 1987); Hall v. Florida, 572 U.S. 701, 704 (2014). The Fourth Circuit recently recognized that a diagnosis of "gender identity disorder ... indicated that the problem was the discordant gender identity". Grimm v. Gloucester City. Sch. Bd., 972 F.3d 586, 611 (4th Cir. 2020). In other words, in 1990 the gender identity disord

54

diagnosis marked being transgender as a mental
illness. Id.

Crucially, advances in medical understanding
led the American Psychiatric Association in 2013
to remove "gender identity disorders" from the most
recent DSM (5th ed. 2013), the DSM-5, and added
"gender dysphoria" which didn't exist until 2013.
The DSM-5, rather than focusing exclusively on
a person's gender identity, defines "gender
dysphoria" as the "clinically significant distress"
felt by some of those who experience "an
incongruence between their gender identity and
their assigned sex." DSM-5 at 451-53. And,
that distress causes intense anxiety, depression,
suicidal ideation, and even suicide. See DSM-5
at 454-55.

Reflecting this shift in understanding Courts
have recognized that the diagnosis concerns
itself primarily with distress rather than
simply being transgender. See Edmo, 935 F.3d
at 771; Grimm, 972 F.3d at 595.

This history supports the notion that not
protecting a person with "gender dysphoria" from
exclusion from the normal process of medical
care inside the BoP discriminates "against
transgender people as a class, implicating the

Equal Protection Clause". Williams v. Kincaid, 45 F.4th 759,   (4th Cir. 2022) (citing Cf. Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of the L. v. Martinez, 561 U.S. 661, 689 (2010) (declining to distinguish between conduct and status when the two are closely correlated)).

Because of the long history of discrimination against transgender people, See generally Kevin M. Barry, Disability Queer = Federal Disability Rights Protection for Transgender People, 16 Yale Human Rts. & Dev. J. 1 (2014) (detailing how moral opprobrium led to adoption of amendment excluding trans people), even federal law lists gender identity disorders alongside pedophilia, exhibitionism, and voyeurism. See also, 135 Cong. Rec. S10765-01 (daily ed. Sep. 6, 1989) ("In short, we are talking about behavior that is immoral, improper, or illegal and which individuals are engaging in of their own volition, admittedly for reasons we don't fully understand").

This history of discrimination may well explain why BOP has been so cruel to plaintiff, and its other trans inmates. Counsel can assist with the collection of their testimony which Warden Mark Gutiérrez has isolated plaintiff to prevent her from procuring. Or to help explain the behavior of BOP attorneys who have used both the BOP and

Tucson U.S. Attorneys Office to fight tooth and nail to prevent her transition, and to use their Governmental position to drive the plaintiff to suicide by denying her Justice.

## Conclusion

Plaintiff seeks a TRO now, and a hearing on the issuance of a preliminary injunction, where she seeks an Order that:

1. BOP must provide plaintiff the means to identify, locate, and contact potential expert witnesses;
2. BOP must provide plaintiff at least 2 hours law library twice per week;
3. BOP must provide plaintiff access to a photocopier, pen, paper, envelopes, stamps as needed throughout this case;
4. BOP must cease housing plaintiff in an isolated area denying her the ability to collect witness declarations or other evidence;
5. BOP must begin plaintiff's transition to a female facility immediately;
6. BOP must fully investigate, including interviewing all witnesses plaintiff identifies, plaintiff's own claim that Mark Gutierrez, Muhammad Zantout, and Christopher Marlow violated 28 C.F.R.

115.67 and 18 U.S.C. 1512, 1515;

7. BOP must use, upon plaintiff, its "Female" procedures outlined in Program Statement 5100.08 and cease using "Male" procedures involving plaintiff.

Jeremy Pinson

## Certificate of Service

I certify service of this motion via postage prepaid U.S. Mail on 6-21-22, and will be served (due to no access to a photocopier) upon defendants via ECF Notice. 28 U.S.C. 1746.

Jeremy Pinson

58