Statement of Facts:

A - <u>The Plaintiff</u>:



The plaintiff is a 37 year old transgender woman and has been diagnosed by BOP Medical Doctors and Psychologists with Gender Dysphoria since 2014. Plaintiff has been the victim of repeated assaults by violent cisgender male inmates since 2007 and has been attacked and beaten on at least 7 times by them. In 2007 plaintiff was sentenced to 240 months imprisonment, and was recommended at sentencing to be housed at FMC Butner at least for four to eight years of medical and mental health treatment after the sentencing Court received expert opinion from a mental health expert Dr. Gerald Preisz. The BOP rejected the sentencing Court designation request, and housed her instead in a High Security U.S. Penitentiary in Beaumont, TX. Plaintiff has an extensive history of self-injury, near-lethal suicide attempts, depression, anxiety, autocastration attempts and has faced emergency hospitalization and surgery several times due to self-inflicted injuries. The plaintiff is regularly misgendered by staff and inmates alike, has endured persistent sexual harassment and sexual violence, by cisgender

7

males. Plaintiff has requested accomodations for her Gender Dysphoria such as Gender Confirmation Surgery ("GCS"), electrolysis, an oriechtomy, breast augmentation, female clothing, makeup, all of which have been denied by the BOP as will be more fully explained hereafter. Plaintiff is outspoken, has published numerous writings critical of the BOP, has been included in media articles for enduring abuse and retaliation, has participated in a class-action lawsuit against the BOP, and vigorously defends her civil and constitutional rights against BOP and its employees.

3- <u>WPATH Standards of Care</u>

The WPATH Standards of Care ("SOC") are the recognized SOC for treatment of transgender inmates by federal courts (See: Edmo v. Corizon Inc., 935 F.3d 757 (9th Cir. 2019) as well as most medical and scientific groups in the United States. (id.). The BOP has admitted in prior lawsuits that it uses WPATH SOC as a "guide" but does not follow them in their entirety, and did so in Iglesias v. Federal Bureau of Prisons, Case No. 19-cv-415-NJR (S.D.Ill.) and Shelby v. Pliler, Case No.

8

19-CV-02020-VSB (S.D.N.Y.). The SOC attempt to prevent a person with Gender Dysphoria's compulsion to engage in self-castration or other physical harm as a result of inadequately treated Gender Dysphoria. Several studies have confirmed this fact, such as: George R. Brown, Autocastration and Autopenectomy as Surgical Self-Treatment in Incarcerated Persons with Gender Identity Disorder, 12 Int'l J. of Transgenderism 31 (2010). WPATH experts have testified in lawsuits against the BOP as to the SOC and how BOP violates them, including Iglesias. BOP officials on its Transgender Executive Council ("TEC") have testified in opposition to the expert opinions of WPATH officials as to the SOC and are aware of their noncompliance with SOC within the BOP. The WPATH SOC instruct that:

"Surgery -- particularly genital surgery -- is often the last and the most considered step in the treatment process for gender dysphoria ... For many others surgery is essential and medically necessary to alleviate their gender dysphoria ... relief from gender dysphoria cannot be achieved without modification of their primary and/or secondary sex characteristics to establish greater congruence

with their gender identity." SOC at 54-55 (2001 ed.).

The WPATH SOC, including the provisions concerning sex reassignment or GCS, have also been endorsed by the National Commission on Correctional Healthcare. The BOP has refused since 2014 to have plaintiff evaluated under the SOC by a specialist for GCS not employed by the BOP on a categorical basis of its internal criteria.

## C. WPATH SOC and Plaintiff:

Plaintiff's being transgender is not itself a medical condition. It is the "clinically significant distress or impairment in social, occupational, or other important areas of functioning" that is associated with the incongruence between gender identity and phenotypic or assigned sex. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 453 (5th ed. 2013) ("DSM-5")

Plaintiff is not receiving effective Gender Dysphoria treatment which causes her to self-mutilate her own genitalia, essentially performing her own makeshift GCS, for which she has required emergency surgery. She has received disciplinary charges, including loss of good-conduct time, for her autocastration attempts

10

The ineffective treatment for her Gender Dysphoria has lead to serious bodily harm, depression, anxiety, and suicide attempts for nearly 10 years. Gender Dysphoria often worsens with age.

