**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeremy Pinson, | No. CV-22-00298-TUC-RM |
| Plaintiff, | **ORDER** |
| v. | |
| Federal Bureau of Prisons, | |
| Defendant. | |

Plaintiff Jeremy Pinson, who was formerly confined in the United States Penitentiary in Tucson, Arizona ("USP-Tucson") and is now confined in USP-Allenwood in Pennsylvania, sues the Federal Bureau of Prisons ("BOP") for injunctive relief under 28 U.S.C. § 1331.  (Doc. 14.)  Pending before the Court are Plaintiff's Motion for Reconsideration (Doc. 29), Motion to Transfer Venue (Doc. 41), numerous Motions seeking injunctive relief (Docs. 27, 31, 35, 62, 80), and several Motions seeking to supplement the record with respect to the requests for injunctive relief (Docs. 58, 97, 100).[1]

## I.        Procedural Background

Plaintiff initiated this action on June 29, 2022, by filing a pro se civil rights Complaint.  (Doc. 1.)  Plaintiff subsequently filed an Application to Proceed in Forma Pauperis (Doc. 4) and a Motion for Preliminary Injunction (Doc. 7).  On screening under 28 U.S.C. § 1915A(a), the Court dismissed Plaintiff's Complaint for failure to state a

---

[1] Plaintiff's Motions seeking preservation of video evidence (Docs. 79, 89) and her Renewed Motion for Appointment of Counsel (Doc. 111) will be resolved separately.

claim and denied the Motion for Preliminary Injunction.  (Doc. 8.)  Plaintiff filed a First Amended Complaint (Doc. 10) and a Motion for Reconsideration challenging the denial of her Motion for Preliminary Injunction (Doc. 11).  The Court dismissed the First Amended Complaint for failure to state a claim and denied the Motion for Reconsideration.  (Doc. 13.)  Plaintiff then filed the operative Second Amended Complaint ("SAC") (Doc. 14) and numerous additional motions including, on March 16, 2023, another Motion for Preliminary Injunction ("March 16 PI Motion") (Doc. 18).  On May 19, 2023, the Court ordered the BOP to answer Counts One, Two, and Three of the SAC, dismissed the remaining claim and defendants without prejudice, and denied the motions, including the March 16 PI Motion.  (Doc. 23.)  Plaintiff moved for reconsideration of the denial of the March 16 PI Motion (Doc. 29), and also filed numerous other motions.

Defendant filed a timely Answer to the SAC on September 29, 2023.  (Doc. 59; *see also* Doc. 55.)[2]  The Court issued a Scheduling Order on October 5, 2023.  (Doc. 62.) On January 31, 2024, the Court revised the Scheduling Order to extend certain deadlines, including the deadline for moving to amend pleadings and join additional parties.  (Doc. 110.)  Pursuant to the revised schedule, the deadline for moving to amend pleadings is February 29, 2024, the deadline for completion of discovery is April 8, 2024, and the deadline for filing dispositive motions on the merits of Plaintiff's claims is May 8, 2024. (*Id.*)

## II.    Allegations of SAC

In her SAC, Plaintiff states that she is transgender and identifies as female but has been incarcerated in male prisons since entering Defendant's custody.  (Doc. 14 at 11–21.)[3]  She also indicates that she has gender dysphoria, a serious medical condition resulting from the incongruence between her experienced and expressed gender and the

---

[2] The Court extended Defendant's deadline for answering or otherwise responding to the SAC pending resolution of a motion Plaintiff had filed seeking leave to file a third amended complaint.  (Doc. 49; *see also* Doc. 36.)  Plaintiff later withdrew her motion to file a third amended complaint.  (Doc. 50.)

[3] The Court cites to the page numbers generated by the Court's electronic filing system.

sex she was assigned at birth. (*Id.* at 8, 12–13, 24.) Plaintiff explains that placement in male prisons has caused her to suffer pervasive sexual harassment and discrimination, as well as multiple assaults, and that it has negatively affected her mental health and led to suicide attempts. (*Id.* at 13–24.) She alleges that the BOP and its employees have failed to ensure her safety, and that the BOP has failed to follow the World Professional Association for Transgender Health Standards of Care for the Health of Transexual, Transgender, and Gender Nonconforming People ("WPATH Standards of Care"). (*Id.* at 8–9, 21–25.)

Plaintiff states that the BOP released a Transgender Offender Manual on January 18, 2017, which established the Transgender Executive Council ("TEC") to offer advice and guidance on the unique treatment and management needs of transgender inmates. (*Id.* at 10–11.) She further states that the Manual was revised in 2018 to require the TEC to use biological sex as the initial determination for designation or transfer, but that the Manual directed the BOP to give serious consideration to a transgender prisoner's own views with respect to his or her safety. (*Id.* at 11.) Plaintiff alleges that, despite this requirement, Defendant has never asked Plaintiff about her views with respect to her own safety prior to placing her in male prisons. (*Id.* at 19–20.) Plaintiff further states that, in 2021, Defendant issued a Female Offender Manual that recognized LGBTQ prisoners in female prisons and set forth the need to manage such prisoners in certain ways; however, Defendant made no similar changes to its policies for LGBTQ prisoners in male prisons. (*Id.* at 22.)

Plaintiff indicates that her security classification has been calculated using the BOP's policies for males, resulting in her being housed in high-security male institutions. (*Id.* at 13–14.) Plaintiff alleges that "[b]ut for her penis," Defendant "would not have housed her in a men's facility" when she entered BOP custody in 2007, and "would not have used her biological sex as the initial determination for designation or transfer[.]" (*Id.*) Plaintiff seeks various forms of injunctive relief. (*Id.* at 7.)

On screening, the Court determined that the SAC sufficiently states Eighth

Amendment claims for inadequate medical/mental healthcare and failure to protect in Counts One and Three, and a Fifth Amendment Equal Protection claim in Count Two. (Doc. 23.)  The Court dismissed on screening Count Four of the SAC, in which Plaintiff asserted a claim under 42 U.S.C. §§ 1985 and 1986 alleging that BOP employees placed her in the Special Housing Unit ("SHU") of USP-Tucson and requested a transfer to another institution in retaliation for Plaintiff's lawsuits.  (Doc. 14 at 26–33; Doc. 23 at 6.) The Court dismissed that claim because neither 42 U.S.C. § 1985 nor § 1986 authorize injunctive relief, and Plaintiff seeks only injunctive relief in her SAC.  (Doc. 23 at 6.)

### III.    Motion to Transfer Venue (Doc. 41)

In her Motion to Transfer Venue, Plaintiff requests that the above-captioned case be transferred to the United States District Court for the District of Columbia.  (Doc. 41 at 7.)  She argues that she would have initiated this case in the District of Columbia if she had known the BOP was going to transfer her to a prison in Pennsylvania.  (*Id.* at 2, 5.) She argues that transferring this case to the District of Columbia is warranted because Washington, D.C. is the location of most of the witnesses and evidence concerning decisions by the TEC and investigations by the Office of Internal Affairs.  (*Id.* at 4–6.) Plaintiff further argues that, although the request for her transfer originated in Arizona, the TEC—located in Washington D.C.—ultimately controls her transfer decisions.  (*Id.*)

Defendant argues that Plaintiff has not met her burden to establish that transfer of this case to the District of Columbia is warranted.  (Doc. 53 at 3–5.)  Defendant argues that Plaintiff's transfer to a prison in Pennsylvania does not establish that litigation in the District of Columbia would be more convenient, and Defendant further argues that relevant witnesses and evidence are located in Arizona.  (*Id.*)  In reply,[4] Plaintiff argues that Washington, D.C. is closer to Pennsylvania than Arizona, and she reiterates that decisions about where she is housed are made by the TEC, which is located in Washington, D.C.  (Doc. 62 at 62–65.)

Pursuant to 28 U.S.C. § 1404(a), a court may transfer a civil action to any other

---

[4] Plaintiff included a Reply in support of her Motion to Transfer in an Expanded Motion for Preliminary Injunction that she filed on October 5, 2023.  (Doc. 62.)

district where it might have been brought "[f]or the convenience of parties and witnesses," and "in the interest of justice." Courts have discretion "to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) (internal quotation marks omitted). Factors to be considered include:

> (1) the location where the relevant agreements were negotiated and executed,
> (2) the state that is most familiar with the governing law,
> (3) the plaintiff's choice of forum,
> (4) the respective parties' contacts with the forum,
> (5) the contacts relating to the plaintiff's cause of action in the chosen forum,
> (6) the differences in the costs of litigation in the two forums,
> (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses,
> (8) the ease of access to sources of proof.

*Id.* at 498–499.

To the extent that Plaintiff must show a change in circumstances since the inception of this case to justify transfer, *see B&G Foods N.A., Inc. v. Embry*, No. 2:20-cv-00526-KJM-DB, 2020 WL 3605070, at *2–3 (E.D. Cal. July 2, 2020), the Court finds that Plaintiff's transfer to the USP-Allenwood is a significant change in circumstances, as that institution is closer to Washington, D.C. than to Arizona. Plaintiff's proximity to Washington, D.C. weighs in favor of transfer, as does the fact that witnesses relevant to the decision-making of the TEC are located in Washington, D.C.

However, other witnesses and evidence are located in Arizona. Plaintiff alleges that the TEC's most-recent transfer decision was made at the request of the Warden of USP-Tucson, and she further alleges that USP-Tucson staff provided false information to the TEC that affected the TEC's determination of where Plaintiff should be housed. (*See, e.g.*, Doc. 14 at 24; Doc. 100 at 2.) Evidence and witnesses relevant to those allegations are located in Arizona, as are evidence and witnesses relevant to Plaintiff's Eighth Amendment failure-to-protect and inadequate-medical-care claims. Furthermore, although both this Court and the District of Columbia are familiar with the governing law, this Court has added familiarity with Plaintiff and her claims, as this Court has

presided over numerous lawsuits filed by Plaintiff, some of which have included requests for relief similar to those at issue here.  Accordingly, the Court does not find that transfer is warranted pursuant to 28 U.S.C. § 1404(a).  Plaintiff's Motion to Transfer will be denied.

