JDN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeremy Pinson, | No. CV-22-00298-TUC-RM |
| Plaintiff, | **ORDER** |
| v. | |
| Federal Bureau of Prisons, | |
| Defendant. | |

In February 2024, the Court directed the parties to file supplemental briefing related to Plaintiff's request for female-officer searches, access to female hygiene products and undergarments, and custody classification determinations used for transgender prisoners. (Doc. 115). After the parties filed their supplemental briefs, the Court resolved the issues of female-officer searches and access to female hygiene products and undergarments, but the Court directed that it would separately resolve Plaintiff's request for injunctive relief related to custody classification determinations. (Doc. 146 at 1.) The Court addresses that issue herein and will grant Plaintiff's request for injunctive relief as explained below.

**I.    Background**

The parties are familiar with the extensive facts and background in this case. Plaintiff Jeremy Pinson, who is confined in the United States Penitentiary ("USP") Allenwood, in White Deer, Pennsylvania, brought this civil rights action under 28 U.S.C. § 1331 against the Federal Bureau of Prisons ("BOP"), USP-Tucson Complex Warden Mark Gutierrez, and BOP National Policy and Program Coordinator Ashley Noble. (Doc.

226.)[1] In her operative Third Amended Complaint, Plaintiff states that she has gender dysphoria and identifies as female but has been incarcerated in male prisons since entering Defendant BOP's custody. (*Id.* at 11–14.) Plaintiff explains that placement in male prisons has negatively affected her mental health, resulted in her being the victim of numerous assaults, and led to multiple suicide attempts. (*Id.* at 14–16.) Upon screening, the Court determined that Plaintiff sufficiently stated an Eighth Amendment medical/mental health care claim and a threat to safety/failure to protect claim against the BOP (Counts One and Three), a Fifth Amendment equal protection claim against the BOP (Count Two), a claim under 42 U.S.C. § 1985(2) against Gutierrez (Count Four), and a claim under 42 U.S.C. § 1986 against Noble (Count Four). (Doc. 225.)

Plaintiff asserts that Defendant BOP uses male procedures to determine her custody classification score. (Doc. 18 at 10; Doc. 62 at 35–36, 50). According to Plaintiff's evidence, the BOP categorically uses its male procedures to calculate the custody classification scores of transgender inmates housed in male institutions. (*See* Doc. 31-4 at 1; Doc. 62-1 at 7.) The Court recognized Plaintiff's argument that using male procedures to calculate the custody classification scores of female transgender prisoners housed in male institutions violates the Equal Protection Clause, which relates to Plaintiff's claim in Count Two. (Doc. 115 at 36.) Plaintiff seeks preliminary injunctive relief related to the use of male procedures to calculate her classification score, which she alleges constitutes a barrier to her gender transition. (*See* Doc. 18 at 3–4, 11; Doc. 62 at 34, 38, 52.)

## II.     Preliminary Injunction Standard

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right"). Nonetheless, "federal courts must not shrink from their

---

[1] Plaintiff was previously housed at the USP Tucson, Arizona. She was transferred to USP Allenwood in early January 2024. (Doc. 103.)

obligation to enforce the constitutional rights of all persons, including prisoners" and must not "allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (citation omitted).

A plaintiff seeking a preliminary injunction must show: (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. When the government opposes a preliminary injunction, "[t]he third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry." *Porretti*, 11 F.4th at 1047. The "balance of equities" concerns the burdens or hardships to a prisoner complainant compared with the burden on the government defendants if an injunction is ordered. *Id.* The public interest mostly concerns the injunction's impact on nonparties rather than parties. *Id.* (citation omitted).

The Ninth Circuit has articulated an alternate formulation of the *Winter* test referred to as the "serious questions" or "sliding scale" approach: a preliminary injunction is appropriate if a plaintiff can show "serious questions going to the merits" and that "the balance of hardships tips sharply in the plaintiff's favor," and the other two *Winter* factors are satisfied. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) ("the 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test"). Under this "serious questions" version of the sliding-scale test, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another. *See id.* at 1135.

