JDN

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jeremy Pinson, | No. CV-22-00298-TUC-RM |
| Plaintiff, | **ORDER** |
| v. | |
| Michael Carvajal, et al., | |
| Defendants. | |

Plaintiff Jeremy Pinson, who is confined in the United States Penitentiary ("USP") Terre Haute, in Terre Haute, Indiana, brought this civil rights action under 28 U.S.C. § 1331 against the Federal Bureau of Prisons ("BOP"), USP Tucson Complex Warden Mark Gutierrez, and BOP National Policy and Program Coordinator Ashley Noble. (Doc. 226.)[1]  Before the Court are the following Motions filed by Plaintiff:

- Motion for Limited Reconsideration (Doc. 125);
- Expanded and Renewed Motion for Preliminary Injunction (Doc. 132);
- Motion to Modify Preliminary Injunction Order (Doc. 166);
- Motion for Preliminary Injunction/Motion to Appoint Special Master (Doc. 190); and
- Motion for Reconsideration (Doc. 198).

The Court will grant Plaintiff's Motion to Modify Preliminary Injunction Order and deny the remaining Motions.

---

[1] Plaintiff initiated this action pro se but is now represented by counsel.  (*See* Doc. 202.)

## I.      Background

The parties are familiar with the extensive facts and background in this case. Plaintiff was previously housed at USP Tucson, Arizona.  She was transferred to USP Allenwood in early January 2024.  (Doc. 103.)  Then, in October 2024, Plaintiff was transferred to USP Terre Haute.  (Doc. 235.)

In her operative Third Amended Complaint, Plaintiff states that she has gender dysphoria and identifies as female but has been incarcerated in male prisons since entering Defendant BOP's custody.  (Doc. 226 at 11–14.)  Plaintiff explains that placement in male prisons has negatively affected her mental health, resulted in her being the victim of numerous assaults, and led to multiple suicide attempts.  (*Id.* at 14–16.) Upon screening, the Court determined that Plaintiff sufficiently stated an Eighth Amendment threat to safety/failure to protect claim against the BOP (Count One), a Fifth Amendment equal protection claim against the BOP (Count Two), an Eighth Amendment medical/mental health care claim against the BOP (Count Three), a conspiracy/retaliation claim under 42 U.S.C. § 1985(2) against Gutierrez (Count Four), and a claim under 42 U.S.C. § 1986 (failure to prevent a conspiracy) against Noble (within Count Four).  (Doc. 225.)

## II.     Motion for Limited Reconsideration (Doc. 125)

### A.      Legal Standard

Motions for reconsideration should be granted only in rare circumstances. *Defenders of Wildlife v. Browner*, 909 F. Supp. 1342, 1351 (D. Ariz. 1995).  "The Court will ordinarily deny a motion for reconsideration of an Order absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence."  LRCiv 7.2(g)(1).  No motion for reconsideration of an Order may repeat any oral or written argument made in support of or in opposition to the motion that resulted in the Order.  *Id.*  Mere disagreement with a previous order is an insufficient basis for reconsideration.  *See Leong v. Hilton Hotels Corp.*, 689 F. Supp. 1572, 1573 (D. Haw. 1988).  "Absent good cause shown," a motion

for reconsideration must be filed "no later than fourteen (14) days after the date of the filing of the Order that is the subject of the motion."  LRCiv. 7.2(g)(2).

**B.    Discussion**

On February 13, 2024, the Court issued an Order that addressed, among many other issues, Plaintiff's request for an injunction requiring the BOP to treat her as female under its policies and regulations and to begin transitioning her to a female institution. (Doc. 115 at 32–36.)   The Court determined that, in light of evidence presented by Defendant BOP showing that Plaintiff is a high-security, maximum custody prisoner with an extensive disciplinary history, Plaintiff had not established she was entitled to a mandatory preliminary injunction to require BOP to transition her to a female facility at this time.  (*Id.* at 35–36.)

In her timely Motion for Limited Reconsideration, Plaintiff states that, after briefing on the underlying Motion for injunctive relief, she learned of or obtained new evidence in discovery showing that, at the Transgender Executive Council (TEC) review to address USP Tucson's transfer request, the USP Tucson Warden falsified Plaintiff's disciplinary history, which had the effect of inflating Plaintiff's security level; falsely claimed Plaintiff had not completed any programming; and made false statements regarding prison investigations related to another prisoner's attack on Plaintiff.  (Doc. 125 at 4–8.)   Plaintiff also states she learned that the Warden excluded Plaintiff's physician's opinion in the transfer request.  (*Id.* at 9–10.)   Plaintiff asserts that the TEC relied on the false information and an improper affidavit from Defendant Noble, and relevant evidence was withheld from the TEC when it made its determination to transfer Plaintiff to the restrictive Special Administrative Unit (SAU) at USP Allenwood.  (*Id.* at 2–11.)   Plaintiff therefore requests reconsideration and an evidentiary hearing "for findings of fact and credibility determinations."  (*Id.* at 11.)[2]

Recently, on September 30, 2024, the Court issued an Order that granted in part

---

[2] The Court did not direct Defendant BOP to file a response to Plaintiff's Motion for Limited Reconsideration.   *See* LRCiv 7.2(g)(2) (no response to a motion for reconsideration may be filed unless ordered by the Court).

Plaintiff's request for injunctive relief related to custody classifications based on gender. (Doc. 233).   The Court directed that the BOP must calculate Plaintiff's custody classification score based on the standard gender-neutral factors and then determine Plaintiff's security and custody levels using the female versions of the relevant security and custody level tables.  (*Id.* at 11.)  The Court further ordered that the BOP must notify the TEC of Plaintiff's revised security/custody level according to the female tables, and the TEC must consider these revised security/custody levels under the female tables when discussing Plaintiff's housing placement.  (*Id.* at 11–12.)[3]

The September 30, 2024 Order addressed Plaintiff's concerns about her security level.   Thus, Plaintiff's original underlying request to be treated as a female under Defendant BOP's policies and regulations was granted in part.