The SOC also recommend that:

1- "health care for ... transgender ... people living in an institutional environment should Mirror that which would be available to them if they were living in a non-institutional setting within the same community". SOC at 67.

2. "Housing ... for ... transgender ... people living in institutions should take into account their gender identity and role, physical status, dignity, and personal safety" SOC at 68.

3. "Institutions where ... transgender ... people reside and receive healthcare should monitor for a ~~treatment~~ tolerant and positive climate to ensure residents are not under attack by staff or other residents" (Id.).

These SOC are violated by virtue of:

a- Plaintiff is housed in a cisgender male prison.

11

b. Plaintiff is misgendered by staff and inmates daily, often even in BOP records and documents that continue to use male pronouns.

c. Plaintiff must wear male clothing and male undergarments.

d. Plaintiff is denied facial and bodily hair removal.

e. BOP uses its "Male" Custody Classification process, which is different from its "Female" version in Program Statement 5100.08, biannually at plaintiff's classification reviews.

f. Plaintiff has been physically and sexually assaulted in cisgender male prisons numerous times.

g. Plaintiff endures regular sexual harrassment and use of slurs like "faggot" and "homo" by staff and inmates on a weekly basis.

h. Plaintiff is subjected to crossgender strip searches by male officers.

i. Plaintiff's hormone levels are not monitored within the SOC.

j. Plaintiff is denied breast augmentation and an oriechtony.

K. Plaintiff is denied injection based hormones that are more effective than pills or transdermal patches.

L. Plaintiff is not allowed to dye her hair as BOP allows women prisoners to do.

## D. PREA Regulations And Plaintiff

BOP is bound by its PREA regulations at 28 C.F.R. Part 115 et seq. but in plaintiff's case violates the following on a regular basis:

1. A seperate shower when in general population, 115.42(f).

2. The right to not be housed based solely on her external genital anatomy, 115.42(e).

3. The right to have "serious consideration" given to her own preferences regarding housing and safety, 115.42(e).

4. Biannual reviews of her classifications, 115.42(d).

## E. Disparate Treatment of Medical Conditions

No medical treatment in the BOP is dependent on non-medical eligibility criteria such as:

1. disciplinary history;

2. nature of conviction;

3. security level;

4. n year of clear conduct

in order to receive treatment except GCS for

13

transgender inmates with Gender Dysphoria. A cisgender male can have a penectomy if approved by a physician but a transgender inmate cannot without the TEC recommending such and the Medical Director approving such. Treatments for cancer, diabetes, heart disease, hypertension, psychosis, dental problems, etc. do not have any such prerequisites as GCS.

F. GCS/Housing Policies And Plaintiff

The 2022 version of the Transgender Offender Manual states BOP will not consider GCS until multiple criteria are met:

1. One year of "clear conduct";
2. Housing in a lesser security prison, first
3. One year in a female prison, second.

No medical procedure other than GCS is subjected to such requirements to any other gender.

BOP Program Statement 5100.08 allows a Warden to request a male inmate only be classified as "Maximum Custody". Once applied, only a Warden can initiate its removal. The removal eligibility is entirely subjective and has no set criteria in policy for removal. A "Maximum Custody" inmate, under 5100.08, cannot be

14

housed in a Medium Custody facility, the first criteria a transgender inmate must meet to even be considered by the TEC for GCS. The TEC will only consider such cases after the Warden of the individual's current facility submits a written request for such according to the Transgender Offender Manual. Since 2007 when her "Maximum Custody" level was applied, 10 Wardens have told plaintiff they "never" remove "Maximum Custody" statuses from any inmate. Some have brought up the plaintiff's litigiousness when asked to remove it (i.e. "you sue me and want my help now?"). In 2022 Warden Damon Colbert at USP Tucson told plaintiff "give me 6 months clear conduct and no BP-9's and I promise to take it off" When she rearrived to USP Tucson. Colbert was replaced by defendant Warden Mark Gutierrez who stated to her he would never remove it and frequently stated "You got nothing coming from me dude" or other threats when plaintiff would try to speak to him.