## IV.   Motion for Reconsideration (Doc. 29)

On March 16, 2023, Plaintiff requested a preliminary injunction prohibiting the BOP from transferring her to the Allenwood Secure Administrative Unit ("SAU-Allenwood") and requiring the BOP to treat her as it treats female inmates under its policies and regulations.  (Doc. 18 at 11.)  Plaintiff premised the March 16 PI Motion on her Equal Protection claim and argued that the BOP classifies its inmates and calculates their point scores and public safety factors on the basis of sex, using separate security designation tables and custody variance tables for male and female inmates.  (*Id.* at 2–4.) Plaintiff alleged that, as a result of her external genitalia, the BOP has used its male policies to calculate her points and public safety factors.  (*Id.* at 4, 6.)  Plaintiff further alleged that she would be classified as low security if treated as a female under the BOP's policies, and she could not be housed at USP-Tucson or SAU-Allenwood if the BOP treated her as female.  (*Id.* at 4, 10.)

The Court denied Plaintiff's March 16 PI Motion in its May 19, 2023 Screening Order.  (Doc. 23.)  The Court found that "Plaintiff's requested injunctive relief is not of the same character and lies wholly outside the issues" in her SAC, because Plaintiff does not make any allegations concerning transfer to SAU-Allenwood in the SAC and because "Plaintiff's request that the BOP be ordered to treat Plaintiff as a female inmate is diametrically opposed to the permanent injunctive relief she seeks" in the SAC, namely, that the BOP be prohibited "from using sex as a basis for designation or transfer initial determinations." (*Id.* at 8–9.)

In her Motion for Reconsideration, Plaintiff argues that her request that the BOP cease treating her as a male on the basis of her sex assigned at birth and instead treat her as a female consistent with her gender identity lies "at the core" of her SAC, and that her

1   March 16 PI Motion was consistent with that aim.  (Doc. 29 at 1–2.)  Plaintiff argues that

2   the Court misinterpreted Plaintiff's use of the terms "female" and "sex" to "mean the

3   same thing," when Plaintiff intended the term "sex" to refer to her assigned sex and the

4   term "female" to refer to her gender identity.  (*Id.*).  Plaintiff further argues that her

5   requested injunctive relief related to her transfer to SAU-Allenwood is encompassed in

6   the relief requested in her SAC because Allenwood is a male facility, and its Secure

7   Administrative Unit is a "quantum increase in restrictive confinement that makes transfer

8   to a women's prison more difficult."  (*Id.* at 2–3.)

9        Pursuant to Local Rule of Civil Procedure ("LRCiv") 7.2(g)(2), the Court ordered

10  Defendant to respond to the Motion for Reconsideration.  (Doc. 34.)  In its Response,

11  Defendant argues that the injunctive relief requested in Plaintiff's March 16 PI Motion is

12  not sufficiently related to the SAC, that Plaintiff has not satisfied the standard for

13  obtaining a preliminary injunction, and that the requested injunctive relief is not narrowly

14  tailored.  (Doc. 54.)  In her Reply, Plaintiff argues that the requested injunctive relief

15  regarding SAU-Allenwood is connected to the operative SAC because transfer to SAU-

16  Allenwood diminishes her ability to transfer to a women's prison and to access gender-

17  affirming surgery, and because the transfer will result in Plaintiff continuing to be held in

18  solitary confinement in a male facility.  (Doc. 62 at 46, 48.)[5]

19                    **A.    Legal Standard**

20        Motions for reconsideration should be granted only in rare circumstances.

21  *Defenders of Wildlife v. Browner*, 909 F. Supp. 1342, 1351 (D. Ariz. 1995).  A motion for

22  reconsideration is appropriate where the district court "(1) is presented with newly

23  discovered evidence, (2) committed clear error or the initial decision was manifestly

24  unjust, or (3) if there is an intervening change in controlling law."  *School Dist. No. 1J,*

25  *Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).  Motions for

26  reconsideration should ordinarily be denied "absent a showing of manifest error or a

27  showing of new facts or legal authority that could not have been brought to [the Court's]

28  _____
[5] Plaintiff included a Reply in support of her Motion for Reconsideration in the Expanded Motion for Preliminary Injunction that she filed on October 5, 2023.  (Doc. 62.)

1   attention earlier with reasonable diligence." LRCiv 7.2(g)(1). Mere disagreement with a

2   previous order is an insufficient basis for reconsideration. *See Leong v. Hilton Hotels*

3   *Corp.*, 689 F. Supp. 1572, 1573 (D. Haw. 1988).

4             **B.**    **Discussion**

5          A court may grant preliminary injunctive relief only if the relief is "of the same

6   nature as that to be finally granted." *Pac. Radiation Oncology, LLC v. Queen's Med.*

7   *Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015). There must be "a sufficient nexus between the

8   claims raised in a motion for injunctive relief and the claims set forth in the underlying

9   complaint itself." *Id.*

10         The Court agrees with Plaintiff that it erred in finding her requested injunctive

11  relief outside the scope of the SAC's allegations to the extent Plaintiff seeks a

12  preliminary injunction requiring the BOP to treat her as a female inmate. The Court

13  addresses the merits of that requested injunctive relief in Section V(F), *infra*.

14         The Court finds that Plaintiff has not shown clear error in the Court's conclusion

15  that the claims raised in Plaintiff's operative SAC lack a sufficient nexus to Plaintiff's

16  request that the BOP be prohibited from transferring her to SAU-Allenwood.[6] Although

17  SAU-Allenwood is a male institution and Plaintiff's SAC alleges the BOP should house

18  her in a female institution, Plaintiff was housed in a male institution—USP-Tucson—at

19  the time she filed her March 16 PI Motion. Accordingly, prohibiting the BOP from

20  transferring Plaintiff to SAU-Allenwood would not have resulted in Plaintiff being

21  housed in a female institution. Furthermore, although Plaintiff alleges that her transfer to

22  SAU-Allenwood will make "transfer to a women's prison more difficult" (Doc. 29 at 3),

23  she does not allege that she would be unable to transition from SAU-Allenwood to a

24  female prison or to an intermediatory prison in pursuit of confinement consistent with her

25  gender identity.[7] The Court finds that there is simply too tenuous of a connection

26                          
    [6] Plaintiff was transferred to SAU-Allenwood during the pendency of her Motion for

27  Reconsideration. (*See* Doc. 104.) Accordingly, Plaintiff's request for injunctive relief
    prohibiting her transfer appears to be moot, and the Court is without authority to grant the
    requested relief for that reason as well.

28  [7] To the extent Plaintiff argues in her Reply that a transfer to SAU-Allenwood would
    diminish her access to gender affirming surgery (Doc. 62 at 48), the Court notes that

1   between Plaintiff's requested injunctive relief regarding SAU-Allenwood and the Equal

2   Protection claim on which Plaintiff's March 16 PI Motion was premised.[8]   In the

3   alternative, for the reasons discussed in Section V(F)(2) and for failure to satisfy the

4   standards of Federal Rule of Civil Procedure 65(b), the Court finds that Plaintiff is not

5   entitled to a temporary restraining order prohibiting her transfer to SAU-Allenwood.

6   Accordingly, the Court will deny Plaintiff's Motion for Reconsideration to the extent it

7   requests reconsideration of the Court's denial of her request for a temporary restraining

8   order prohibiting her transfer to SAU-Allenwood.

9   **V.      Motions for Injunctive Relief (Docs. 18, 27, 31, 35, 62, 80) and Motions to**

10  **Supplement (Docs. 58, 97, 100)**

11          In the March 16 PI Motion and her numerous other pending Motions for injunctive

12  relief, Plaintiff requests that the Court:

13      1.  Enjoin her transfer from USP Tucson to SAU-Allenwood.  (Doc. 18 at 11; Doc. 80
14          at 11.)

        2.  Require the BOP to treat her as it treats female inmates under its policies and
15          regulations.  (Doc. 18 at 11; Doc. 31 at 58.)

16      3.  Require the BOP to begin Plaintiff's transition to a female facility.  (Doc. 31 at
17          57.)

18      4.  Enjoin the BOP and its staff from performing cross-gender strip searches of
            Plaintiff.  (Doc. 27 at 6.)

19      5.  Enjoin the BOP from using cisgender male inmates or staff to watch Plaintiff on
20          suicide watch.  (*Id.*)

21      6.  Require the BOP to enforce the antiretaliatory regulation of the Prison Rape
            Elimination Act ("PREA"), 28 C.F.R. § 115.67.  (*Id.* at 6-7; Doc. 62 at 2.)

22      7.  Require the BOP to fully investigate Plaintiff's claims of violations of 28 C.F.R. §
23          115.67 and 18 U.S.C. §§ 1512 and 1515.  (Doc. 31 at 57–58.)

24  _____

25  Plaintiff previously sought injunctive relief requiring that she be provided gender
    affirming surgery in *Pinson v. United States Department of Justice*, CV 19-00235-TUC-
26  RM (D. Ariz. 2019).  The Court granted summary judgment against Plaintiff in that case
    (Doc. 127 in CV 19-235), and Plaintiff's appeal remains pending in Ninth Circuit case
27  number 22-15687.
    [8] As stated in Section II, *supra*, in former Count Four of the SAC, Plaintiff alleged a
28  retaliatory request for transfer.  (Doc. 14 at 26–32.)  However, Count Four was dismissed
    on screening (Doc. 23 at 6), and Plaintiff's March 16 PI Motion was premised solely on
    the Equal Protection Claim asserted in Count Two of the SAC (Doc. 18).

8. Require the BOP to provide Plaintiff with the means to identify, locate, and contact potential expert witnesses.  (*Id.* at 57.)

9. Require the BOP to provide Plaintiff with at least two hours of law library time twice per week.  (*Id.*)

10. Require the BOP to provide Plaintiff with access to a photocopier, pen, paper, envelopes, and stamps as needed throughout this case.  (*Id.*)

11. Enjoin the BOP from housing Plaintiff in isolation, which denies her the ability to collect witness declarations and other evidence.  (*Id.*; Doc. 35 at 21.)