Where a plaintiff seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). "This standard does not supersede the Ninth Circuit's 'serious questions'

test. Rather, the severity of the legal questions correlates with a movant's likelihood of success; the greater the likelihood of success, the less doubtful the case." *Morrar v. United States*, No. 2:19-cv00833-KJM-KJN, 2019 WL 2715618, at *4 (E.D. Cal. June 28, 2019).

Under the Prison Litigation Reform Act, injunctive relief must be narrowly drawn and be the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

**III.    Analysis**

    **A.    Likelihood of Success**

        **1.    Equal Protection**

Gender-based equal protection prison claims are subject to intermediate scrutiny. *Harrison v. Kernan*, 971 F.3d 1069, 1076–1080 (9th Cir. 2020) (vacating and remanding because the district court applied the deferential standard under *Turner v. Safley*, 482 U.S. 78, 89–90) (1987), instead of applying intermediate scrutiny to the prisoner's gender discrimination claim). Thus, prison policies that employ gender-based distinctions "are constitutional only if the government demonstrates they "serve[ ] important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 1076 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). But deference owed to judgments made by prison officials is still considered under the intermediate scrutiny standard. *Id.* at 1079. The deference owed to prison officials' decisions "is factored into the importance of the government's asserted interest." *Id.*

Under the intermediate scrutiny standard, the party seeking to uphold a regulation that makes gender-based distinctions carries the burden of showing "an exceedingly persuasive justification for the classification." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). This burden is met by "show[ing] at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533 (internal quotation omitted). "The justification must be genuine, not

hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations about" the difference between males and females. *Id.*

### 2. Discussion

The Court directed Defendant BOP to file supplemental briefing addressing whether the "use of male procedures to determine the custody classification levels of female transgender prisoners housed in male institutions is substantially related to the achievement of an important governmental objective." (Doc. 115 at 36–37, 39–40.)

In support of its Supplemental Response, Defendant BOP submits the declaration of Timethea Pullen, the BOP National Policy and Program Coordinator, who explains that custody classification is a procedure that assigns to a prisoner a "level of supervision" according to that prisoner's criminal history and institutional behavior/adjustment. (Doc. 118-1 at 2, Pullen Decl. ¶¶ 1, 21.) Pullen states that custody classification base scoring considers 16 factors that are gender neutral; that is, the factors are equally applied to male and female prisoners. (*Id.* ¶ 25.)[2] Federal BOP Program Statement 5100-08-CN at ch. 6, page 2–14. Pullen states that, while the points assessed through these factors are gender neutral, there are male and female versions of the Security Level/Custody Level Table, the Security Designation Table, and the Custody Variance Table. (*Id.* ¶ 26.) For example, according to these Tables, a total of 24 points for a male prisoner would equate to a High security level and a Maximum custody level, but a total of 24 points for a female prisoner would equate to a Low security level and an "Out" or "In" custody level (the second lowest and second highest levels). Federal BOP Program Statement 5100-08-CN at ch. 1, page 2, & at ch. 2, pages 2, 4.[3] Custody classifications ordinarily occur every 12 months at regular program reviews. (Doc. 118-1 at 2, Pullen Decl. ¶ 21.)

---

[2] Some of the 16 individual factors include severity of current offense, months to release date, criminal history score, voluntary surrender, age, educational level, drug/alcohol abuse, program participation, and family/community ties. *See Federal Bureau of Prisons Program Statement P5100.08, Inmate Security and Designation Custody Classification*, www.bop.gov/policy/progstat/5100_008cn.pdf (last visited Sept. 24, 2024).

[3] *See Federal Bureau of Prisons Program Statement P5100.08, Inmate Security and Designation Custody Classification*, www.bop.gov/policy/progstat/5100_008cn.pdf (last visited Sept. 24, 2024). The BOP custody levels from lowest to highest are: Community, Out, In, and Maximum. *Id.* at ch. 2, pages 2, 4.