Plaintiff's request for relief in her Motion for Limited Reconsideration—for a hearing to conduct credibility determinations—is not definite or specific, and presumably, Plaintiff would seek additional relief following any evidentiary hearing.  *See* 18 U.S.C. § 3626(a)(2) (in prisoner cases, injunctive relief must be narrowly drawn and be the least intrusive means necessary to correct the harm).   Moreover, the subject TEC review and determination to transfer Plaintiff was made almost a year ago, and Plaintiff was transferred to the SAU at USP Allenwood in January 2024.  While Plaintiff's newly discovered evidence may support her claim against Defendant Gutierrez, her request for limited reconsideration has been mooted by time and subsequent events.

Since briefing on Plaintiff's Motion for Limited Reconsideration, Plaintiff has been appointed counsel.   Counsel may file a new motion if specific relief is sought related to Plaintiff's newly discovered evidence.

For the above, reasons, the Court will deny Plaintiff's Motion for Limited Reconsideration.

. . . .

---

[3] The September 30, 2024 Order and the BOP's use of male and female tables to calculate custody/security levels is explained more fully infra in discussion of Plaintiff's Expanded and Renewed Motion for Preliminary Injunction.

1   **III.    Expanded and Renewed Motion for Preliminary Injunction (Doc. 132)**

2        **A.    Legal Standard**

3        "A preliminary injunction is 'an extraordinary and drastic remedy, one that should

4   not be granted unless the movant, by a clear showing, carries the burden of persuasion.'"

5   *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*,

6   520 U.S. 968, 972 (1997) (per curiam)); *see Winter v. Natural Res. Def. Council, Inc.*,

7   555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary

8   remedy never awarded as of right").  Nonetheless, "federal courts must not shrink from

9   their obligation to enforce the constitutional rights of all persons, including prisoners"

10  and must not "allow constitutional violations to continue simply because a remedy would

11  involve intrusion into the realm of prison administration." *Porretti v. Dzurenda*, 11 F.4th

12  1037, 1047 (9th Cir. 2021) (citation omitted).

13       A plaintiff seeking a preliminary injunction must show: (1) she is likely to succeed

14  on the merits; (2) she is likely to suffer irreparable harm in the absence of injunctive

15  relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public

16  interest. *Winter*, 555 U.S. at 20.  When the government opposes a preliminary injunction,

17  "[t]he third and fourth factors of the preliminary-injunction test—balance of equities and

18  public interest—merge into one inquiry." *Porretti*, 11 F.4th at 1047.

19       Where a plaintiff seeks a mandatory injunction, rather than a prohibitory

20  injunction, injunctive relief is "subject to a higher standard" and is "permissible when

21  'extreme or very serious damage will result' that is not 'capable of compensation in

22  damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872

23  F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma*

24  *GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)).

25       "When a plaintiff seeks injunctive relief based on claims not pled in the complaint,

26  the court does not have the authority to issue an injunction." *Pac. Radiation Oncology*,

27  *LLC v. Queen's Med. Center*, 810 F.3d 631, 633 (9th Cir. 2015); *see Devose v.*

28  *Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (affirming denial of an injunction request

based on alleged retaliatory conduct unrelated to the basis of a prisoner's § 1983 claim). A court should not grant an injunction "when the injunction in question is not of the same character, and deals with a matter lying wholly outside the issues in the suit." *Kaimowitz v. Orlando*, 122 F.3d 41, 43 (11th Cir. 1997).

Under the Prison Litigation Reform Act ("PLRA"), injunctive relief must be narrowly drawn and be the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

**B.     Parties' Contentions**

Plaintiff seeks an injunction that: (1) enjoins the BOP from using "clear conduct" or "lesser security" prerequisites to deny transgender prisoners gender affirming facilities and gender affirming surgery; (2) enjoins BOP from housing Plaintiff in a restrictive SAU; and (3) requires BOP to evaluate Plaintiff for housing in a lesser-security facility to facilitate her transition to a female facility after 12 months in lesser security. (*Id.* at 17.)

Defendant BOP opposes Plaintiff's Expanded and Renewed Preliminary Injunction on procedural grounds, arguing that Plaintiff's Motion simply rehashes arguments that have been repeatedly raised and addressed by the Court. (Doc. 141.)

**C.     Equal Protection**

Gender-based equal protection prison claims are subject to intermediate scrutiny. *Harrison v. Kernan*, 971 F.3d 1069, 1076–1080 (9th Cir. 2020) (vacating and remanding because the district court applied the deferential standard under *Turner v. Safley*, 482 U.S. 78, 89–90) (1987), instead of applying intermediate scrutiny to the prisoner's gender discrimination claim). Thus, prison policies that employ gender-based distinctions "are constitutional only if the government demonstrates they "serve[ ] important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 1076 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). But deference owed to judgments made by prison officials is still considered under the intermediate scrutiny standard. *Id.* at 1079. The deference owed to

prison officials' decisions "is factored into the importance of the government's asserted interest." *Id.*

Under this standard, the party seeking to uphold a regulation that makes gender-based distinctions carries the burden of showing "an exceedingly persuasive justification for the classification." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982).  This burden is met by "show[ing] at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533 (internal quotation omitted).  "The justification must be genuine, not hypothesized or invented post hoc in response to litigation.  And it must not rely on overbroad generalizations about" the difference between males and females.  *Id.*

**D.    Discussion**

Plaintiff states that her pending Motion addresses the "grossly disparate treatment transgender prisoners receive in direct consequence of disciplinary infractions compared to cisgender female inmates in violation of the Equal Protection Clause." (Doc. 132 at 6.) According to Plaintiff, this disparity impacts her mental health and her gender dysphoria condition, which leads to a failure to adequately treat Plaintiff in violation of the Eighth Amendment.  (*Id.*)

Plaintiff argues that, as a transgender female, she may be kept in a facility inconsistent with her gender identity and denied the means of social transitioning as a consequence of her disciplinary infractions.  (*Id.* at 3.)  She contends that this constitutes discriminatory treatment because a cisgender female prisoner can never be housed in a facility inconsistent with her gender and never denied gender-affirming items because of a disciplinary infraction.  (*Id.* at 3–4.)  Plaintiff notes that Defendant BOP supports its continued housing of Plaintiff in male institutions based on the fact that Plaintiff has a "long assaultive history while incarcerated," which includes threats to a psychologist. (*Id.* at 10.)  According to Plaintiff, if a cisgender female prisoner commits the same infractions—assault and threats—she is not subject to the same discipline as Plaintiff;

namely, continued housing in a male institution, placement in substantially more violent conditions, and eligibility for placement in SAU. (*Id.*)

Plaintiff asserts that the Transgender Resource Guide ties "'clear conduct' (meaning no disciplinary infractions) to gender-affirming surgery." (*Id.*) Plaintiff alleges that the BOP dramatically increased her security and custody classifications and housing status in retaliation for her attempt to seek witnesses for bench trials in this Court and for her cooperation with a news media investigation. (*Id.* at 11–12.)