6. The Sept. 2022 Attack

BOP has a "zero-tolerance" policy on

15

sexual misconduct as codified in its PREA regulations and Program Statements. See: 28 CFR Part 115 et seq. Plaintiff rearrived to USP Tucson in June 2022. She was assigned 2 weeks later to A-1 Unit where all non-Challenge Program, Mental Health Care Level 3 inmates are housed. Tyrone Brown, a sexual predator was also housed in A-1 Unit. When Brown began pressuring plaintiff for sex, and to allow him to sex traffick her which he was already doing to another Care Level 3 Transgender female Jessica Gulisano, plaintiff filed a PREA Complaint with her treating psychologist DR. Samantha Licata. He was ordered placed in SHU to protect plaintiff from him pending a PREA investigation. Warden Colbert stated Brown would "never" be released from the SHU and would be transferred to protect her from him. An SIS investigation was conducted, and multiple inmates interviewed confirmed Brown intended to hurt plaintiff and Gulisano if released from SHU. SIS recommended he be transferred and a request to transfer him was submitted. His transfer was denied, and he was released from SHU on Sept. 13, 2022. Upon release, Brown approached Plaintiff, Gulisano, and Plaintiff's cellmate Ernesto Zaragosa-Solis threatening to rape and to kill them. Plaintiff immediately reported these

threats to Dr. Licata, Lt. Keith Falconer, Lt. J. Christensen and inmates other than the plaintiff did the same. Inexplicably Christensen informed Brown that plaintiff and the other victims were snitching on him, but did not take action to protect them from Brown as required by 28 C.F.R. 115.62 and the SIS Manual. The next day, Sept. 14, 2022, staff allowed Brown to remain "out of bounds" in the dining hall, where he attacked the plaintiff, Gulisano and Zaragosa-Solis inflicting serious physical and emotional/psychological injuries.

## H. Post-Sept. 2022 Events

Following the 9-14-22 attack all involved inmates were placed in SHU pending an SIS investigation. On Oct. 5, 2022 during the investigative interview Christensen and Gutierrez delivered an ultimatum to all the inmates involved = drop all current or planned lawsuits or claims, or remain in the SHU long-term and be transferred. Plaintiff, Zaragosa Solis, and Armendariz refused to drop anything. Gulisano, Berrios and Davis (the others involved)

17

agreed and were promptly released from SHU. Plaintiff, Zaragosa-Solis were both submitted for "Close Supervision" transfers, typically used to increase an inmates level of security housing by Gutierrez. Zaragosa-Solis was designated to USP Terre Haute, Pinson to the Allenwood Secure Admin Unit ("SAU"). The SAU is a male facility unit where inmates are housed in solitary confinement under harsh and restrictive conditions.

However transfer was not simply the sole act of retaliation by Gutierrez and his coconspirators. While maintaining her and Zaragosa-Solis in the Special Housing Unit ("SHU") at USP Tucson, Gutierrez acted in concert with Associate Warden Muhammad Zantout and Captain Christopher Marlow to harrass, threaten and intimidate both Pinson who was both a party and witness in federal court proceedings as well as Zaragosa-Solis (also both a party and witness in federal court proceedings), John Dobbs (also both a party and witness in federal court proceedings), Michael Duran (also both a party and witness in federal court proceedings), Michael King (witness to federal court proceedings), Steven Grovo (witness to federal court proceedings), Eric Gooch (party and witness to federal court proceedings), Raul Galindo (witness to federal court proceedings), Jonah Garza (party and witness to federal court proceedings), Brian Rogers (witness to federal court proceedings), Mikeal Stine (party and witness to federal court proceedings), Keyshla Hadaway (party and witness

to federal court proceedings), Daniel McNeal (witness
to federal court proceedings), and others. At various
times after Sept. 14, 2022 Zaragosa-Solis, Dobbs,
King, Duran, Grove, Gooch, Galindo, Garza, Rogers, Stine,
Hadaway, McNeal supplied plaintiff with declarations
pursuant to 28 U.S.C. 1746 testifying under the
penalty of perjury in plaintiff's civil actions before
this Court, plaintiff submitted each person's
declaration to this Court often on a publicly
available docket, and in each and every instance
a witnesses testimonial declaration would be filed
by the Court Clerk, Gutierrez, Zantout and
Marlow would approach each witness and
threaten them invariably with a long-term in
the SHU and a transfer, within 5 to 7 days of
the declaration appearing on the public docket.