12. Enjoin the BOP from continuing to segregate Plaintiff in the SHU.  (Doc. 62 at 2, 60–62.)

13. Enjoin the BOP from withholding Plaintiff's mail containing a Notice of Appeal. (Doc. 35 at 20.)

14. Enjoin the BOP from withholding/tampering with Plaintiff's general correspondence sent by the Brennan Center for Justice.  (*Id.* at 20–21.)

15. Enjoin the BOP from opening and inspecting Plaintiff's legal mail outside her presence.  (*Id.* at 21.)

16. Enjoin the BOP from unreasonably limiting the frequency or duration of Plaintiff's telephone calls with attorneys.  (*Id.*)[9]

As an initial matter, the Court notes that it is improper to file multiple motions seeking the same or overlapping relief.  The practice makes it burdensome for Defendant to respond to Plaintiff's requests and for this Court to adjudicate them.

Furthermore, LRCiv 7.2(e)(1) provides that a motion and its supporting memorandum may not exceed 17 pages.  Pro se litigants are bound by the rules of procedure.  *Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995); *see Carter v. Comm'r of Internal Revenue*, 784 F.2d 1006, 1008 (9th Cir. 1986) ("[a]lthough pro se, [a litigant] is expected to abide by the rules of the court in which [s]he litigates").  Plaintiff has filed motions that far exceed the page limit of LRCiv 7.2, including a 58-page Motion for Temporary Restraining Order to Prevent Further Violations of the First and Fifth Amendments (Doc. 31) and a 65-Page Expanded Motion for Preliminary Injunction

---

[9] To the extent Plaintiff has requested in her Motions the appointment of a special master, the Court finds such appointment is not necessary or appropriate at this time.  The Court also finds that an evidentiary hearing is not necessary or warranted at this time, though it will take Plaintiff's request for an evidentiary hearing under advisement pending the supplemental briefing required by this Order.

(Doc. 62).  While the Court is inclined to give Plaintiff some leeway with respect to hand-written motions, these two Motions so grossly exceed the page limits of LRCiv 7.2 that the Court finds summary denial appropriate.[10]

For the reasons discussed above in Section IV, *supra*, the Court declines to reconsider its finding that Plaintiff's requested injunctive relief prohibiting her transfer to SAU-Allenwood lacks a sufficient nexus to the allegations of her operative SAC. Furthermore, Plaintiff has already been transferred to SAU-Allenwood.  Accordingly, the Court will deny Plaintiff's Renewed Motion for Temporary Restraining Order (Doc. 80), in which Plaintiff renews her already-denied request for an injunction prohibiting her transfer.  (Doc. 80.)  The Court addresses below Plaintiff's other requests for injunctive relief, as well as her related requests to supplement.

## A. Legal Standard

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (internal quotation marks omitted); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right"). Nonetheless, "federal courts must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners" and must not "allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (citation omitted).

A plaintiff seeking a preliminary injunction must show: (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  The moving party has the burden of proof on each element of the test.  *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027

---

[10] In the alternative, the Court finds the Motions should be denied on the merits for the reasons addressed below.

(E.D. Cal. 2000).  When the government opposes a preliminary injunction, "[t]he third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry." *Porretti*, 11 F.4th at 1047.  Under the "sliding scale" test, if a plaintiff shows that the balance of hardships "tips sharply" in her favor, then the plaintiff must only show "serious questions going to the merits"—in addition to satisfying the public interest and irreparable harm factors—in order to justify preliminary injunctive relief.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (finding "serious questions" version of the sliding scale test for preliminary injunctions remains viable after *Winter*).

However, where a plaintiff seeks a mandatory rather than a prohibitory injunction, the plaintiff is "subject to a higher standard." *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017).  To establish an entitlement to mandatory preliminary injunctive relief, the plaintiff must show that "the merits of the case are not 'doubtful'" and that, in the absence of the requested relief, "'extreme or very serious damage will result' that is not 'capable of compensation in damages.'"  *Id.* (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)).  A mandatory preliminary injunction "should not be issued unless the facts and law clearly favor the moving party." *Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993).

Additionally, under the Prison Litigation Reform Act, injunctive relief must be narrowly drawn and be the least intrusive means necessary to correct the harm.  18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

"The urgency of obtaining a preliminary injunction necessitates a prompt determination" and makes it difficult for a party to procure supporting evidence in a form that would be admissible at trial.  *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).  As a result, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  In its determination on

a motion for a preliminary injunction, "a court may properly consider evidence that would otherwise be inadmissible at trial." *Cherokee Inc. v. Wilson Sporting Goods Co.*, No. CV 15-04023 BRO (Ex), 2015 WL 3930041, at *3 (C.D. Cal. June 25, 2015); *see Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (district court did not abuse its discretion by considering "unverified client complaints" and the plaintiff's counsel's interested declaration when it granted a preliminary injunction); *Flynt Distrib. Co.*, 734 F.2d at 1394 (the district court has discretion to rely on hearsay statements when deciding whether to issue a preliminary injunction).  A court may also consider evidence or developments that postdate the pleadings. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

When evaluating the merits of a preliminary injunction motion, a court's factual findings and legal conclusions are not binding at trial on the merits. *Univ. of Tex.*, 451 U.S. at 395.

**B. Preliminary Injunctive Relief Related to Visual Strip Searches and Suicide Watch Observation (Doc. 27)**

On May 26, 2023, Plaintiff filed a Motion for Preliminary Injunction ("May 26 PI Motion") (Doc. 27),[11] in which she makes the following allegations.  Plaintiff is a preoperative transgender woman with well-developed breasts.  (*Id.* at 3.)  On May 6, 2023, Plaintiff emailed the TEC and filed a PREA complaint against a lieutenant after he forced her to walk in her panties in front of a housing tier of male prisoners.  (*Id.* at 4.)  Early the next morning, Plaintiff was taken to suicide watch—although she informed officials she was not suicidal—and Lieutenant Deleon slapped and choked her, forced her to remove her clothes, and subjected her to a strip search in front of male officers and prisoners.  (*Id.* at 4–5.)  Plaintiff was left naked in a suicide cell for nearly 24 hours in view of other prisoners, and the experience was emotionally and mentally traumatizing.  (*Id.* at 5.)  Plaintiff requests an order prohibiting Defendant from (1) performing cross-gender strip searches of Plaintiff, (2) allowing cisgender male prisoners and staff to view

---

[11] Plaintiff sought a temporary restraining order (Doc. 27), but the Court denied the request for a temporary restraining order and construed Plaintiff's May 26, 2023 Motion as seeking a preliminary injunction (Doc. 60).

her on suicide watch, and (3) failing to enforce PREA's antiretaliation regulation.  (*Id.* at 6–7.)

In response, Defendant states that, on May 7, 2023, Lieutenant Deleon placed Plaintiff on suicide watch after receiving a copy of an email Plaintiff had sent to the TEC the day before.  (Doc. 64 at 7–8; Doc. 62-2 at 9–10, Deleon Decl. ¶¶ 29–30 (in part).)[12] In her May 6, 2023 email, Plaintiff reported that Officer Vasquez, a defendant in another civil rights case brought by Plaintiff, had just informed two prisoners in the SHU that Plaintiff had snitched on him.  (Doc. 64-2 at 22.)  Plaintiff explained that Vasquez was the officer who had given Plaintiff a razor three years before, which resulted in Plaintiff cutting herself, but that, despite that incident, prisoners were still getting razors and hurting themselves.  (*Id.*)  Plaintiff also reported that another prisoner submitted a PREA complaint in 2020 and had not been seen or interviewed about his complaint in three years.  (*Id.*)  Plaintiff complained that nothing ever changes, the TEC does not investigate or do anything, and BOP does not follow its own policies.  (*Id.*)  Plaintiff wrote that the TEC will not hold anyone responsible and that:

> blood drips all over this SHU, and will continue to drop until someone dies. Will a suicide wake you people up into taking action?  What exactly has to happen?  Ten suicides?  I mean, this is just stupid in my view, that this stuff happens over and over again and you people in Washington exhibit willful blindness to it . . .
>
> I look forward to the trials coming up, I really do, because I cannot wait for

---

[12] Lieutenant Deleon avers that Plaintiff's email was forwarded to the institution by Dr. Ashley Noble, National Policy Coordinator and a member of the TEC.  (Doc. 64-2 at 9, Deleon Decl. ¶ 29.)  Deleon avers that Dr. Noble believed one sentence in Plaintiff's email caused concern for possible self-harm, and that as result of the email and a phone call with Dr. Noble, Deleon placed Plaintiff on suicide watch.  (*Id.* at ¶¶ 29–30.) Defendant submits a copy of Plaintiff's email; however, the face of the email shows only that it was "FROM 16267064 Pinson, Jeremy Vaughn" and "TO: Transgender Executive Council"—there is no indication that the email was forwarded by Dr. Noble, nor is there any message from Dr. Noble regarding concerns about the email.  (*Id.* at 22.)  Defendant does not submit a declaration from Dr. Noble, there is no medical record documenting Dr. Noble's concerns about Plaintiff's email or mentioning a telephone call from Dr. Noble, and there is no medical record dated May 7, 2023 related to Plaintiff's placement on suicide watch.  (*See* Doc. 66 (sealed medical records).)  Thus, even under the relaxed standards applied in a preliminary injunction analysis, Deleon's statements as to Dr. Noble's beliefs and concerns are unsupported and unreliable.

the nightmare shit-show that is this institution to be aired out in a federal courthouse for the public, the media, and the court to finally see.  Doing nothing is not a problem solving tool guys . . . .

(*Id.*)

Deleon avers that he did not punch, slap, hit, or otherwise strike Plaintiff when placing her on suicide watch, nor did he make any derogatory statements to her or laugh at her.  (Doc. 64-2 at 10, Deleon Decl. ¶ 31.)  Deleon states that no prisoner observed Plaintiff naked or semi-naked as part of the suicide watch; rather Plaintiff was taken to a private room, and she was placed in a suicide safety smock that provides coverage.  (*Id.*)  At the same time, however, Deleon avers that he does not recall who conducted the visual search of Plaintiff, whether Plaintiff requested to be searched by a female, or whether Plaintiff made any statements to him during the interaction on May 7, 2023.  (*Id.* ¶¶ 32–33.)