Defendant BOP submits a copy of Plaintiff's "Male Custody Classification Form," which shows that, at the last review in February 2024, Plaintiff's scores totaled 22 security level points and 14 custody points, which Pullen asserts equates to a Medium security level and a Maximum custody level. (Doc. 118-1 at 8, Pullen Decl. ¶ 27; Doc. 118-1 at 22.)[4]

Pullen explains that, although a custody classification form is prepared using these factors, the form is only a recommendation, and the Unit Team or Warden make the final determination as to custody status. (*Id.* ¶¶ 23, 29.) Pullen further explains that, when a transgender prisoner seeks to house at a gender-affirming institution, custody classification is just one of many factors considered by Defendant BOP's Transgender Executive Counsel ("TEC"). (*Id.* ¶ 30.) The TEC consists of senior level staff members from various branches within the BOP, and it is led by the Senior Deputy Assistant Director, Reentry Services; the Senior Deputy Assistant Director, Correctional Programs Division; and the Senior Deputy Assistant Director, Health Services. (Doc. 54-2 at 15.) The TEC is Defendant BOP's official decision-making body on all issues affecting the transgender population. (*Id.*) Pullen asserts that the TEC has the authority to decide that a particular transgender prisoner can be housed in a lesser security institution or a female institution regardless of the prisoner's custody classification. (Doc. 118-1 at 8, Pullen Decl. ¶ 31.)

Defendant BOP argues that Plaintiff's custody classification has no relevance to the claims in this action unless it prevents Plaintiff from being transferred to a female prison, and that because the TEC can decide to transfer a transgender prisoner to a female institution regardless of the prisoner's custody classification, the use of male versus female custody classification with respect to Plaintiff does not constitute a violation of her equal

---

[4] The Federal BOP Program Statement 5100.08 includes a table of the security and custody levels that correspond to scores for males and female. *Id.* at ch. 1, page 2. According to this table, Plaintiff's total score of 22 security level points corresponds to a Medium security level and an "Out and In" custody level (referring to the second and third custody levels). *See id.* Plaintiff's Maximum custody level does not correspond with her score; however, Defendant BOP explains that the Unit Team and/or Warden has the final review authority to determine custody level, and custody changes are not dictated solely by the point total. (Doc. 118 at 7.) Defendant BOP explains that Plaintiff has been designated a Maximum custody prisoner since 2008. (Doc. 118-1 at 8, Pullen Decl. ¶ 27.) If Plaintiff's totaled score of 22 security points was applied to the female tables, she would be classified as Low security level and "Out and In" custody level. *Id.*

- 6 -

protection rights. (Doc. 118 at 10.)

In her Supplemental Reply, Plaintiff insists that a prisoner's security level plays a central role in both the ability to transfer to a female institution and the ability to access medical care in the form of gender-affirming surgery. (Doc. 129 at 3.) Plaintiff points to the Transgender Resource Guide, which explains that prisoners "may need to step down to a lesser security facility prior to transfer to a gender affirming facility." (Doc. 129-1 at 18.) Plaintiff argues that the use of the male custody classification procedures effectively prevents her from ever being able to transfer to a gender-affirming institution because she must have a security classification score appropriate for the institution to which she would transfer, which would most likely be a low or minimum-security institution, as most female institutions are low or minimum security. (Doc. 129 at 3.)

As the Court explained in its prior Order, Plaintiff's challenge to the BOP's use of male procedures to determine the custody classification levels of transgender prisoners in male institutions is separate from Plaintiff's challenge to the TEC's decision to house Plaintiff in male institutions. (Doc. 115 at 36.) Thus, the fact that the TEC may approve a transfer to a gender-affirming institution regardless of the prisoner's custody classification level does not excuse an allegedly discriminatory procedure for determining a transgender prisoner's custody classification.