Plaintiff previously sought an injunction to prohibit her transfer to the SAU, and that request was denied. (Docs. 18, 23.) In November 2023, Plaintiff filed a Renewed Motion for a Temporary Restraining Order again seeking to enjoin her transfer to SAU, and that Motion was denied. (Docs. 80, 115.)

To the extent that Plaintiff challenges the use of her disciplinary history as a consideration in the determination of whether to transition her to a female facility, that issue was addressed both in the February 13, 2024 Order and in the September 30, 2024 Order. (Docs. 115, 233.)

In its February 13, 2024 Order, the Court addressed Plaintiff's various requests for injunctive relief, including requests that the Court require the BOP to begin Plaintiff's transition to a female facility and require the BOP to treat her as it treats female prisoners under its policies and regulations. (Doc. 115 at 9–10.) With respect to Plaintiff's requests related to transition to a female institution, the Court stated:

> Defendant has submitted evidence showing Plaintiff is a high-security, maximum custody inmate with an extensive disciplinary history that includes numerous violent offenses, including the assault of a female prison officer in October 2016. (Doc. 54-2 at 6, 42, 50). Plaintiff was assigned maximum custody level on January 17, 2008—less than one year into her federal incarceration—after she "demonstrated that she cannot follow institutional rules." (*Id.* at 50.) The record indicates that Plaintiff has committed at least 59 disciplinary violations while in federal custody, including the aforementioned assault on a female staff member, as well as "assaulting with serious injury," "fighting with another person," "destroying property" of various valuations, "refusing to obey orders," "possessing intoxicants," and numerous instances each of "possessing a

dangerous weapon," "threatening bodily harm," and "assaulting without serious injury." (*Id.* at 42, 50). The record demonstrates that the TEC considered Plaintiff's security classification, maximum custody level, failure to obtain hormone level goals, and failure to maintain clear conduct in determining that she should be housed in a male institution. (Doc. 54-2 at 6–7.) The record further demonstrates that the TEC selected SAU Allenwood because it "specializes in housing high security inmates with serious mental illness who require a secure setting," and that the TEC may re-assess whether Plaintiff should be placed at a female institution if Plaintiff "can address her mental health issues, continue to participate in hormone treatment, and lower her security and custody levels." (*Id.* at 9.) On this record, Plaintiff has not established that "the facts and law clearly favor her" so as to entitle her to mandatory preliminary injunctive relief requiring the BOP to transition her to a female facility at this time. *Dahl*, 7 F.3d at 1403 ("mandatory preliminary relief is subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party").

(Doc. 115 at 35–36.)

Plaintiff conceded that division of the sexes within its prisons to protect female prisoners from sexual violence is a legitimate governmental interest. (*Id.* at 34, citing Doc. 62 at 18.) Plaintiff made no claim that this legitimate governmental interest lacks a substantial relationship to the individualized, case-by-case approach to the designation and transfer of transgender prisoners that is set forth in the BOP's Transgender Offender Manual. (Doc. 115 at 34.) And Plaintiff did not challenge the individualized, case-by-case approach that the TEC uses to make transfer determinations for transgender prisoners. (*Id.*) The Court found that, given Plaintiff's disciplinary history in prison and her classification and custody level, the TEC's determination not to transfer Plaintiff to a female facility at this time served a legitimate governmental objective and Plaintiff could not show a likelihood of success on her claim. (*Id.* at 35–36.)

As mentioned above, in its September 30, 2024 Order, the Court granted preliminary injunctive relief related to Plaintiff's custody level determination. (Doc. 233). The Order explained that custody classification scores are based on 16 gender-neutral factors; that is, the factors are equally applied to male and female prisoners. (*Id.* at 5.) But male and female tables to which these scores are applied are different, such

that a total of 24 points for a male prisoner would equate to a High security level, but a total of 24 points for a female prisoner would equate to a Low security level. (*Id.*) The Court ordered Defendant BOP to calculate Plaintiff's custody and security level using female tables instead of male tables and for the TEC to consider these revised custody and security scores/levels when discussing Plaintiff's housing at the next annual review of Plaintiff in November 2024. (Doc. 233 at 11–12.) The September 30, 2024 Order addressed Plaintiff's concern about the difference in treatment between cisgender and transgender females' discipline history because the number, type, and frequency of incident reports are included in the gender-neutral factors considered when determining custody level, and Plaintiff's custody classification will now be determined under the female tables. *See* Federal BOP Program Statement 5100-08-CN at ch. 6, pages 2–14.[4]

Thus, many of the arguments and requests for relief in Plaintiff's pending Motion overlap with previous arguments and requests that have been addressed by the Court. This is at least Plaintiff's third request to enjoin the BOP from placing her in a SAU (*see* Docs. 18, 26), and her second request to evaluate Plaintiff for housing in a lesser security facility to facilitate her transition to a female facility (*see* Doc. 31; *see also* Doc. 125).

To the extent Plaintiff alleges discrimination based on the consequences of disciplinary action taken against equally violent cisgender and transgender female prisoners, Plaintiff's claim is unsupported. There is no evidence that violent cisgender female prisoners are not subject to more restrictive, administrative housing or housing placements that Plaintiff would consider "more violent," as Plaintiff alleges violent transgender female prisoners are subject to. (*See* Doc. 132 at 3–4, 10.) Nor is there any evidence that violent cisgender female prisoners do not suffer medical or mental health issues, housing transfers, or other negative consequences as a result of disciplinary action.