The plaintiff was aware that federal law gave
her the right " to sue, be parties, give evidence,
and to the full and equal benefit of all laws
and proceedings" (42 U.S.C. 1981), that if prison
officials " conspire to deter by force, intimidation,
or threat, any party or witness in any Court ...
from attending such court, or from testifying to
any matter" (42 U.S.C. 1985(2)) they were liable,
and that " Every person who, having knowledge that

any of the wrongs conspired to be done" in a 42 U.S.C. 1985(2) conspiracy" and having power to prevent or aid in the preventing the commission of the same, neglects or refuses to do so ... shall be liable to the party injured" (42 U.S.C. 1986).

The conspiracy was carried out in a multitude of ways:

1. On Oct. 5, 2022 Christensen and Gutierrez threatened Pinson, Zaragosa-Solis and Armendariz to drop any civil lawsuits or claims or stay in SHU and be transferred. Both were aware of pending litigation No. 19-CV-422-RM (D. Ariz.) and Pinson and Zaragosa's intent to testify at trial therein and made their threat immediately following Pinson pointing to documents in her hand reflecting the Order of Judge Marquez denying Summary judgment in that case, involving PREA violations.

2. On Nov. 3, 2022 Zantout called plaintiff "a troublemaker" en route to her settlement conference in Pinson v. United States, No. 19-CV-00401-RM (D. Ariz.) and stated that he and Gutierrez were going to keep plaintiff in SHU long-term and transfer her for continuing to file and prosecute lawsuits against them and USP Tucson staff. When told she had a multitude of witnesses ready to testify against them Zantout promised to "get rid of them all" among other

20

threatening remarks.

3. Defendants Gutierrez and Marlow removed Stine and Eisenhour from their cell, siezed a declaration from each that testified to Gutierrez verbally threatening Pinson and verbally told them "if we catch you writing declarations for her you wont like where we send you."

4. Gutierrez and Marlow each confronted Brian Rogers, Michael Zeigler, David Holland, Leroy Ingram after their declarations were filed in Plaintiff's court cases in the District of Arizona warning them not to supply Pinson with declarations or "We're gonna ship you to a dangerous place you wont like."

5. After Daniel McNeal testified to staff enticing him to supply false testimony against Pinson and Zaragosa-Solis (see, e.g. Doc-26 in Zaragosa-Solis v. Gutierrez, No. 22-cv-00498-JCH (D.Ariz.)) along with John Dobbs (id.)(who was housed next to McNeal at the time of their declaration testimony) were both told they would end up in SHU, transferred to a dangerous prison that is less safe where they might

21

end up dead. Dobbs also informed plaintiff, under penalty of perjury that Gutierrez called her a "nigger dumbfuck".

While this is not a complete list, plaintiff can prove by live witness testimony that Christensen, Gutierrez, Marlow and Zantout threatened more than 20 inmates after Sept. 14, 2022 who supplied her with their written testimony under penalty of perjury for this Court. The plaintiff can also prove, again - by live witness testimony that prior to Sept. 14, 2022 Gutierrez assembled all USP Tucson inmates who identify as transgender or gender non-conforming into the USP Tucson Chapel and in response to William Fly (a.k.a. Toni Fly) asking him about the PREA issues in Pinson's lawsuit No. 19-CV-00422-RM (D.Ariz.) and "why do us trans inmates have to live in fear of being raped or threatened for testifying in Pinson's case that's our civil right you know" Gutierrez told the crowd of more than 75 inmates "you can testify, that's your right, I can lock you up and ship you somewhere else, that's my right, so be careful what you say that goes for everyone in this room."

Plaintiff attempted by a variety of means to report Gutierrez, Zantout, Marlow and Christensen to hold

them accountable, including but not limited to:

1. Reporting via TRULINCS Staff Messaging system to Jenna Epplin of the Transgender Executive Committee.
2. Reporting verbally to Acting SIA Jeremy Ulrich, SIS Lt. Keith Falconer.
3. Reporting via Certified U.S. Mail to:

> Regional Director M. Rios
> Inspector General Michael Horovitz
> Law Professor Dean Spade
> Attorney James Davy
> Attorney Andrew Tolai
> American Correctional Association
> Attorney Stacy Scheff
> Reporter Beth Schwartzapfel
> Richard Saenz - Attorney LAMBDA LEGAL
> PAM Sonnen - PREA Auditors of America
> Debora Pinson
> Asst. Inspector General Sarah Lake
> National Center For Transgender Equality

4. Verbally reported, with other inmates, to a Union Representative for American Federation of Government Employees (local office).