There are no medical records from May 7, 2023.  (*See* Doc. 66.)  Other medical records show that, in the early morning of May 8, 2023, Plaintiff was seen by chief psychologist James Hayden, who assessed that Plaintiff was a low risk for suicide and that suicide watch was not warranted at the time.  (*Id.* at 66.)  Dr. Hayden documented the reasons for removing Plaintiff from suicide watch, including that Plaintiff did not present with any risk factors for self-harm or suicide, she did not engage in self-harm behavior or make threats of self-harm or suicide, and she was future-oriented and focused on her legal work.  (*Id.* at 60.)  Dr. Hayden noted that the references in Plaintiff's email to self-harm and "blood" dripping all over SHU "were descriptions of her past behavior and the context for these references in her e-mail was her lawsuits against the Bureau."  (*Id.* at 59.)

In opposing Plaintiff's May 26 PI Motion, Defendant argues (1) there is not a sufficient nexus between Plaintiff's requests for injunctive relief and the claims in the SAC; (2) Plaintiff is not likely to succeed on the merits of her claims because BOP policies regarding transgender prisoners are substantially related to penological interests;

(3) Plaintiff has not met the remaining factors required for a preliminary injunction; and (4) Plaintiff's request for relief is not narrowly tailored. (Doc. 64.)

With respect to Plaintiff's request that female officers conduct any strip searches of Plaintiff, Defendant submits evidence showing that, under BOP policy guidelines, for purposes of a visual search, which includes all body surfaces and body cavities, prisoners are searched in accordance with the gender housed at the institution. (Doc. 64 at 5 n.3; Doc. 64-2 at 7, Deleon Decl. ¶ 19.)   However, a transgender prisoner may submit an Inmate Request to Staff to the Warden for an exception to the requirement that the prisoner be searched in accordance with the gender housed at the institution. (Doc. 64-2 at 7, Deleon Decl. ¶¶ 20–21.)  Upon receipt of such a request, the Warden consults with Health Services, Psychology Services, Unit Management, and Correctional Services, and if the request is approved, an exception will be described in a memorandum, communicated to staff, reflected in SENTRY (the BOP database), and noted on the prisoner's identification badge. (*Id.* ¶¶ 20–22.)  If the request is denied, the prisoner may request a review by the TEC through the BOP's Administrative Remedy Program. (*Id.* ¶ 21.)  Defendant asserts that Plaintiff has not made a request to the Warden to be placed on the female-only visual search list. (*Id.* ¶ 32.)

In her Reply, Plaintiff avers that, prior to May 7, 2023, she had submitted a female-only visual search request to Warden Damon Colbert, who granted the request. (Doc. 77-1 at 1–2, Pl. Decl. ¶ 6.)  Plaintiff avers that she was never provided notice that Warden Mark Gutierrez removed Plaintiff from the female-only visual search list. (*Id.*)  Plaintiff also avers that the suicide smock she was given was too small for her body, and Deleon and other officers refused to provide a larger sized smock; therefore, she was forced to remain naked and sleep naked in the suicide cell while being watched by two prisoner monitors, both of whom were known to Plaintiff and are convicted sex offenders. (*Id.* ¶¶ 3–5.)

. . . .

. . . .

- 16 -

### 1.  Nexus Between Complaint and Injunction Request

As discussed above, this Court does not have authority to issue injunctive relief when the injunction deals with a matter lying wholly outside the issues in the suit.  *See Pac. Radiation Oncology*, 810 F.3d at 633.  Plaintiff's May 26 PI Motion seeks to require female officers to strip search Plaintiff and to prohibit cisgender male prisoners and staff from viewing her on suicide watch.  (Doc. 27 at 6–7.)  Plaintiff's SAC sets forth Eighth Amendment claims arising from mental health treatment, or the lack thereof, related to her transgender status and gender dysphoria, and the accompanying difficulties that result from Defendant's alleged failure to adequately treat her, protect her from harm, and properly house her.  *See Edmo v. Corizon*, 935 F.3d at 786 (9th Cir. 2019) (serious medical needs under the Eighth Amendment "can relate to physical, dental and mental health").  Both Plaintiff's May 26 PI Motion and her SAC relate to Plaintiff's status as a transgender prisoner and to conditions and treatment that affect her mental health.  The Court finds it has authority to consider Plaintiff's injunctive requests for female visual strip searches and female suicide watch observers, as the requests are sufficiently related to the Eighth Amendment claims asserted in the SAC.  However, as discussed in Section V(C), *infra*, Plaintiff's request that the BOP be required to enforce PREA's anti-retaliation provision does not bear a sufficient nexus to the remaining claims in Plaintiff's SAC, and the Court is therefore without authority to grant that request.

### 2.  Narrowly Tailored Request

Defendants argue that requiring female-only visual strip searches and preventing male staff and prisoners from viewing Plaintiff on suicide watch would significantly hamper the BOP's ability to conduct searches for safety and to address suicidal crises that Plaintiff may experience in the future.  (Doc. 64 at 15–16.)

Plaintiff's request for female-only visual searches is a specific, narrowly tailored request and one that Defendants, according to their own evidence, can and do accommodate in certain situations.  As such, the Court rejects Defendants' argument that accommodating such a request would significantly hamper the BOP's ability to conduct

1    searches for safety.

2        Plaintiff's request that only female staff and prisoners view her while on suicide

3    watch, however, is not a narrowly tailored request.   The PLRA requires that, in

4    fashioning prospective relief with respect to prison conditions, "[t]he court shall give

5    substantial weight to any adverse impact on public safety or the operation of a criminal

6    justice system caused by the relief."   18 U.S.C. 3626(a)(1).   As Defendants argue,

7    continual monitoring of a prisoner considered suicidal serves an important penological

8    interest.   (*See* Doc. 64 at 12–13.)   The BOP's Program Statement governing suicide

9    prevention states that a prisoner believed to be suicidal should be under continuous

10   observation and that, for all suicide watches, there must be observation, which may be

11   conducted by prisoners who are specially selected and trained as prisoner observers.[13]

12   Because there are no female prisoners available to be prisoner observers in Plaintiff's

13   facility, Plaintiff's request is that only female staff view her on suicide watch.[14]   When

14   trying to balance the need to fairly accommodate Plaintiff's right to adequate mental

15   health care as it relates to her transgender status and any adverse impact on the operations

16   of the BOP, the Court finds that an order requiring only female staff members to view

17   Plaintiff while on suicide watch would interfere with staffing and operations.   Depending

18   on  the  number  of  female  staff  members  employed  at  Plaintiff's  institution  of

19   confinement,  such  an  order  may  greatly  interfere  with  work  schedules  and  the

20   administration of the facility.   Thus, Plaintiff seeks a significantly intrusive form of relief

21   that the Court is unable to award at this time.

22       Moreover, there is a less-intrusive remedy that would address the harm alleged by

23   Plaintiff.   Much of the harm and trauma Plaintiff allegedly suffered when on suicide

24   watch in May 2023 appears to stem from being housed in a suicide cell while practically

25   naked and viewed by two male prisoner observers.   The record shows that a suicide

---

[13]   *See* BOP Program Statement No. 5324.08, Suicide Prevention Program, https://www.bop.gov/policy/progstat/5324_008.pdf (last visited Jan. 25, 2024).

[14]  Plaintiff filed her Motion while housed at USP-Tucson and has since been transferred to SAU-Allenwood.   Both USP-Tucson and SAU-Allenwood are male prisons; accordingly, no female prisoners are available to serve as prisoner observers at either institution.

safety smock is to be provided to prisoners on suicide watch. (*See* Doc. 64-1, Deleon Decl. ¶¶ 30–31 & n.6.) A suicide smock—if appropriately sized—would alleviate the very harm Plaintiff suffered. (*See* Doc. 64-1, Deleon Decl. ¶¶ 30–31 & n.6.) Although Plaintiff alleges that, on May 7, 2023, she was given a smock that was too small and therefore did not provide coverage, her allegations support that this was an isolated incident involving BOP personnel who were acting contrary to BOP policy.

### 3.  Female-Only Visual Search

Plaintiff's remaining claim for injunctive relief in the May 26 PI Motion is her request for an order for female-only visual searches. As stated, this request for relief relates to Plaintiff's underlying Eighth Amendment mental health care claim that the treatment and conditions she is subject to in a male prison negatively affect her mental health and exacerbate her gender dysphoria.

### a.  Likelihood of Success on Merits

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard. First, a prisoner must show a "serious medical need." *Id.* (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). As stated, "[s]erious medical needs can relate to 'physical, dental and mental health.'" *Edmo*, 935 F.3d at 785.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir.

1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).

Medical records submitted by Defendant show that Plaintiff has been diagnosed with gender dysphoria. (Doc. 66 at 6, 8.) The Ninth Circuit has recognized that gender dysphoria is a sufficiently serious medical need that implicates the Eighth Amendment. *Edmo*, 935 F.3d at 785. Plaintiff must therefore show that Defendant's response to her serious medical need exhibits deliberate indifference; specifically, that visual strip searches performed by male officers constitutes deliberate indifference to her gender dysphoria.

The Ninth Circuit has found that "incarcerated prisoners retain a limited right to bodily privacy." *Michenfelder v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988). "Shielding one's unclothed figure from the view of strangers, particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *Id.* Courts have recognized the "frightening and humiliating invasion" occasioned by a strip search "even when conducted with all due courtesy." *Way v. Cnty. of Ventura*, 445 F.3d 1157, 1160 (9th Cir. 2006) (internal quotation marks omitted); *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1143 (9th Cir. 2011). While some visual body cavity searches of prisoners may be reasonable, others can "be excessive, vindictive, harassing, or unrelated to any legitimate penological interest." *Michenfelder*, 860 F.2d at 322. The Seventh Circuit has expressed that "one of the clearest forms of degradation in Western Society is to strip a person of his clothes. The right to be free from strip searches and degrading body inspections is thus basic to the concept of privacy." *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994). And it is "a greater invasion to have one's naked body viewed

by a member of the opposite sex." *Id.*

An Eighth Amendment violation has been found where female prisoner plaintiffs, found to be particularly vulnerable to a severe psychological injury from the search, are subjected to random cross-gender clothed body searches unrelated to prison security. *Jordan v. Gardner*, 986 F.2d 1521, 1525–28 (9th Cir. 1993) (finding cross-gender body search policy constituted unnecessary "infliction of pain" under the Eighth Amendment where women prisoners had "shocking histories of verbal, physical, and, in particular, sexual abuse" by men). The Ninth Circuit and numerous other circuit courts have held that cross-gender strip searches involving contact, absent emergency circumstances, are unreasonable under the Fourth Amendment. *See Byrd v. Maricopa Cnyt. Sheriff's Dep't*, 629 F.3d 1135, 1146–47 (9th Cir. 2011); *Moore v. Carwell*, 168 F.3d 234, 235 (5th Cir. 1999); *Lee v. Downs*, 641 F.2d 1117, 1120 (4th Cir. 1981).