Moreover, Defendant previously asserted that the TEC recommended Plaintiff be placed in a male facility based on a consideration of different factors, including "Plaintiff's HIGH security classification, MAXIMUM custody level, failure to meet hormone treatment goals, and failure to maintain clear conduct." (Doc. 54 at 5 (emphasis in original).) This assertion supports that Plaintiff's security classification and custody level were important factors in the decision to keep Plaintiff in a male institution and not transfer her to a female institution. As argued by Plaintiff, using a male custody level table to determine her classification may prevent her from obtaining a classification level she requires to be eligible for transfer to a female institution. It follows that Plaintiff's custody classification is relevant to the claims in this lawsuit.

1 Plaintiff points out that, despite the Court's specific directive to address "[w]hether the BOP's use of male procedures to determine the custody classification scores of female transgender inmates housed in male institutions is substantially related to the achievement of an important governmental objective," Defendant failed to provide a single important governmental objective supporting the use of male procedures to determine the custody classification scores of female transgender prisoners housed in male institutions. (Doc. 115 at 40; Doc. 129 at 4.) The Court agrees. In relying on its claim that there is no equal protection violation because the TEC can transfer a prisoner regardless of their custody classification, Defendant fails to present any argument that using male procedures to determine the custody classification of female transgender prisoners serves an important governmental objective.

As stated, Defendant BOP has the burden to show that the challenged procedure serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives, and the justification must be exceedingly persuasive. *Virginia*, 518 U.S. at 533. Because Defendant BOP fails to present any governmental objective for using male procedures to determine the custody classification of female transgender prisoners, it fails to meet its burden. Consequently, Plaintiff has shown serious questions going to the merits of her equal protection claim, and she satisfies the first *Winter* factor. *See Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) ("[s]erious questions need not promise a certainty of success . . . but must involve a fair chance of success on the merits") (internal quotation omitted).

### B. Irreparable Harm

A plaintiff must demonstrate that irreparable injury is "likely in the absence of an injunction." *Winter*, 555 U.S. at 22; *see Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (speculative injury is not irreparable injury sufficient for a preliminary injunction). "[T]here must be a presently existing threat of harm, although injury need not be certain to occur." *Villaneuva v. Sisto*, CIV S-06-2706 LKK EFB P, 2008 WL 4467512, at *3 (E.D. Cal. Oct. 3, 2008) (citing *FDIC v. Garner*, 125 F.3d 1272, 1279–

80 (9th Cir. 1997)).

Plaintiff alleges she suffers symptoms of gender dysphoria including anxiety, depression, and suicidal thoughts and actions. (Doc. 62 at 39.) Plaintiff explains that her mental health has suffered, which has led to suicide attempts and attempts to castrate herself, and she continues to suffer depression and suicidal thoughts. (Doc. 62 at 40.)

Defendant BOP argues that Plaintiff cannot show irreparable harm because its staff takes her suicidal ideation seriously; whenever there is a concern she may be suicidal, staff places her on suicide watch until she can be assessed by a mental health care provider. (Doc. 72 at 13.)

Although Defendant BOP staff responds to Plaintiff's suicidal ideation, that does not preclude a finding that she is currently suffering due to her gender dysphoria and depression. Emotional stress, depression, psychological distress, and other psychological problems can constitute irreparable injury. *See Stanley v. Univ. of Southern Cal.*, 13 F.3d 1313, 1324 n.5 (9th Cir. 1994); *Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.* 840 F.2d 701, 709 (9th Cir. 1988); *see also Whitaker by Whitaker v. Kenosha Unified School Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045–46 (7th Cir. 2017) (suicide and diminished well-being do not have an adequate remedy at law and are irreparable harms), *abrogated on other grounds by Illinois Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020).

Moreover, "[t]he deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *see Nelson v. Nat'l Aeronautics & Space Admin*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134 (2011) ("[u]nlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm"). Plaintiff has met the second element under *Winter*.