Plaintiff claims that cisgender female prisoners are not denied medical treatment

---

[4] *See Federal Bureau of Prisons Program Statement P5100.08, Inmate Security and Designation Custody Classification*, www.bop.gov/policy/progstat/5100_008cn.pdf (last visited Oct. 8, 2024).

as a result of disciplinary incidents, whereas transgender female prisoners are denied medical treatment—in the form of gender-affirming housing and/or surgery—as a result of disciplinary incidents. (Doc. 132 at 11.) Plaintiff argues that this violates both her right to equal protection and her right to adequate medical treatment under the Eighth Amendment. (*Id.* at 6, 9–11, 15.) She therefore requests an order to enjoin the BOP from using "clear conduct" or "lesser security" prerequisites when considering whether to transfer a transgender female to a female institution. (*Id.* at 17.) But this would prevent the BOP from considering a transgender prisoner's disciplinary history before transfer to a female prison. (*Id.* at 17.) Such a requirement would undermine the legitimate governmental interest of protecting female prisoners from sexual violence. The Ninth Circuit explained that, even under the intermediate scrutiny standard, special difficulties that arise in the prison context can be taken into consideration, and penological interests may still factor into the analysis of an equal protection claim. *See Harrison*, 971 F.3d at 1079. While Plaintiff raises some serious concerns regarding her current placement as a medium custody prisoner with a serious medical need, she fails to address the legitimate governmental interest in using disciplinary and conduct-related prerequisites when considering transfer of a transgender female prisoner to a female prison.

For the above reasons, Plaintiff's Expanded and Renewed Motion for a Preliminary Injunction constitutes an improper motion for reconsideration or, alternatively, it fails to show a likelihood of success on the merits. The Motion will therefore be denied.

## IV.     Motion to Modify Preliminary Injunction Order (Doc. 166)

### A.     Legal Standard

"As long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles, Harbor Div. v. Santa Monica*, 254 F.3d 882, 885 (9th Cir. 2001) (internal citations omitted). A preliminary injunction order is an interlocutory order and thus may be reconsidered or modified by the court.

### B.    Relevant Facts/Parties' Contentions

On March 29, 2024, the Court granted Plaintiff's request for injunctive relief in the form of female undergarments and female hygiene items.  (Doc. 146.)  The Court directed Defendant BOP to ensure that Plaintiff was given two bras and two pairs of female underwear and to either give Plaintiff the standardized list of commissary items from which to order transgender/female hygiene products or allow Plaintiff to use the Special Purpose Order process to order transgender/female hygiene products.  (*Id.* at 8.)  The Court also directed Defendant BOP to provide a way for Plaintiff to remove her facial hair.  (*Id.*)

On April 18, 2024, Plaintiff filed her Motion to Modify Preliminary Injunction Order as to the provision of female hygiene products.  (Doc. 166.)  Plaintiff states that she was provided the Standardized list of Commissary items and attempted to order items; however, her order was denied.  (*Id.* at 1.)  Plaintiff was told her order was denied for multiple reasons: her account funds are inaccessible; she is on commissary restriction; and she cannot receive the ordered items at BOP expense without modification of her doctor's treatment plan.  (*Id.* at 1–2.)  Plaintiff requests that the Court modify its March 29, 2024 Order to address what she claims is BOP's post hoc justifications for denying her female products.  (*Id.* at 2–9.)

Defendant BOP opposes Plaintiff's Motion to Modify on the grounds it did not violate the Court's Order because it provided Plaintiff a commissary list; Plaintiff has no constitutional right to purchase commissary items; there is no evidence she needs to wear makeup to treat her gender dysphoria; and she already receives bras and female underwear as well as hormones and the opportunity to shave her facial hair.  (Doc. 173.)

### C.    Discussion

In its March 29, 2024 Order granting injunctive relief in the form of female hygiene products, the Court determined that Plaintiff has been diagnosed with gender dysphoria, which is recognized as a serious medical need implicating the Eighth Amendment.  (Doc. 146 at 5.)  The Court recognized that permitting social transitioning

behaviors, like hair removal and wearing makeup, is effective in treating gender dysphoria. (*Id.*)   And the Court noted that the BOP Transgender Offender Manual refers to the "Standardized lists of Commissary items for transgender inmates." (*Id.* at 6.) Despite the number of "transgender items" available on the commissary list, the evidence showed that, in her Special Housing Unit, Plaintiff is only allowed to have Suave deodorant. (*Id.* at 7.) As the Court stated:

> Based on the parties' submissions, USP Allenwood has a blanket policy that limits female hygiene items available to transgender prisoners in the Special Housing House to Suave deodorant. The Ninth Circuit has held that denial of treatment for gender dysphoria based on a blanket prison policy, rather than individual need, may constitute deliberate indifference under the Eighth Amendment standard. *See Rosati v. Igbinoso*, 791 F.3d 1037, 1039–40 (9th Cir. 2015); *Allard v. Gomez*, 9 F. App'x 793, 795 (9th Cir. 2001); *see also Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir.2014) (holding that the "blanket, categorical denial of medically indicated surgery solely on the basis of an administrative policy that one eye is good enough for prison inmates is the paradigm of deliberate indifference" (internal quotation marks omitted)). The Ninth Circuit has also held that "[p]rison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny . . . or intentionally interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quotation omitted). Accordingly, the first *Winter* element is met.

> Plaintiff asserts that, while housed in the Special Housing Unit, she cannot shave, she is denied female products, and she cannot live day to day as a female. (Doc. 62 at 16.) Plaintiff states that being forced to wear facial hair triggers her gender dysphoria every day. (*Id.* at 50.) Plaintiff previously averred that she has repeatedly attempted suicide to "end [her] misery living in a men's prison." (Doc. 18-1 at 4, Pl. Decl. ¶ 12.) Plaintiff's suffering as a result of the ongoing denial of treatment in the form of basic products for social transitioning behavior supports a finding of irreparable harm.

(*Id.*) Thus, the Court viewed the provision of female products as treatment for Plaintiff's gender dysphoria, and denying such products to Plaintiff implicated the Eighth Amendment.

In its Order, the Court relied on Defendant BOP's representations that Plaintiff, as a prisoner in the Special Housing Unit, was authorized transgender items and was

allowed to order items such as hair care, bras, underwear, socks, a watch, and shoes through the Special Purpose Order process.  (*Id.*)  Defendant BOP asserted that "Plaintiff has access to female hygiene products," and that a "Special Purpose Order" process is available for Plaintiff to order more items.  (*Id.* at 8, citing Doc. 118 at 12.)