23

5. Via regular U.S. Mail to:

> BOP Attorney Clay Cook
> AUSA Sarah Letzkus
> AUSA Denise Ann Faulk
> U.S. Attorney Gary Restaino
> ACLU National Prison Project
> ACLU of Arizona
> ACLU LGBT Project — John Knight
> Federal Public Defender Jon Sands
> DOJ Civil Rights Division Vanita Gupta
> USA Today
> Michael Barbaro — New York Times
> Benjamin Crump — Civil Rights Attorney
> David Lane — Civil Rights Attorney
> Alan Mills — Civil Rights Attorney

and many other individuals and organizations.

For purposes of the § 1986 Claim in this case, defendants Epplin, Rios, Ulrich, Lake and the American Federation of Government Employees could have acted to prevent, or aided in the prevention of Gutierrez conspiracy to retaliate with Marlow, Christensen, Zantout, against Plaintiff, but did nothing to stop Gutierrez or his Coconspirators.

24

The Union Representative, to plaintiff's shock and dismay, told her the American Federation of Government Employees Union "are going to back the Warden 100% making sure all our officers are on the same page when it comes to you Pinson its called a blue wall of silence for a reason" When plaintiff asked him if Officers could testify for her about Gutierrez, Marlow, Zantout and Christensen targeting litigators and their witnesses at USP Tucson. When plaintiff stated to him "a blue wall, that sounds like perjury"he replied "thats life man."

An interviewer for PREA Auditors of America told plaintiff that dozens of inmates had confirmed with her that Gutierrez was targeting PREA filers and litigants with retaliation and confirmed it was a problem. But AUSA Michael Linton later seemed to assert in Case No. 19-cv-00422-RM (D.Ariz.) that PREA Auditors of America had ommitted such from their audit reports. This exclusion was not what the interviewer told William Fly, Ernesto Zaragosa-Solis and others was going to be in the report "after we talk with Warden Gutierrez about the problems first". Such

25

reports are publicly available on the internet, and omitting the reports of chronic abuse and retaliation under PREA could not have been accidental or mistaken given the numerous complaints and diversity of complainants. The omission apparently occured after PREA Auditors of America met with Gutierrez.

In addition to the inmates' own reports, their family members also wrote emails, made phone calls or in-person complaints seeking to hold Gutierrez, Zantout, Marlow and Christensen accountable for threatening Plaintiff and her witnesses, including:

Debra Pinson (Mother of Plaintiff)
Maria Torrez (Mother of Zaragosa-Solis)
Brenda Solis (Sister of Zaragosa-Solis)
Martha Solis (Sister of Zaragosa-Solis)
Nashlee Solis (Daughter of Zaragosa-Solis)
Rosetta Davis (Mother of Daniel McNeal)
Angela Zigler (Mother of Michael Zeigler)
Jerusha Ramos (Friend of Plaintiff)
Dean Spade (Friend of Plaintiff)
Andrew Talai (Attorney of Plaintiff)
Dee-Dee Samet (Attorney of Plaintiff)

to BOP, OIG, USAO, PREA Auditors of America or AFGE.

26

Count V, Supporting Facts:
(Cont'd From Page 5-C)

In 2003 Congress passed the Prison Rape Elimination Act ("PREA"), 42 U.S.C. 15601 et seq., that called upon the U.S. Attorney General to promulgate national standards for the detection, prevention, reduction, and punishment of prison rape. 42 U.S.C. 15607. Those regulations, promulgated in 2010, are found at Title 28, Code of Federal Regulations, Part 115.

The PREA regulations require ALL BOP staff to protect all victims, 28 CFR 115.62, and to prevent retaliation against victims, 28 CFR 115.67.