The Supreme Court has directed courts that review strip searches in the prison context to consider and balance the scope of the intrusion, the manner in which the search is conducted, the justification for initiating it, and the place in which the search is conducted. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Absent extenuating circumstances, strip searches should be conducted in private. *See Amaechi v. West*, 237 F.3d 356, 364 (4th Cir. 2001) ("we have repeatedly emphasized the necessity of conducting a strip search in private"); *Michenfelder*, 860 F.3d at 333 (noting that strip searches conducted in a private cell supported finding of reasonableness).

The Court has not found a Ninth Circuit case specifically addressing whether transgender female prisoners have a right to be strip searched by female officers only. But Plaintiff cites to *Doe v. Massachusetts Department of Corrections*, which granted an injunction requiring the defendant prison officials to utilize female corrections officers whenever feasible when conducting strip searches of the plaintiff—a transgender female prisoner. No. 17-12255-RGS, 2018 WL 1156227 (D. Mass. March 5, 2019). Defendant insists that reliance on *Doe* is misplaced because the relief granted in *Doe* was "much narrower" than Plaintiff's request for "the use of female officers in every instance."

(Doc. 64 at 14.)  The plaintiff in *Doe* specifically requested, among other relief, an order to "enjoin Defendants from using male correctional officers to conduct strip searches of Jane Doe, except in exigent circumstances[.]"  2018 WL 1156227, at *1, n.2.  This request is virtually identical to Plaintiff's request, which is for an order to enjoin Defendants "from performing cross-gender strip searches of Plaintiff."  (Doc. 27 at 6.) *Doe* shows that an injunction enjoining prison officials from using male officers to conduct strip searches of transgender female prisoners is not novel.

Plaintiff also cites to the WPATH Standards of Care to support that a component of treatment under WPATH includes "social transitioning."  (Doc. 77 at 6.)  "Most courts agree" that the WPATH Standards of Care "are the internationally recognized guidelines for the treatment of individuals with gender dysphoria."  *Endo*, 935 F.3d at 769 (quotation omitted).  Social transitioning refers to "the ability to live consistently with one's gender identity," such as dressing and grooming accordingly, using pronouns for one's gender identity, and other accommodations.  *Keohane v. Fla. Dep't of Corrs. Secretary*, 952 F.3d 1257, 1263–64 (11th Cir. 2020).

Plaintiff is diagnosed with and takes hormones for gender dysphoria, she identifies as female, Defendant is aware of her diagnosis and female gender identity, and she avers that a male-conducted visual strip search was emotionally traumatizing for her.  (Doc. 27 at 5.)  Considering the holdings in *Edmo*, *Jordan*, and *Doe*, and pursuant to the WPATH Standards of Care, an accommodation in the form of utilizing female officers for visual strip searches of Plaintiff is reasonable in the circumstances, and Defendant's failure to make such an accommodation may rise to deliberate indifference.

### b.  Irreparable Injury

The second *Winter* factor requires Plaintiff to demonstrate that, absent an injunction, she will be exposed to irreparable harm.  *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see Winter*, 555 U.S. at 22.  "[T]here must be a presently existing threat of harm, although injury need not be certain to occur." *Villaneuva v. Sisto*, CIV S-06-2706 LKK EFB P, 2008 WL 4467512, at *3 (E.D. Cal.

Oct. 3, 2008) (citing *FDIC v. Garner*, 125 F.3d 1272, 1279–80 (9th Cir. 1997)). Speculative injury is not irreparable injury sufficient for a preliminary injunction. *Caribbean Marine*, 844 F.2d at 674. To support a mandatory preliminary injunction, a plaintiff must demonstrate ongoing harm or the present threat of irreparable injury, not a past injury. *See Conn. v. Mass.*, 282 U.S. 660, 674 (1931) (an injunction is only appropriate "to prevent existing or presently threatened injuries"); *Caribbean Marine*, 844 F.2d at 674.

Plaintiff identifies as female and is continuing her gender dysphoria treatment and social transitioning. Plaintiff alleges that being subjected to male-conducted visual strip searches is traumatizing. (Doc. 27 at 5.) Meanwhile, Defendant's evidence establishes that, pursuant to regulation, visual strip searches of prisoners are conducted by BOP staff in numerous instances: when there is a reasonable belief that a prisoner is concealing contraband; when a good opportunity for concealment has occurred; upon placement in the SHU; when leaving the institution; upon re-entry into the institution; and, as demonstrated here, upon placement on suicide watch. (Doc. 64-2 at 6–7, Deleon Decl. ¶ 18 (citing 28 C.F.R. 552.11(c)(1)).) It is not speculative that Plaintiff will be subject to more visual strip searches while in BOP custody. Thus, as long as Plaintiff is subject to searches by male officers, there exists a present threat of irreparable injury.[15]

### c.  Balance of Equities and Public Interest

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quotation marks omitted). Because Defendant already provides an exception to transgender prisoners allowing for female-only visual strip searches, Defendant cannot argue that it will suffer harm if Plaintiff's request for injunctive relief is granted. Conversely, without an injunction, Plaintiff risks being subjected to male officer searches and the accompanying emotional and mental trauma those searches cause due to her

---

[15] Plaintiff's transfer to SAU-Allenwood does not diminish the threat of irreparable injury from male-officer searches, because SAU-Allenwood, like USP-Tucson, is a male institution.

gender dysphoria. Accordingly, the balance of equities tips sharply in Plaintiff's favor.

Lastly, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Porretti*, 11 F.4th at 1047. And "the public has a strong interest in the provision of constitutionally-adequate health care to prisoners." *McNearney*, 2012 WL 3545267, at \*16 (quoting *Flynn v. Doyle*, 630 F. Supp. 2d 987, 993 (E.D. Wis. 2009)). Here, it is in the public interest to ensure that Plaintiff receives constitutionally adequate mental health care and accommodations for her gender dysphoria.

### 4. Additional Briefing

As stated, Defendant has a process in place for transgender prisoners to request to be searched by a staff member of the prisoner's identified gender. (Doc. 64-2 at 7, Deleon Decl. ¶ 20.) In her Reply, Plaintiff alleges that she had previously been granted such an exception, but Warden Gutierrez canceled it. The Court will stay a ruling on Plaintiff's May 26 PI Motion until the question of Plaintiff's status for an exception for female-officer searches has been further briefed. Defendant will be directed to file a Response explaining whether Plaintiff was previously granted an exception for female-officer searches, and, if so, why the exception was canceled even though Plaintiff's transgender status has not changed. Defendant shall also address in the Response whether and how Plaintiff's transfer to SAU-Allenwood has affected her status for an exception for female-officer searches.

### C. Preliminary Injunctive Relief Related to Retaliation (Docs. 27, 31, 62)

Plaintiff requests injunctive relief requiring the BOP to enforce PREA's anti-retaliation regulation and to fully investigate Plaintiff's claims of retaliation and witness tampering. (Doc. 27 at 6; Doc. 31 at 57-58; Doc. 62 at 2.) As stated above, although Plaintiff alleged in former Count Four of the SAC that Defendants conspired to retaliate against her for filing lawsuits (Doc. 14 at 26-33), the Court dismissed Count Four on screening (Doc. 23 at 6). The remaining claims of the SAC do not allege retaliation. Plaintiff's requested injunctive relief related to retaliation and witness tampering by BOP

1  staff does not bear a sufficient nexus to Plaintiff's remaining Eighth Amendment claims

2  for inadequate medical care and threat to safety/failure to protect, or to her Fourteenth

3  Amendment Equal Protection claim.  *See Pac. Radiation Oncology*, 810 F.3d at 633.  If

4  Plaintiff seeks to add a retaliation claim for injunctive relief under 28 U.S.C. § 1331, she

5  must move for leave to amend or supplement her SAC.[16]

6  **D. Preliminary Injunctive Relief Related to Access to the Courts (Docs.**

7  **31, 35)**

8  In her Motion for Temporary Restraining Order to Prevent Further Violations of

9  the First and Fifth Amendments,[17] Plaintiff alleges that on June 12, 2023, Mailroom

10  Officer Felix came to Plaintiff's cell to deliver legal mail and a photocopy of

11  correspondence from a news reporter.  (Doc. 31 at 1–2.)  Felix asked Plaintiff what she

12  was going to say to the media about him and USP-Tucson, to which Plaintiff responded

13  that she would tell the truth, it was none of Felix's business, and Felix could read it when

14  the article is published.  (*Id.* at 2.)  Felix then said to Plaintiff, "oh yeah, well you just got

15  your last piece of mail, period," and Felix refused to accept or mail Plaintiff's outgoing

16  legal mail.  (*Id.*)

17  Plaintiff asserts that she has been denied the right to assistance; she has no ability

18  to hire an expert witness; her ability to litigate this matter has been frustrated or impeded;

19  and she has been denied access to legal materials, a law library, a photocopier, a copy of

20  the Court's Local Rules, and her legal files and papers.  (*Id.* at 5–9, 11–12.)  Plaintiff

21  states that, without legal access, she is unable to properly draft motions and complaints.