### C.     Balance of Equities/Public Interest

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quotation omitted).

In prior briefing, Defendant BOP relied on *Turner* to argue generally that there should be judicial restraint regarding prison officials' decisions, and "it would not be equitable, nor would it serve the public interest, to severely limit the Bureau's discretion here" by granting injunctive relief. (Doc. 54 at 17.) Although deference owed to prison officials is still considered under intermediate scrutiny, that deference must be factored into the importance of the government's asserted interest, and here, as stated, Defendant BOP does not assert any interest for using male procedures to determine the custody classification of female transgender prisoners. *See Harrison*, 971 F.3d at 1079. As such, Defendant BOP does not identify any harm it would incur if injunctive relief is granted.

Plaintiff notes that Defendant BOP fails to explain why its "discretion" is more important than her physical, mental, and emotional wellbeing; her life; and her body autonomy. (Doc. 62 at 45.) As mentioned, without relief, Plaintiff continues to suffer because of her gender dysphoria and depression.

Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002; *see United States v. Raines*, 362 U.S. 17, 27 (1960) ("there is the highest public interest in the due observance of all the constitutional guarantees"). And the public has an interest in ensuring that the plaintiff's health is maintained during the pendency of a lawsuit. *Farnam v. Walker*, 593 F. Supp. 2d 1000, 1017 (C.D. Ill. 2009).

The *Winter* factors favor a preliminary injunction.

### D. Remaining Factors

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Despite this mandatory language, "Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation omitted). The district court may dispense with the filing of a bond when it

concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct. *Id.*

Defendants have not requested a bond or submitted any evidence regarding likely damages. Accordingly, the Court will waive the bond requirement.

As stated, the PLRA requires any injunctive relief to be narrowly drawn and the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2). The Court can fashion relief that is narrowly drawn by limiting an injunction to Defendant BOP's use of procedures to determine Plaintiff's security level and custody classification.

According to the documents proffered by Defendant BOP, Plaintiff is scheduled for her formal annual review by the TEC in approximately November 2024. (Doc. 118-1 at 31.) The Court will therefore order that, before this next formal annual review, Defendant BOP must calculate Plaintiff's custody classification score based on the 16 gender-neutral factors and then determine Plaintiff's security and custody levels using the female versions of the Security Level/Custody Level Table, the Security Designation Table, and the Custody Variance Table. The BOP must then notify the TEC of Plaintiff's security classification score under the female tables, and the TEC must consider this revised score/custody level when discussing Plaintiff's housing placement at the November 2024 annual review.

**IT IS ORDERED:**

(1) Plaintiff's request for injunctive relief related to custody classifications based on gender (set forth in part within Docs. 18, 62) is **granted in part** as set forth herein.

(2) Prior to Plaintiff's November 2024 TEC annual review, Defendant BOP must calculate Plaintiff's custody classification score based on the 16 gender-neutral factors and then determine Plaintiff's security and custody levels using the *female* versions of the Security Level/Custody Level Table, the Security Designation Table, and the Custody Variance Table.

(3) Defendant BOP must notify the TEC of Plaintiff's revised security/custody level according to the female tables.

(4) At the November 2024 TEC annual review of Plaintiff, the TEC must consider Plaintiff's revised security/custody level under the female tables when discussing Plaintiff's housing placement.

(5) Within **ten (10) days** from the date of Plaintiff's annual review by the TEC, Defendant BOP must file a Notice indicating:

    (a) Plaintiff revised security/custody level under the female tables:

    (b) the TEC's November 2024 housing decision; and

    (c) how Plaintiff's revised custody/security level under the female tables factored into and affected the TEC's decision.

(6) This relief is narrowly drawn, extends no further than necessary to correct the harm, and is the least intrusive means necessary to correct the harm. See 18 U.S.C. § 3626(a)(2).

(7) Plaintiff is not required to post bond.

Dated this 30th day of September, 2024.

_____
Honorable Rosemary Márquez
United States District Judge