Based on the above, the Court granted Plaintiff's request for relief in the form of female hygiene products and directed Defendant BOP to provide the standardized list of c ommissary items from which to order products (beyond Suave deodorant) or allow Plaintiff to use the Special Purpose Order process to order products.  (Doc. 146 at 8.)

As stated, Defendant BOP provided Plaintiff with the commissary list, but when she submitted an order for products, the order was denied.  Defendant BOP states that Plaintiff cannot make any purchases through the commissary because she has outstanding debts in an amount of over $300,000.  (Doc. 173 at 3.)  Defendant BOP explains that, pursuant to BOP Statement 4500.12, Trust Fund/Deposit Fund Manual, a prisoner's trust fund account may be subjected to an encumbrance, which places a hold on a prisoner's available trust fund account balance.  (*Id.* at 2–3.)[5]  Defendant BOP states that Plaintiff's trust fund account is encumbered due to her outstanding debts, which stem from debt agreements for photocopies, postage, and other services provided during her incarceration, and federal court filing fees.  (*Id.* at 3.)

This debt is not new.  Defendant BOP knew that, at the time it asserted "Plaintiff has access to female hygiene products" through the commissary and the Special Purpose Order process, she, in fact, did not have access to female hygiene products because she is prevented from ordering commissary items until her debt is paid.  Defendant BOP nonetheless maintains that it complied with the Court's Preliminary Injunction Order because it gave Plaintiff a commissary list that includes transgender/female hygiene items.  (*Id.* at 3–4.)

If Defendant BOP wants to maintain credibility with the Court, it must be more forthcoming with relevant facts and refrain from this type of sharp practice.  Again, the

---

[5] *See* Program Statement 4500.12 § 8.8, https://www.bop.gov/policy/progstat/4500.12.pdf (last visited Oct. 23, 2024).

Court's grant of injunctive relief was based on the denial of medical treatment (i.e., female hygiene products) for Plaintiff's gender dysphoria. The issue is not whether Plaintiff has a right to purchase commissary products. The clear purpose of the Order for injunctive relief was for Plaintiff to obtain female products as part of treatment for her condition. Simply giving Plaintiff a commissary list of items that she cannot order does not serve that purpose.[6]

Defendant BOP argues that Plaintiff is not entitled to the requested injunctive relief because there is no evidence she needs to wear makeup to treat her gender dysphoria; she is provided sufficient treatment in the form of facial hair removal, hormones, and psychological care; and the Eighth Amendment does not require prison officials to provide Plaintiff with treatment simply because it is "psychologically pleasing." (Doc. 173 at 6.) None of these arguments were presented in Defendant BOP's Supplemental Response on this issue. (*See* Doc. 118 at 11–13.) Defendant BOP's Response to Plaintiff's Motion to Modify presents more like an improper request for reconsideration of the March 29, 2024 Order because it opposes an injunction that has already been issued and raises arguments that could have been raised earlier. *See Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (a motion for reconsideration "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation"). Defendant BOP's request for reconsideration is also untimely, and its arguments are unavailing. *See* LRCiv 7.2(g)(2) (motion for reconsideration must be filed no later than 14 days from date of the Order that is subject of the motion).

As Plaintiff points out in her Reply, to support its opposition to injunctive relief, Defendant BOP relies on *Fisher v. Federal Bureau of Prisons*, 484 F. Supp. 3d 521 (N.D. Ohio 2020), and *Keohane v. Florida Department of Corrections Secretary*, 952 F.3d 1257 (11th Cir. 2020), two out-of-circuit cases that are contrary to the Ninth Circuit's

---

[6] Plaintiff specifically requests that the Court address and correct this deficiency with a modification of its prior Order rather than a contempt finding and/or sanctions for failure to comply with the Injunction Order. (Doc. 166 at 3.)

holding in *Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019).  (Doc. 178 at 6.)  In *Edmo*, the Ninth Circuit concluded that gender confirmation surgery was medically necessary for Edmo and issued an order for the Idaho Department of Corrections to provide the surgery.  *Id.*  The Ninth Circuit found that the state was deliberately indifferent to Edmo's serious medical need because the state knew Edmo had attempted to castrate herself and suffered significant distress due to her gender dysphoria and yet continued to provide ineffective treatment.  935 F.3d at 793.  The Ninth Circuit also explained that just because the defendants provided some care to Edmo (hormone treatment), it did not immunize them from the Eighth Amendment's requirements.  *Id.*

*Fisher* is not supportive because it construed the prisoner's request to stock the commissary with female clothing and grooming products as a claim for the constitutional right to commissary access.  484 F. Supp. 3d at 529, 534.  As stated above, that is not the proper classification of Plaintiff's claim because the provision of female products to Plaintiff in this instance constitutes medical treatment for her gender dysphoria.

*Keohane* also differs from the instant case.  There, the prison medical treatment team, the staff psychiatrist, and the defendant's expert determined that social transitioning accommodations were not medically necessary to treat the transgender female plaintiff and that requiring the plaintiff to comply with the prison's "clothing and grooming policies does not place her at a substantial risk of self-harm or severe psychological pain."  952 F.3d at 1254, 1274.  Here, the Court determined that Plaintiff was at risk of irreparable injury based on evidence of her repeated suicide attempts and continued suffering as a result of the ongoing denial of treatment in the form of basic products for social transitioning behavior.  (Doc. 146 at 7.)  Defendant BOP did not provide any psychiatrist or medical expert opinion or other evidence to the contrary.

Plaintiff argues that social transitioning products constitute treatment for gender dysphoria and are no different than accommodations for other medical conditions, including special medical diets for certain conditions, glasses for visual impairments, and canes and walkers for mobility impairments.  (Doc. 166 at 5.)  Defendant BOP did not

respond to this argument or refute that it provides other prisoners various items—at no cost to the prisoner—as accommodations for medical conditions.  The Court will modify the prior Order to direct Defendant BOP to provide female products to Plaintiff as an accommodation to treat her gender dysphoria in this same manner.