Systemwide the BOP has failed in its PREA obligations, resulting in excess of $20,000,000.00 in settlements across the nation. See: Doc. 1 in Beaubrun et al. V. United States, No. 19-CV-00015-TJC-PRL (M.D. Fla.).

In Dec. 2022, the same time plaintiff was filing her own FTCA Claim, Att. C, alleging sexual misconduct, the U.S. Senate ~~from~~ Committee on Homeland Security and Governmental Affairs issued a report detailing recent and rampant sexual abuse and misconduct in BOP facilities, including the BOP's chronic failure to address the abuse.

In Oct. 2022 U.S. DOJ Inspector General Michael Horowitz issued a scathing report to

27

BOP Director Colette S. Peters condemning the systemwide practice of failing to, even refusing to, find claims by any inmate victims credible if the victims complaint was not also corroborated by independent evidence (i.e., DNA, video recordings). Even as BOP ran a "Rape Club" in Dublin, CA.

The Senate and OIG reports have also led federal judges to release inmates on a compassionate release basis finding BOP's failure to protect inmates and failure to provide mental health treatment following their being abused, extraordinary and compelling reasons.

In sum, BOP has a systemwide problem of chronic sexual abuse, failure to follow PREA regulations, and abuse of the victims post-reporting, as well as post-reporting retaliation

As stated in Count 3 and 4 herein plaintiff was victimized by a sexual predator, then revictimized by retaliatory staff in Sept. and Oct. 2022. This Count concerns an incident with BOP employee Lt. Andreik G. DeLeon and his sexual misconduct towards plaintiff. The plaintiff was housed in USP Tucson's SHU when on Sept. 28, 2022 she was victimized again.

On 9-28-22 Lt. Andreik G. DeLeon came onto D-Range of the USP Tucson SHU, where plaintiff was housed, and stated "All you rats can snitch on me all you want but I do things on my time, not any inmate's time". Plaintiff asked DeLeon, "are you calling me a rat too?" to which DeLeon began a

ten minute diatribe against plaintiff during which he threatened to physically and sexually abuse Plaintiff repeatedly saying "Suck my dick" to plaintiff.

The plaintiff demanded to see a psychologist to file a PREA complaint against DeLeon and was very upset. DeLeon instead forced plaintiff to walk, in her panties with no clothing from the waist down, down the tier as 20 to 25 cisgender male inmates yelled statements like "put big booty in here" and "damn girl can I see the boobies too?". Plaintiff was then embarrassed and humiliated.

DeLeon placed plaintiff in a holding cell at which point she reported him to Lt. Joseph O. Woodbey and Dr. S. Johnson pursuant to 28 C.F.R. 115.51. Upon doing so, DeLeon called the Warden Mark Gutierrez, the Asst. Warden Zantout, and Captain for permission to use force upon plaintiff, which was granted. DeLeon then used a 6-Man team of cisgender men to forcibly remove plaintiff's clothing until she was naked with nearly 10 other male staff watching and seeing her naked and laughing. The use of force team came armed with Oleoresin Capsicum spray, a Pepperball gun, batons, concussion grenades despite the fact plaintiff was unarmed and

cooperative and no threat to anyone. After stripping her naked, DeLeon placed her in leg shackles, hand restraints affixed to a chain and black box and left her in that condition for 10 hours with no food, water, nor access to a toilet. After the team and its cameras left DeLeon returned and punched her in the face with a closed fist causing swelling and bruising to her face. About half an hour later he returned and delivered plaintiff incident report no. 3679910 and was self-assigned to investigate the incident he started, on camera, as plaintiff screamed at the top of her lungs for DeLeon to leave her alone and to scream for help. Plaintiff was never separated from DeLeon, protected from DeLeon, in violation of PREA regulations. Instead, the Warden, Asst. Warden and Captain vowed to keep her in SHU long-term and to transfer her in retaliation for her continuing to file on staff at USP Tucson. When these facts were reported to BOP's Transgender Executive Council and DOJ Inspector General nothing was done to investigate, hold staff accountable, stop the retaliation, or even to protect her from these individuals. The 10 hours in restraints debraided the skin of her ankles so badly her ankles remain to this day permanently scarred and will be for life. Her PTSD is worse, thoughts of suicide worse and her rights violated.

30