---

22  [16] Plaintiff cannot seek monetary damages for a First Amendment retaliation claim

23  pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).  *See Egbert v. Boule*, 596 U.S. 482, 498 (2022).  However, she can still seek injunctive relief

24  pursuant to 28 U.S.C. § 1331.  *See Simmat v. United States Bureau of Prisons*, 413 F.3d 1225, 1232 (10th Cir. 2005) ("Section 1331 provides jurisdiction for the exercise of the

25  traditional powers of equity in actions arising under federal law.  No more specific statutory basis is required"); *see also Corr. Serv. Corp. v. Malesko*, 534 U.S. 61, 74

26  (2001) ("unlike the *Bivens* remedy, which we have never considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally").

27  [17] The Court finds that Plaintiff has not met the requirement for a temporary restraining order under Rule 65(b) of the Federal Rules of Civil Procedure, as she does not indicate

28  any effort to give notice to Defendant or state why notice should not be required.  The Court construes Plaintiff's Motion as seeking a preliminary injunction.

(*Id.* at 14–15, 18.)  Plaintiff argues she has suffered actual injury as demonstrated by the dismissal of her original and First Amended Complaints, the denial of her request for counsel, and the denials of her prior preliminary injunction motions.  (*Id.* at 8, 14.) Plaintiff asks the Court to issue injunctive relief requiring the BOP to provide her with the means to identify, locate, and contact potential expert witnesses; provide her with at least two hours of law library time twice per week; provide her with access to a photocopier, pen, paper, envelopes, and stamps as needed; and cease interfering with her ability to collect witness declarations and evidence.  (*Id.* at 57.) Plaintiff requests an evidentiary hearing and renews her request for counsel.  (*Id.* at 42–57.)[18]

In her Motion for Preliminary Injunction to Protect Access to the Courts, Plaintiff asserts that her outgoing mail—except for certified or legal mail—is not being mailed out.  (Doc. 35 at 1.)  In her declaration supporting the Motion, Plaintiff avers that, beginning in May 2023, she began receiving letters from individuals to whom Plaintiff had written but who had not received her letters, as evidenced by their correspondence. (Doc. 35-1 at 1, Pl. Decl. ¶ 2.)  Plaintiff attaches a portion of a letter from an individual who states she had not heard from Plaintiff.  (*Id.*, Attach. A.)  Plaintiff also avers that, on May 27, 2023, she placed into the mail a prepaid-postage envelope containing a Notice of Appeal that appealed this Court's denial of Plaintiff's preliminary injunctions but that, to Plaintiff's knowledge, was not mailed to the Court.  (*Id.* ¶ 4.)  Plaintiff states that other mail she received, including from the Brennan Center for Justice, did not include attachments that were mentioned in the correspondence.  (*Id.* ¶ 5, Attach. B.)  Plaintiff avers that she never received a legal book she purchased from Prison Legal News and that legal mail sent to her has been opened outside her presence and photocopied.  (*Id.*

---

[18] In this Motion, Plaintiff also requests that the BOP be required to investigate her claims of retaliation, that the BOP be required to use its female procedures for her, that the BOP be required to begin her transition to a female facility, and that the BOP cease isolating her.  (*Id.* at 57-58.)  The Court addresses the requested injunctive relief related to retaliation in Section V(C), *supra*.  The Court addresses the requested relief related to female procedures and transition to a female facility in Section V(F), *infra*.  The Court addresses the requested relief related to isolated housing in Section V(E), *infra*. Plaintiff's request for an evidentiary hearing is denied.   Plaintiff's request for appointment of counsel is taken under advisement and will be resolved when the Court issues a ruling on her Renewed Motion for Appointment of Counsel (Doc. 111).

¶¶ 6, 8.)  And Plaintiff avers that mail sent to her from the U.S. Attorneys' Office in Oklahoma on June 13, 2023, was not received by her until July 14, 2023.  (*Id.* ¶ 16.)  Plaintiff requests an injunction requiring the BOP to immediately cease withholding the envelope to this Court that contains Plaintiff's Notice of Appeal; cease tampering with and withholding Plaintiff's general correspondence, publications, and books sent to Plaintiff by the Brennan Center for Justice; cease opening legal mail outside Plaintiff's presence; cease prohibiting her access to prisoner witnesses; and cease unreasonably limiting her telephone access to attorneys.  (Doc. 35 at 20–21.)[19]

### 1.  Legal Standard

Although a court generally may not issue an injunction for relief on claims not pled in the operative complaint, an exception arises when the injunctive relief sought is related to a prisoner's access to the court.  *See Prince v. Schriro, et al.*, CV 08-1299-PHX-SRB, 2009 WL 1456648, at *4 (D. Ariz. May 22, 2009) (where the relief sought relates to a prisoner's access to the court, "a nexus between the preliminary relief and the ultimate relief sought is not required[,]" and the court need not consider the merits of the underlying complaint) (citing *Diamontiney v. Borg*, 918 F.2d 793, 796 (9th Cir. 1990)).

The constitutional right of access to the courts encompasses a right to litigate without active interference.  *See Silva v. Di Vittorio*, 658 F.3d 1090, 1102 (9th Cir. 2011), *overruled on other grounds by Richey v. Dahne*, 807 F.3d 1202, 1209 n.2 (9th Cir. 2015).  To support an active interference claim, a prisoner must allege facts showing that officials' actions hindered the ability to litigate and that, as a result, the prisoner suffered an actual injury.  *Silva*, 658 F.3d at 1102; *see Lewis v. Casey*, 518 U.S. 343, 349 (1996) (to maintain an access-to-the-courts claim, a prisoner must show an "actual injury" resulting from the defendant's actions).  Actual injury must be "actual prejudice . . . such as the inability to meet a filing deadline or to present a claim." *Lewis*, 518 U.S. at 348–49.

---

[19] Plaintiff also requests in this Motion an injunction requiring the BOP to cease isolating her in the USP-Tucson SHU.  (Doc. 31 at 20–21.)  That request is addressed in Section V(E), *infra*.

**2.  Discussion**

It appears Plaintiff's transfer to SAU-Allenwood may render moot her injunctive relief requests related to access to the courts, as the requests are premised on practices occurring at USP-Tucson.  Regardless, Plaintiff is not entitled to the requested relief because she has not shown actual injury.

Because prisoners do not have a "freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar." *Lewis*, 518 U.S at 351.  Rather, the inmate must "demonstrate that the alleged shortcomings in the library or legal assistance program hindered [her] efforts to pursue a legal claim." *Id.*

Dismissal with leave to amend of Plaintiff's original Complaint and the First Amended Complaint are not evidence of actual injury, because Plaintiff was given the opportunity to correct deficiencies and again present her claims.  Nor does denial of Plaintiff's motions for injunctive relief constitute actual injury.  When determining whether a plaintiff states a claim for relief or demonstrates entitlement to a preliminary injunction, the Court looks at the facts alleged; no legal citations are necessary to support a constitutional or federal claim.  *See Alvarez v. Hill*, 518 F.3d 1152, 1157–59 (9th Cir. 2008) ("[a] complaint need not identify the statutory or constitutional source of the claim raised"); *Huftile v. Miccio-Fonseca*, No. CIV-S-1522 FCD DAD P, 2009 WL 3011426, at *8 (E.D. Cal. Sept. 17, 2009) ("in seeking prospective injunctive relief, plaintiff must *allege facts* that if proven would establish that [s]he is likely to suffer future injury if defendant is not so enjoined") (emphasis added) (citing *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999)).  Accordingly, lack of access to a law library or to legal materials does not affect a plaintiff's ability to present relevant facts in support of a claim or a request for injunctive relief.

Further, the prior denial of appointment of counsel does not constitute actual injury.  There is no constitutional right to the appointment of counsel in a civil case.  *Aidr Int., LLC v. Starr Indem. & Liab. Co.*, 994 F.3d 1032, 1038–39 (9th Cir. 2021).

Appointment of counsel under 28 U.S.C. § 1915(e)(1) is required only when "exceptional circumstances" are present, a consideration that takes into account a plaintiff's ability to articulate her claims pro se. *Terrell v. Brewer*, 935 F.2d 1015, 1017 (9th Cir. 1991). The docket in this matter shows that Plaintiff has been able to present her claims to the Court, and the Court found she sufficiently stated constitutional claims in her SAC. In addition, Plaintiff has filed numerous motions; has responded to Defendant's motions; and has presented evidence in the form of declarations, BOP policies, federal regulations, materials copied from LexisNexis, BOP memoranda, and medical records. Even with the limitations imposed on Plaintiff as a federal prisoner, she has shown an ability to articulate her claims and litigate this action.

Plaintiff alleges that her Notice of Appeal, which was placed in the mail on May 27, 2023, was never sent to the Court. Plaintiff states that this Notice of Appeal was an appeal of the denial of injunctive relief in the Court's Order at Doc. 23 "and all other denials of Motions seeking preliminary injunctions[.]" (Doc. 35-1 at 1, Pl. Decl. ¶ 4). The docket does not include a Notice of Appeal; thus, it was never received by the Court. However, Plaintiff was able to move for reconsideration of the Court's Order at Doc. 23. (*See* Doc. 29.) Moreover, the denial of the Motions for Preliminary Injunction at Docs. 7 and 18 were denials without prejudice, meaning that Plaintiff may refile her requests for relief. In these circumstances, Plaintiff cannot establish actual injury from a failure to mail her Notice of Appeal.

Although Defendant's failure to give Plaintiff the attachments that were included with a letter from the Brennan Center for Justice, and Defendant's apparent failure to mail out some of Plaintiff's personal correspondence are concerning, Plaintiff fails to show how either of these instances constitutes an actual injury.