In her Motion, Plaintiff asks for relief in the form of an amendment to direct Defendant BOP to ensure that Plaintiff has been given or is given two bras and two pairs of female underwear and that BOP ensures she is allowed to exchange these items for clean items at least three times per week.  (Doc. 166 at 8.)  She also asks for an amendment directing Defendant BOP to provide a means for her to remove her facial hair—either electrolysis, beard trimmers, or alternative dermatologist-approved method. (*Id.* at 9.)

The Court's March 29, 2024 Order directed that Defendant BOP "ensure that Plaintiff has been given or is given two bras and two pairs of female underwear," and that Defendant BOP "immediately provide a way for Plaintiff to remove her facial hair, either through the requested hair removal/electrolysis, shaving products, or other means." (Doc. 146 at 8.)  In its Response, Defendant BOP asserts that Plaintiff has been given 4 pairs/sets of female undergarments, which the Court understands as 4 bras and 4 pairs of female underwear.   (Doc. 173 at 6, citing Doc. 157-1, Timothy Tyler Decl. ¶ 4.) Defendant BOP asserts that Plaintiff has been and will continue to be provided the opportunity to shave her facial hair.  (*Id.*, citing 157-1, Tyler Decl. ¶¶ 5–6.)  But in her Reply, Plaintiff avers that she is not allowed to use the facial hair removal devices more than once every other week.  (Doc. 178-1 at 3, Pl. Decl. ¶ 9.)  Plaintiff avers Lieutenant Tyler informed Plaintiff that allowing her to shave more often would not be fair to other prisoners who only get to shave twice a month.  (*Id.*)

It appears on this record that Plaintiff has four sets of bras and female underwear, which is two more than Plaintiff requested in her Motion, and this is a sufficient amount. (Doc. 166 at 8.)  The Court will not direct Defendant BOP as to the number of times each week that Plaintiff's clothing items must be exchanged/laundered, as that is governed by

1    the prison's day-to-day laundry operations.

2        Limiting Plaintiff's access to facial hair removal tools to twice a month, which is

3    the same access cisgender male prisoners have, is unacceptable and does not serve the

4    purpose of the Preliminary Injunction Order.  Accordingly, the Preliminary Injunction

5    Order will be modified to specify that Defendant BOP must provide treatment for

6    Plaintiff's gender dysphoria in the form of access to facial hair removal tools at least

7    three times per week.

8        Notably, Plaintiff moved to modify the Preliminary Injunction Order while she

9    was housed at USP Allenwood, but she has since been transferred to USP Terre Haute.

10   (*See* Doc. 235.)  A prisoner's claim for injunctive relief generally becomes moot upon a

11   transfer because the prisoner is no longer subject to the offending conduct or policy.  *See*

12   *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991) (per curiam) (holding claims for

13   injunctive relief "relating to [a prison's] policies are moot" when the prisoner has been

14   moved and "he has demonstrated no reasonable expectation of returning to [the prison]").

15   But that is not the case here.  The Court's Preliminary Injunction Order was directed to

16   the BOP; the BOP is still a Defendant, and Plaintiff remains in the custody of the BOP.

17   Plaintiff's debts follow her to USP Terre Haute; therefore, she remains subject to the

18   BOP policy that provides for encumbrances on Plaintiff's trust fund account and prohibits

19   her from obtaining items for medical treatment through the commissary absent the

20   injunctive relief and modifications ordered herein.  The order directing Defendant BOP to

21   provide treatment for Plaintiff's gender dysphoria in the form of access to facial hair

22   removal tools at least three times per week is also not affected by Plaintiff's transfer to

23   USP Terre Haute.  Plaintiff's medical condition and her need for this treatment continue

24   despite her transfer, and Defendant BOP remains obligated to comply with the Court's

25   Order for injunctive relief.

26       Plaintiff's Motion to Modify the Preliminary Injunction Order will be granted.

27   . . . .

28   . . . .

- 18 -

**V.      Motion for Preliminary Injunction (Doc. 190)**

      **A.      Parties' Contentions**

      Plaintiff seeks injunctive relief to protect her from "staff abusers" who have threatened her with bodily harm.  (Doc. 190 at 2.)  Plaintiff requests an injunction that orders the BOP to move Plaintiff "out of harm's way" by transferring her to a women's prison or into the Transitional Care Unit at USP Allenwood, and orders "that Plaintiff's future cell mates and overseeing staff be screened and filtered to avoid exposure to known sexual predators or those who are intolerant to transgender individuals[.]"  (Doc. 228 at 7–8.)

      Plaintiff details an incident from her time in USP Tucson, when she filed a Prison Rape Elimination Act ("PREA") complaint against another prisoner alleging harassment and attempts by the other prisoner to coerce Plaintiff into becoming a prostitute with the other prisoner acting as her pimp.  (Doc. 190-1 at 2, Pl. Decl. ¶ 2.)  The prisoner was placed in SHU for PREA investigation; however, the following day, BOP staff released the prisoner back into general population, and the prisoner assaulted Plaintiff with a weapon, causing serious injury.  (*Id.* ¶¶ 4–7.)  Plaintiff alleges that during an investigation of the assault, Lieutenant Christensen authored a report with false allegations against Plaintiff, and this report was used to hold Plaintiff in SHU and then transfer her to USP Allenwood.  (*Id.* ¶¶ 8–9.)

      Plaintiff avers that when she was transferred from USP-Tucson to Allenwood, she was held in transit at the Federal Transfer Center, where she was housed in SHU with a gang member who sexually assaulted her for five days.  (*Id.* ¶ 15.)

      Plaintiff further avers that, since her arrival at USP Allenwood, while housed in SAU, she has been subjected to attempted sexual abuse by Officer Reese, who demanded fellatio, and two other officers, who threatened Plaintiff with serious bodily harm.  (Doc. 190-1 at 4, Pl. Decl. ¶ 17.)  Plaintiff was also subjected to sexual harassment by another prisoner.  (*Id.* ¶ 18.)  Plaintiff reported these incidents to USP Allenwood Warden and the TEC.  (*Id.* ¶¶ 17–18.)  Plaintiff avers that on June 22, 2024, Plaintiff asked an officer for

telephone access, and the officer harassed Plaintiff for reporting on Officer Reese; the officer then denied Plaintiff telephone access. (*Id.* ¶ 19.) Plaintiff reported this incident to two lieutenants. (*Id.*) Plaintiff also avers that officers have labelled her a snitch and a rat in front of other prisoners in the SAU, and officers have served her "ghost trays"— meal trays with no food. (*Id.* ¶ 20.) Plaintiff explains that by serving a ghost tray, on security video footage it appears that officers are providing a prisoner a meal. (*Id.*) Plaintiff avers that she has lost 50 pounds since March 2024. (*Id.*) Plaintiff avers that these experiences have caused her to suffer depression, anxiety, fear, and paranoia, and she thinks about committing suicide every day. (*Id.* ¶ 21.)