As to Plaintiff's request that legal mail be opened in her presence, there is no doubt that "prisoners have a protected First Amendment interest in having properly marked legal mail opened only in their presence." *Hayes v. Idaho Corr. Center*, 849 F.3d 1204, 1211 (9th Cir. 2017). But "mail from the courts, as contrasted to mail from a

prisoner's lawyer, is not legal mail." *Id.* (quoting *Keenan v. Hall*, 83 F.3d 1083, 1094 (9th Cir. 1996). Plaintiff submits a copy of a United States Bankruptcy Court, Southern District of New York document titled "Notice of Deadlines for Filing Proofs of Claim," which sets out the deadlines for individuals to file proofs of claim in a debtor's chapter 11 case, and which Plaintiff states was sent to her from the law firm of Skadden, Arps, Slate, Meagher & Flom LLP. (Doc. 35-2 at 3–6.) Plaintiff also submits a copy of an envelope addressed to Plaintiff from GLAAD Legal Advocates and labeled "Legal Mail from Attorney Office, Do Not Open." (Doc. 35-2 at 3–6, 8.) Plaintiff avers generally that these documents, which constitute legal mail, were opened outside of her presence, read, and photocopied. (Doc. 35-1 at 2, Pl. Decl. ¶ 8.) But Plaintiff does not present any specific facts to show personal knowledge that the documents were in fact opened outside of her presence, read, and photocopied. Without more, she fails to state a claim for a First Amendment violation based on officials opening legal mail outside of her presence.

Plaintiff alleges that she "has attorneys in several cases," but is limited to one 15-minute phone call a month to family and attorneys and can otherwise only speak with an attorney if that attorney requests a private call. (Doc. 35 at 11–12.) "The right of access to courts has been found to encompass the right to talk in person and on the telephone with counsel in confidential settings[.]" *Hydrick v. Hunter*, 500 F.3d 978, 999 (9th Cir. 2007), *vacated and remanded on other grounds by* 556 U.S. 1256 (2009). But the right to speak with counsel privately on the telephone under the right to access courts is subject to "legitimate restrictions related to the purpose and circumstances of detention." *Id.* at 999-1000. Plaintiff does not explain how Defendant's restrictions on telephone use has interfered with her ability to litigate this case or any of her other cases. Plaintiff claims that she cannot initiate a telephone call to an attorney in an emergency; however, she does not allege or show that there has been such an emergency, that she suffered harm as a result of being unable to make a call to an attorney, or that there is a likelihood she will need to make an emergency telephone call to an attorney. (Doc. 35 at 12.)

In sum, Plaintiff fails to show actual injury or the likelihood of actual injury as required to support an access-to-the-court claim. Accordingly, her requests for injunctive relief related to access to the courts will be denied.

### E. Preliminary Injunctive Relief Related to Solitary Confinement (Docs. 31, 35, 62)

Plaintiff seeks injunctive relief enjoining the BOP from segregating her in the SHU at USP-Tucson. (Doc. 31 at 57; Doc. 35 at 21; Doc. 62 at 2, 60–62.) Plaintiff has been transferred from USP-Tucson to SAU-Allenwood, and therefore the requested injunctive relief is moot to the extent Plaintiff seeks release from the SHU at USP-Tucson. However, if liberally construed to request release from segregated confinement in general, the requests are not moot, because Plaintiff avers she remains housed in solitary confinement at SAU-Allenwood. (*See* Doc. 100 at 2.)

Even if Plaintiff's requested injunctive relief is not moot, however, the Court is without authority to grant the relief because it does not bear a sufficient nexus to the remaining claims in Plaintiff's operative SAC. Plaintiff alleged retaliatory placement in the SHU in former Count Four of the SAC, but as discussed above, Count Four was dismissed on screening. Plaintiff's requests for preliminary injunctive relief requiring the BOP to release her from solitary confinement to the general population of a male institution do not have a sufficient nexus to the remaining claims of the SAC, which allege that Plaintiff should be treated as female and housed in a female institution. If Plaintiff seeks injunctive relief related to allegations that the BOP has housed her in solitary confinement and transferred her to SAU-Allenwood in retaliation for her litigiousness, or if she seeks to challenge her confinement in segregation under the Fifth or Eighth Amendments, Plaintiff may move to amend her SAC.

The Court also notes that Plaintiff has filed Petitions Under 28 U.S.C. § 2241 for a Writ of Habeas Corpus requiring her release from segregation or solitary confinement in CV-23-00074-RM and CV-23-00273-RM.[20] It is uncertain whether the Court has habeas

---

[20] Plaintiff filed a similar Petition in CV-20-00071-RM and has an ongoing appeal of that case pending in Ninth Circuit case number 23-15025.

jurisdiction in those cases.  *See Pinson v. Carvajal*, 69 F.4th 1059, 1070-72 (9th Cir. 2023).  But Plaintiff may move to amend her SAC in this case to assert claims for injunctive relief under 28 U.S.C. § 1331 for the claims asserted in the § 2241 Petitions.

### F. Preliminary Injunctive Relief Related to Female Policies and Transition to a Female Institution

Plaintiff requests injunctive relief requiring the BOP to treat her as female under its policies and regulations (Doc. 18 at 11; Doc. 31 at 58) and to begin transitioning her to a female institution (Doc. 31 at 57).  In support of this requested injunctive relief, Plaintiff avers that, because she has been designated maximum custody pursuant to the BOP's classification system for male inmates under Program Statement 5100-08, she has been categorically excluded from housing in lesser security institutions and from gender confirmation surgery.  (Doc. 18-1 at 1–4; Doc. 31-1 at 4–5.)  She avers that, due to her gender dysphoria, her ineffective hormone therapy, her inability to obtain gender confirmation surgery, and her housing in male institutions, she has endured physical and sexual assaults as well as pervasive sexual harassment; she has attempted suicide and auto-castration repeatedly; and she has suffered from depression, post-traumatic stress disorder, and anxiety.  (*Id.* at 5–7.)  Plaintiff submits a response to a March 31, 2023 Request for Administrative Remedy, which states that Plaintiff's public safety factors have been appropriately scored using the BOP's male classification procedures because the scores are based off an inmate's designated institution.  (Doc. 31-4 at 1.)  Plaintiff also submits a response to a July 21, 2023 Regional Administrative Remedy Appeal, stating that Plaintiff's custody classification score was calculated using the BOP's male procedures because Plaintiff is housed in a male facility.  (Doc. 62-1 at 7.)

In response, Defendant explains that the BOP's Transgender Offender Manual, Program Statement 5200-08, requires initial and transfer designations involving transgendered inmates to be referred to the TEC, which designates transgender inmates "on a case-by-case basis, with consideration to the inmates' security level, criminal and behavioral/disciplinary history, current gender expression, programming, medical, and

mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse." (Doc. 54 at 2–3; *see also* Doc. 54-2 at 17.) Defendant avers that the current iteration of the Transgender Offender Manual does not require the TEC to consider biological sex as the initial determination in making designation and transfer placements. (Doc. 54 at 3, 15; *see also* Doc. 54-2 at 12–25.) Defendant avers that the TEC has determined Plaintiff should be housed in male facilities based on the factors listed in the Transgender Offender Manual, including Plaintiff's high security classification, maximum custody level, failure to meet hormone treatment goals, and failure to maintain clear conduct. (Doc. 54 at 4–5.)

Defendant argues that its policies survive intermediate scrutiny under the Equal Protection Clause because (1) the BOP's segregation of inmates into male and female facilities "is substantially related to its important interest in preventing sexual assault and disparate impacts to its female prison population"; (2) the BOP provides transgender inmates "a meaningful opportunity to be housed in a facility that matches their gender identities"; and (3) requiring the BOP to automatically designate transgendered inmates to a facility matching the inmate's gender identity—as opposed to using the individualized, case-by-case approach set forth in the Transgender Offender Manual— would put female inmates at undue risk of sexual assault. (Doc. 54 at 11–14.) Defendant further argues that Plaintiff has no constitutional right to a particular security classification or to be housed in any particular prison. (*Id.* at 14–15.) Accordingly, Defendant argues that Plaintiff cannot show a likelihood of success on the merits supporting her requested preliminary injunctive relief. (*Id.* at 8–16.) Defendant further argues that Plaintiff's allegations concerning violence and harassment that she experienced at USP-Tucson do not demonstrate she is likely to suffer irreparable harm at SAU-Allenwood. (*Id.* at 16.) Finally, Defendant argues that the balance of equities and the public interest weigh in favor of denying Plaintiff's requested preliminary injunctive relief, and that Plaintiff's requested relief is not narrowly tailored. (*Id.* at 16–17.)

. . . .

- 33 -

### 1. Equal Protection

The Equal Protection Clause of the Fifth Amendment requires that all similarly situated persons be treated alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).[21] Heightened scrutiny applies to discrimination on the basis of sex. *See Craig v. Boren*, 429 U.S. 190, 197 (1976). "To withstand constitutional challenge" under this heightened scrutiny standard of review, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Id.* Laws that discriminate against transgender people are sex-based classifications" and thus warrant heightened-scrutiny review. *Doe v. Horne*, No. CV-23-00185-TUC-JGZ, 2023 WL 4661831, at *16 (July 20, 2023) (citing *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019)).

### 2. Transition to a Female Institution

Plaintiff concedes that protecting female inmates from sexual violence is a legitimate governmental interest. (Doc. 62 at 18.) She does not argue that this legitimate governmental interest lacks a substantial relationship to the individualized, case-by-case approach to the designation and transfer of transgender inmates that is set forth in the Transgender Offender Manual. Plaintiff challenged in her SAC the BOP's use of biological sex as a basis for designation or transfer initial determinations (Doc. 14 at 7), but the current version of the Transgender Offender Manual does not require the TEC to consider biological sex as the initial determination in making designation and transfer placements (*see* Doc. 54-2 at 12–25). Plaintiff does not challenge as unconstitutional the individualized, case-by-case approach that the Transgender Offender Manual requires the TEC to take in making transfer and designation determinations for transgender inmates.

---

[21] The Supreme Court's approach to equal protection under the Fifth Amendment has always been "precisely the same" as its approach to equal protection under the Fourteenth Amendment. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975); *see also United States v. Paradise*, 480 U.S. 149, 166 n. 16, (1987) (plurality opinion of Brennan, J.) ("[T]he reach of the equal protection guarantee of the Fourteenth . . . ."); *Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.").

- 34 -

1      Instead, Plaintiff challenges the manner in which the TEC has applied the

2 Transgender Offender Manual's individualized approach to her personal situation. (*See*

3 Doc. 62 at 10, 18–20.)  Specifically, Plaintiff argues that the TEC did not appropriately

4 consider all factors set forth in the Transgender Offender Manual in its evaluations of her

5 case, and she argues that she does not pose a danger to female inmates because she is not

6 a sex offender, none of her crimes involved violence against women, she is strictly

7 attracted to men, and she cannot gain or maintain erections due to her hormone therapy.