In response to Plaintiff's Motion, Defendant BOP argues that Plaintiff's requested injunctive relief lacks the required nexus to the claims at issue in Plaintiff's Second Amended Complaint because there is no retaliation claim in this case. (Doc. 218 at 8–9.) Defendant BOP further argues that Plaintiff's allegations of physical and/or sexual abuse do not support an Eighth Amendment claim because her claims are not credible. (*Id.* at 9–10.) According to Defendant BOP, an investigation into the 2022 incident at USP Tucson does not support Plaintiff's claim and Plaintiff's allegations of sexual abuse at the Federal Transfer Center are contradicted by Plaintiff's deposition testimony, in which she specifically denied being a victim of any sexual abuse or harassment during the timeframe that included her time at the Federal Transfer Center. (Doc. 218 at 10.) Defendant BOP also asserts that an investigation has been initiated to address Plaintiff's allegations against Officer Reese. (*Id.* at 11.)

**B.    Discussion**

In arguing there is no underlying retaliation claim in this action, Defendant BOP relies on the Second Amended Complaint. The operative pleading is the Third Amended Complaint, which, as set forth above, includes a conspiracy/retaliation claim under 42 U.S.C. § 1985(2). (*See* Doc. 226.)[7] The Court determined, however, that this claim was against Tucson Warden Gutierrez, not the BOP or any individual staff member at USP

---

[7] The Third Amended Complaint was filed after Defendant BOP filed its Response to Plaintiff's Motion for Preliminary Injunction. (*See* Docs. 218, 226.)

Allenwood. Consequently, there is no nexus between Plaintiff's allegations against BOP staff at USP Allenwood and her underlying retaliation claim under § 1985(2). *See Pac. Radiation Oncology*, 810 F.3d at 633.

In her pending Motion for Preliminary Injunction, Plaintiff argues that her allegations and evidence support a preliminary injunction under the Eighth Amendment. (Doc. 190 at 6.) Plaintiff's Third Amended Complaint includes an Eighth Amendment threat-to-safety claim based on Plaintiff's allegations that she has been assaulted and sexually abused by male prisoners in male prisons. In other words, Plaintiff's Eighth Amendment claim alleges that Defendant BOP has failed and continues to fail to protect her from assaults and sexual abuse by other prisoners.

Plaintiff alleges in her pending Motion that, while at USP Allenwood, officers have sexually harassed her and threatened her, an officer attempted to sexually abuse her, officers have denied her food and she has lost significant weight, and officers labeled her a snitch in front of other prisoners. These allegations all implicate the Eighth Amendment. *See Wood v. Beauclair*, 692 F.3d 1041, 1046 (9th Cir. 2012 ("[s]exual harassment or abuse of a prisoner by a corrections officer is a violation of the Eighth Amendment"); *Johnson v. Unnamed Defendants*, No. 1:16-cv-00708-DAD-MJS (PC), 2016 WL 6094837, at *3 (E.D. Cal. Oct. 17, 2016) ("[t]he intentional denial of food resulting in a significant loss of weight and illness over the course of months states a sufficiently serious deprivation") (citing *Keenan v. Hall*, 83 F.3d 1081, 1091 (9th Cir. 1996)); *Valandingham v. Bojorquez*, 866 F.2d 1135, 1139 (9th Cir. 1989) (allegations that prison officials called a prisoner a "snitch" in the presence of other inmates were sufficient to state a claim of deliberate indifference to an prisoner's safety); *see also Burns v. Martuscello*, 890 F.3d 77, 91 (2d Cir. 2018) (recognizing "courts have found an Eighth Amendment violation where a guard publicly labels an inmate a snitch, because of the likelihood that the inmate will suffer great violence at the hands of fellow prisoners"). But these are new claims against individual BOP staff members. As such, they are not related to the underlying Eighth Amendment threat-to-safety/failure-to-protect claim

1    against the BOP raised in Plaintiff's Third Amended Complaint.  *See Pacific Radiation*

2    *Oncology*, 810 F.3d at 633.  If Plaintiff seeks to pursue these new claims, she must file a

3    new case in the appropriate venue.

4         Because Plaintiff's allegations against USP Allenwood staff are not related to the

5    retaliation or Eighth Amendment threat-to-safety claims in the Third Amended

6    Complaint, Plaintiff's Motion for Preliminary Injunction will be denied.

7    **VI.    Motion to Appoint Special Master (within Doc. 190)**

8         **A.    Legal Standard**

9         "A special master is a surrogate of the court and in that sense the service

10   performed is an important public duty of high order in much the same way as is serving

11   in the Judiciary."  *Cordoza v. Pacific States Steel Corp.*, 320 F.3d 989, 995 (9th Cir.

12   2003) (internal quotation omitted).

13        Under the PLRA, "[i]n any civil action in a Federal court with respect to prison

14   conditions, the court may appoint a special master . . . to conduct hearings on the record

15   and prepare proposed findings of fact." 18 U.S.C. § 3626(f)(1)(A).   "The PLRA

16   authorizes the Court to appoint a special master in a civil action regarding prison

17   conditions (1) 'who shall be disinterested and objective and who will give due regard to

18   the public safety, to conduct hearings on the record and prepare proposed findings of

19   fact' (2) 'during the remedial phase of the action only upon a finding that the remedial

20   phase will be sufficiently complex to warrant the appointment.'" *Chatman v. Otani*, No.

21   21-00268 JAO-KJM, 2021 WL 2941990, at *22 (D. Haw. July 13, 2021) (citing 18

22   U.S.C. § 3626(f)(1)(A)–(B)).   The PLRA defines a "special master" as "any person

23   appointed by a Federal court pursuant to Rule 53 of the Federal Rules of Civil Procedure

24   or pursuant to any inherent power of the court to exercise the powers of a master,

25   regardless of the title or description given by the court." 18 U.S.C. § 3626(g)(8).