8 (*Id.* at 6–11, 19–20; Doc. 62-1 at 1.)

9      "When an equal protection claim is premised on unique treatment rather than on a

10 classification, the Supreme Court has described it as a 'class of one' claim." *N. Pacifica*

11 *LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008) (quoting *Village of*

12 *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)).  "In order to claim a

13 violation of equal protection in a class of one case," a plaintiff must establish that the

14 government intentionally and irrationally treated her differently from others similarly

15 situated.  *Id.*  An equal protection claim premised on class of one theory fails when the

16 challenged governmental action involves "discretionary decisionmaking based on a vast

17 array of subjective, individualized assessments."  *Engquist v. Oregon Dep't of Agr.*, 553

18 U.S. 591, 603 (2008).

19      Defendant has submitted evidence showing Plaintiff is a high-security, maximum

20 custody inmate with an extensive disciplinary history that includes numerous violent

21 offenses, including the assault of a female prison officer in October 2016.  (Doc. 54-2 at

22 6, 42, 50).  Plaintiff was assigned maximum custody level on January 17, 2008—less

23 than one year into her federal incarceration—after she "demonstrated that she cannot

24 follow institutional rules."  (*Id.* at 50.)  The record indicates that Plaintiff has committed

25 at least 59 disciplinary violations while in federal custody, including the aforementioned

26 assault on a female staff member, as well as "assaulting with serious injury," "fighting

27 with another person," "destroying property" of various valuations, "refusing to obey

28 orders," "possessing intoxicants," and numerous instances each of "possessing a

1  dangerous weapon," "threatening bodily harm," and "assaulting without serious injury."

2  (*Id.* at 42, 50).   The record demonstrates that the TEC considered Plaintiff's security

3  classification, maximum custody level, failure to obtain hormone level goals, and failure

4  to maintain clear conduct in determining that she should be housed in a male institution.

5  (Doc. 54-2 at 6–7.)   The record further demonstrates that the TEC selected SAU-

6  Allenwood because it "specializes in housing high security inmates with serious mental

7  illness who require a secure setting," and that the TEC may re-assess whether Plaintiff

8  should be placed at a female institution if Plaintiff "can address her mental health issues,

9  continue to participate in hormone treatment, and lower her security and custody levels."

10  (*Id.* at 9.)   On this record, Plaintiff has not established that "the facts and law clearly

11  favor her" so as to entitle her to mandatory preliminary injunctive relief requiring the

12  BOP to transition her to a female facility at this time.   *Dahl*, 7 F.3d at 1403 ("mandatory

13  preliminary relief is subject to heightened scrutiny and should not be issued unless the

14  facts and law clearly favor the moving party").

### 3.   Requiring BOP to Use Female Procedures

16  Plaintiff avers that the BOP uses its male procedures to determine her custody

17  classification score (Doc. 18 at 10; Doc. 62 at 35–36, 50), and she has submitted evidence

18  supporting that averment (Doc. 31-4 at 1; Doc. 62-1 at 7).   Plaintiff's evidence indicates

19  that the BOP categorically uses its male procedures to calculate the custody classification

20  scores of transgender inmates housed in male institutions.   (*See* Doc. 31-4 at 1; Doc. 62-1

21  at 7.)   Accordingly, unlike Plaintiff's challenge to the TEC's decision to house her in

22  male institutions, Plaintiff's challenge to the BOP's use of male procedures to determine

23  the custody classification scores of transgender inmates in male institutions is not a class-

24  of-one claim.

25  Defendant has not adequately responded to Plaintiff's argument that using male

26  procedures to calculate the custody classification scores of female transgender inmates

27  housed in male institutions violates the Equal Protection Clause.   The Court will order

28  supplemental briefing on this issue.   Pending the supplemental briefing, the Court will

take under advisement the portion of Plaintiff's March 16 PI Motion requesting a preliminary injunction requiring the BOP to treat her as it treats female inmates under its policies and regulations.[22]   The Court will also direct Defendant to address in its supplemental brief whether Plaintiff is being provided access to female hygiene products and female undergarments at SAU-Allenwood.  (*See, e.g.*, Doc. 62 at 16, 50.)

### G. Requests to Supplement (Docs. 58, 97, 100)

In her Motion to Supplement Request for Evidentiary Hearing, Plaintiff requests to supplement her Motions for Preliminary Injunction with testimony from the September 12-13, 2023 trial in case No. 19-CV-00401-RM (D. Ariz.).  (Doc. 58 at 1.)  Specifically, Plaintiff seeks to use testimony from the trial that pertains to Plaintiff's housing in segregation and its impact on Plaintiff's mental health, as well as testimony regarding the times that prisoners in segregation have hurt themselves with contraband razors.  (*Id.*) Plaintiff also requests that a hearing be set at which she can present nine witness who will testify as to conditions in the SHU, the lack of mental health and psychiatric care, and Defendant's response to suicide attempts.  (*Id.* at 4–5.)  In the alternative, Plaintiff seeks limited appointment of counsel to take a videotaped deposition of one witness, Ralph Aydelott, who has terminal liver cancer and receives end-of-life palliative care.  (*Id.* at 5–6.)

As stated in Section V(E), *supra*, Plaintiff's requests for preliminary injunctive relief requiring the BOP to release her from the SHU at USP-Tucson are moot in light of her transfer to SAU-Allenwood.  Furthermore, even if the Court were to liberally construe the requests as seeking preliminary injunctive relief requiring the BOP to release Plaintiff from solitary confinement, the requests do not have a sufficient nexus to the remaining claims asserted in Plaintiff's SAC.  If Plaintiff wishes to challenge her placement in solitary confinement in this case, she must move to amend her SAC.

---

[22] Plaintiff makes a duplicative request for preliminary injunctive relief in her June 26, 2023 Motion for Preliminary Injunction.  (Doc. 31 at 57–58.)  Because the request is duplicative and the Court is denying the other requests for injunctive relief contained in the June 26 Motion for the reasons discussed in this Order, the Court will deny the June 26 Motion in its entirety.

Given the scope of the remaining claims in the SAC, Plaintiff is not entitled to preliminary injunction relief at this time regarding release from the SHU at USP-Tucson or release from solitary confinement generally, and therefore no evidentiary hearing regarding conditions in the SHU is necessary at this time.  Accordingly, the Court will deny Plaintiff's Motion to Supplement Request for Evidentiary Hearing.

Plaintiff also requests that Defendant be required to file supplemental briefing addressing how her transfer to SAU-Allenwood affects her pending motions (Doc. 97), and she seeks to file a declaration regarding her transfer to SAU-Allenwood (Doc. 100). The Court will grant Plaintiff's Motion to File Supplemental Declaration to the extent it has considered her supplemental declaration herein.  The Court will partially grant Plaintiff's request that Defendant be required to file supplemental briefing addressing Plaintiff's transfer to SAU-Allenwood, to the extent that this Order requires Defendant to address whether and how Plaintiff's transfer to SAU-Allenwood affects Plaintiff's status for female-officer visual strip searches and her ability to purchase female commissary items.

**IT IS ORDERED**:

1. Plaintiff's Motion for Preliminary Injunction (Doc. 27) is **partially denied and partially taken under advisement pending further briefing**.  The Motion is denied without prejudice to the extent Plaintiff requests preliminary injunctive relief enjoining the BOP from using cisgender male inmates or staff to observe her on suicide watch, and to the extent it requests preliminary injunctive relief requiring the BOP to enforce 28 C.F.R. § 115.67.  The Motion is taken under advisement to the extent it requests preliminary injunctive relief requiring the BOP and its staff to use female officers for visual strip searches of Plaintiff.

2. Plaintiff's Motion for Reconsideration (Doc. 29) is **partially granted and partially denied**.  The Court declines to reconsider its denial of Plaintiff's request for an injunction prohibiting her transfer to SAU-Allenwood.  The

Court will order supplemental briefing regarding Plaintiff's request for an injunction requiring the BOP to use its female procedures in calculating her custody classification score. The Court takes that request under advisement pending supplemental briefing.

3. Plaintiff's Motion for Temporary Restraining Order (Doc. 31) is **denied without prejudice**.

4. Plaintiff's Motion for Preliminary Injunction to Protect Access to Courts (Doc. 35) is **denied without prejudiced**.

5. Plaintiff's Motion to Transfer Venue (Doc. 41) is **denied**.

6. Plaintiff's Motion to Supplement Request for Evidentiary Hearing (Doc. 58) is **denied without prejudice**.

7. Plaintiff's Expanded Motion for Preliminary Injunction (Doc. 62) is **denied without prejudice**.

8. Plaintiff's Motion for Temporary Restraining Order (Doc. 80) is **denied**.

9. Plaintiff's Motion to Supplement (Doc. 97) is **granted** to the extent the Court is requiring Defendant to address how Plaintiff's transfer to SAU-Allenwood affects her status for an exception to male officer searches and her ability to access female hygiene products and undergarments, but is otherwise **denied**.

10. Plaintiff's Motion to File Supplemental Declaration (Doc. 100) is **granted** to the extent the Court has considered Plaintiff's declaration herein.

**IT IS FURTHER ORDERED** that within **ten (10) days** from the date of this Order, Defendant shall file a Supplemental Response to Plaintiff's Motions for Preliminary Injunction (Docs. 18, 27) that addresses the following issues:

A. Whether Plaintiff was previously granted an exception for female-officer searches;

B. If so, why that exception was canceled;

. . . .

C. The effect, if any, of Plaintiff's transfer to SAU-Allenwood on her status for an exception for female-officer searches;

D. Whether the BOP's use of male procedures to determine the custody classification scores of female transgender inmates housed in male institutions is substantially related to the achievement of an important governmental objective; and

E. Whether Plaintiff is being provided access to female hygiene products and female undergarments at SAU-Allenwood.

**IT IS FURTHER ORDERED** that Plaintiff may file a Reply to Defendant's Supplemental Response within **seven (7) days** of service of the Supplemental Response.

Dated this 12th day of February, 2024.

_____
Honorable Rosemary Márquez
United States District Judge