26        Rule 53(a)(1)(B)(i) allows courts to appoint special masters to "hold trial

27   proceedings and make or recommend findings of fact on issues to be decided without a

28   jury if appointment is warranted by . . . some exceptional condition."  An exceptional

condition may be the volume of cases pending in a proceeding, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-5944 SC, 2011 WL 6141066, at *1 (N.D. Cal. Dec. 8, 2011), or "the prospect of noncompliance" with an injunction." *Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828, F.2d 536, 542, 544 (9th Cir. 1987) (appointment of special master was warranted because, among other reasons, there was evidence of violations and a disregard of court orders).

Rule 53(a)(1)(C) allows courts to appoint special masters to "address pretrial . . . matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." A special master appointed under this Rule has broad authority to "supervise and conduct pretrial matters, including discovery activity, the production and arrangement of exhibits and stipulations of fact, the power to hear motions for summary judgment or dismissal and to make recommendations thereto." *Burlington northern R. Co. v. Dep't of Revenue of Wash.*, 934 F.2d 1064, 1073 (9th Cir. 1991) (internal quotation marks omitted). "For appointments under Rule 53(a)(1)(C), the relevant question is whether appointment is necessary because there are no available district or magistrate judges to "effectively and timely" address pretrial matters." *Thakur v. Cofiroute USA, LLC*, No. 8:19-cv-02233-ODW (JDEx), 2020 WL 10731939, at *4 (C.D. Cal. Aug. 5, 2020).

**B.    Discussion**

Plaintiff requests that the Court appoint a special master to investigate and issue a report on topics related to the safety of transgender prisoners. (Docs. 190, 228.) Defendant BOP opposes the request on the ground that this action is not the remedial phase; therefore, the PLRA does not authorize the appointment of a special master at this stage of the case. (Doc. 218 at 18.)

In Plaintiff's Reply in Support of the Motion to Appoint Special Master, which was filed by counsel, Plaintiff did not address Defendant BOP's argument that a special master is not authorized under the PLRA. (*See* Doc. 228.) Because this case is not in the remedial phase, appointment of a special master under § 3626(f) is not warranted.

Nor did Plaintiff present any basis for appointment of a special master under Rule 53(a)(1)(B) or (C).  (*See* Doc. 228.)  No exceptional conditions exist that would support appointment of a special master, and there are available district or magistrate judges to address the pretrial matters in this action.

Plaintiff's Motion for Appointment of Special Master will be denied.

**VII.  Motion for Reconsideration (Doc. 198)**

**A.  Plaintiff's Motion**

Plaintiff previously moved for a preliminary injunction to enjoin Defendant BOP from using male officers to strip search Plaintiff.  (Doc. 27.)  Before the Court ruled on Plaintiff's Motion, Defendant BOP presented evidence that the Warden at USP Allenwood approved an accommodation for Plaintiff to be pat searched or visually searched by female staff and for body scanning technology to be utilized when available in lieu of female staff searches.  (Doc. 118-1 at 20, 22.)  Accordingly, the Court denied Plaintiff's request for injunctive relief as moot.  (Doc. 146 at 5.)

In her pending Motion, Plaintiff states that she was sexually abused by a lieutenant at USP Allenwood, and, after reporting the incident multiple times, she was finally interviewed by an investigator.  (Doc. 198 at 1.)  Plaintiff alleges that, two days later, pursuant to the Prison Rape Elimination Act requirement for a medical exam, two male officers and one male medical staff member took Plaintiff to a medical exam room and ordered her to remove all her clothing for a rape kit.  (*Id.* at 2.)  Plaintiff told the officers she had an accommodation for female-only strip searches, but the officers threatened her and squeezed her arms in response.  (*Id.*)  Plaintiff states that, out of fear, she elected to return to her cell and forgo the rape kit.  (*Id.*)

Plaintiff requests that, in light of this incident, the Court reconsider its prior order denying her request for injunctive relief in the form of female searches as moot and order Defendant BOP to submit the video recording of the relevant incident.  (Doc. 198 at 4.)[8]

. . . .

---

[8] The Court did not direct Defendant BOP to file a response.  *See* LRCiv 7.2(g)(2).

**B.      Discussion**

Plaintiff identifies a single incident where Defendant BOP's staff did not comply with the approved accommodation for Plaintiff to be strip searched only by female staff. While this incident is troubling, it is not clear that it represents a cancelation of the previously approved accommodation.  Plaintiff does not cite any other incidents at USP Allenwood where she has been subjected to a male strip search.  Notably, Plaintiff was not forced to go through with the strip search and was able to return to her cell.  Without more, there is insufficient evidence to support reconsideration of the prior Order.

Plaintiff's Motion for Reconsideration will be denied.

**IT IS ORDERED:**

(1)      Plaintiff's Motion for Limited Reconsideration (Doc. 125) is **denied**.

(2)      Plaintiff's Expanded and Renewed Motion for Preliminary Injunction (Doc. 132) is **denied**.

(3)      Plaintiff's Motion to Modify Preliminary Injunction Order (Doc. 166) is **granted**.  The March 29, 2024 Order (Doc. 146) is modified as follows:

(a)      Defendant BOP must immediately direct its provider(s) at USP Terre Haute to issue a prescription order for Plaintiff for the 18 transgender items on the commissary list.

(b)      Defendant BOP must ensure that Plaintiff is provided the 18 transgender items on the commissary list, at no cost, as prescribed treatment for her gender dysphoria.

(c)      Defendant BOP must immediately provide Plaintiff access to facial hair removal tools at least three times per week.

(d)      Within **10 days** from the date of this Order, Defendant BOP must file a Notice, supported by a declaration from an official with personal knowledge, indicating that Plaintiff has received the modified relief ordered herein.

(4)      Plaintiff's Motion for Preliminary Injunction/Motion to Appoint Special Master (Doc. 190) is **denied**.

(5)     Plaintiff's Motion for Reconsideration (Doc. 198) is **denied**.

Dated this 24th day of October, 2024.

_____
Honorable Rosemary Márquez
United States District Judge